# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CASE NO. 15-11362-AA

JACQUELINE LEWIS,
Appellant,

v.

CITY OF UNION CITY, GA, and
CHIEF OF POLICE CHARLES
ODOM, in his official and
Individual capacities,
Appellees.

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION
CASE NO. 1:12-cv-04038-RWS

**INITIAL BRIEF OF APPELLANT JACQUELINE LEWIS**

**Cheryl Barnes Legare, Georgia Bar No. 038553**
**LEGARE, ATTWOOD & WOLFE, LLC**
**400 Colony Square, Suite 1000**
**1201 Peachtree Street NE**
**Atlanta, Georgia 30361**
**(470) 823-4000**
**Paulding Chichester IV, Georgia Bar No. 189958**
**THE BUCKLEY LAW FIRM, LLC**
**1230 Peachtree Street NE, Suite 900**
**Atlanta, Georgia 30309**
**(404) 781-1100**

**Counsel for Appellant Jacqueline Lewis**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Eleventh Circuit Rule 26.1, the undersigned counsel of record verifies that those persons or entities listed below have or may have an interest in the outcome of this case:

Chichester, Paulding IV – counsel for Appellant

City of Union City, Georgia – Appellee / Defendant below

Glanton, Tracy Lynn – counsel for Appellee

King, Hon. Janet F. – Chief Magistrate Judge, United States District Court

Legare, Cheryl B. – counsel for Appellant

Legare, Attwood & Wolfe, LLC – counsel for Appellant

Lewis, Jacqueline – Appellant / Plaintiff below

Morgan, Sharon P. – counsel for Appellee

Odom, Charles, Chief of Police – Appellee / Defendant below

Story, Hon. Richard W. – Judge, United States District Court

The Buckley Law Firm, LLC – counsel for Appellant

# STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant Jacqueline Lewis believes that oral argument would benefit the Court, because the issues to be decided concern a complex factual and procedural record.  This matter concerns important questions relating to proper comparator standards as applied to race and gender discrimination claims, as well as what should or should not constitute a disability under the more expanded definitions and regulations under the Americans with Disabilities Act Amendments Act of 2008.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ..............................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF CITATIONS ..........................................................................v

STATEMENT OF JURISDICTION.......................................................ix

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE...................................................................3

I.       Course of Proceedings and Disposition Below ..............................3

II.      Statement of Facts...........................................................................4

          A. Introduction ...............................................................................4

          B.  Ms. Lewis's Role As a Detective ..............................................5

          C.  Weapons and The Force Continuum...........................................5

                    1. The Taser Gun ..................................................................6

          D.  Request for Accommodation......................................................7

          E.  Comparators ..............................................................................8

          F.  Additional Evidence of Pretext .................................................9

          G. Failure to Engage in the Interactive Process .........................11

III.    Standard of Review.........................................................................12

IV.    Summary of Argument .................................................................13

V.    Argument and Citations of Authority..........................................15

    A.    Defendants Discriminated Against Ms. Lewis Because of Her Gender and Race in Violation of Title VII, 42 U.S.C. § 1981 and 42 U.S.C. § 1983. .........................................................................15

        1. Plaintiff is a qualified individual under Title VII, § 1981, and § 1983........................................................................16

        2. The City treated similarly situated non-black, male employees more favorable than Ms. Lewis .............................16

        3. Defendant's failure to follow its own policy is further evidence of pretext ...................................................................24

        4.  The Lower Court erred in failing to acknowledge that Ms. Lewis established a genuine issue of material fact for her § 1981, § 1983, and Title VII race and gender claims through the presentation of a mosaic of circumstantial evidence ................25

    B.    The Lower Court Erred in Its Finding That The City is Immune From Municipal Liability under § 1981 and the Equal Protection Clause of the United States Constitution, via §1983..........................................27

    C.    The Lower Court Erred in Dismissing Ms. Lewis's ADA Claims ....31

        1. The Lower Court erred in concluding that Ms. Lewis does not have a disability as defined by the ADAAA ....................31

        2. The Lower Court erred in its conclusion that Ms. Lewis is not a "qualified individual" because she could not perform the essential tasks of her job .........................................................38

    i.    Ms. Lewis performed, and could continue performing, the essential functions of a Detective ..................................................................39

    ii.   Even if this Court agrees with the Lower Court that carrying a Taser is an essential function of a Union City detective, Ms. Lewis could carry a Taser without being exposed to a Taser shock Ms. Lewis performed, and could continue performing, the essential functions of a Detective. ...................................................44

   iii.   Working around Tasers and OC Spray did not pose a significant risk of substantial harm to Ms. Lewis .............................................47

   iv.   Working near Tasers and OC spray did not pose a "direct threat" to Ms. Lewis ......................................................................................50

    v.   Even if this Court agrees with the District Court that Ms. Lewis could not perform the essential functions of a Police Detective without being exposed to a Taser shock, she could still perform the essential functions of an available position with an accommodation .......................................................................................52

   D. Defendant's reason for terminating Ms. Lewis is pretextual ...................54

         1. Defendant treated non-disabled officers more favorably .....54

CONCLUSION ........................................................................................55

CERTIFICATE OF COMPLIANCE......................................................57

CERTIFICATE OF SERVICE ...............................................................58

# TABLE OF CITATIONS

## CASES

*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253 (11th Cir. 2010) ...............25

*Anderson v. Embarq/Spring*, 379 Fed. Appx. 924 (11th Cir. 2010) .......................40

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ............................................13, 15

*Bass v. Bd. of County Com'rs, Orange Cnty, Fla.,* 256 F.3d 1095
(11th Cir. 2001) ....................................................................................................24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................13

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002) .........................................51

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) .............................................22

*Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068
(11th Cir. 1995) ....................................................................................................15

*Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) .............................................15

*Dickerson v. Sec'y, Dep't of Veterans Affairs*, 489 F. Appx. 358
(11th Cir. 2012)..............................................................................................passim

*E.E.O.C. v. Am. Tool & Mold, Inc.*, No. 8:12-CV-2772-T-35EAJ, 2014 WL
2185013, at *6 (M.D. Fla. Apr. 16, 2014) .............................................................51

*E.E.O.C. v. Res. for Human Dev., Inc.*, 827 F. Supp. 2d 688, 693
(E.D. La. 2011) ....................................................................................................34

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011) ..................4

*Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374 (7th Cir.2000) ...................16

*Katz v. Adecco USA, Inc.*, 845 F. Supp. 2d 539 (S.D.N.Y. 2012) .........................36

*Keith v. Cnty. of Oakland,* 703 F.3d 918, 926 (6th Cir. 2013) ...............................39

*Haley v. Cmty. Mercy Health Partners*, No. 3:11-CV-232, 2013 WL 322493
(S.D. Ohio Jan. 28, 2013) ....................................................................................35

*Hawkins v. Schwan's Home Serv., Inc.*, No. CIV-12-0084-HE, 2013 WL 2368813
(W. D. Okla. May 28, 2013) ..................................................................................32

*Hoffman v. Carefirst of Ft. Wayne, Inc.*, 737 F. Supp. 2d 976
(N. D. Ind. 2010) ...................................................................................................36

*Holifield v. Reno,* 115 F.3d 1555 (11th Cir. 1997) ................................................15

*Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286
(11th Cir. 2006) .....................................................................................................24

*Jones v. Dillard's, Inc.*, 331 F.3d 1259 (11th Cir. 2003) .......................................12

*Keaton v. Cobb Cnty.*, 545 F. Supp. 2d. 1275 (N.D. Ga. 2008) ...........................24

*Lloyd v. Montgomery Hous. Auth.*, 857 F. Supp. 2d 1252 (M.D. Ala. 2012) ........34

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001) ............................53

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) .............27

*Moore v. Jackson Cnty. Bd. of Educ.*, 979 F. Supp. 2d 1251 (N.D. Ala. 2013) .....35

*Morro v. City of Birmingham*, 117 F.3d 508 (11th Cir. 1997) ...............................29

*Nichols v. City of Mitchell*, 914 F. Supp. 2d. 1052 (D. S.D. 2012) ........................32

*Orton-Bell v. Indiana*, 759 F.3d 768 (7th Cir. 2014) .............................................21

*Peele v. Country Mut. Ins. Co.*, 288 F.3d 319 (7th Cir. 2002) ...............................21

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) .................13, 15

*Rioux v. City of Atlanta*, 520 F.3d 1269 (11th Cir. 2008) ........................................25

*Robert v. Carter*, 819 F. Supp. 832 (S.D. Ind. 2011) .......................................41, 42

*Rorrer v. City of Stowe*, 743 F.3d 1025 (6th Cir. 2014) .........................................39

*Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253 (11th Cir. 2001) ....................54

*Smith v. City of St. Martinville*, 575 F. App'x 435, (5th Cir. 2014) .................17, 19

*Smith v. Lockheed-Martin*, 644 F.3d 1321 (11th Cir. 2011) .......................25, 26, 37

*Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir. 1987) ................55

*Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318 (11th Cir. 1998) ........................15

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328 (11th Cir. 1999) ..........................30

*Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151 (11th Cir. 2012) ..........................13

*Torres-Skair v. Medco Health Solutions, Inc.*, No. 13-14476, 2014 WL 6805113 (11th Cir. Dec. 4, 2014) ..........................................................................................26

*Torres- Toole v. Metal Servs. LLC*, No. CIV.A. 13-00145-KD-B, 2014 WL 1760955 (S.D. Ala. May 2, 2014) ...........................................................................26

*Tullius v. Albright*, 240 F.3d 1317 (11th Cir. 2007) ................................................4

*Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886 (11th Cir. 2013) ................................................................................................54

*Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270 (11th Cir. 2002)..........................................................................................24

*Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 210 (D. Conn. 2012) ...............................................................................................35

*Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 33-34
(1st Cir. 2000) ...........................................................................................38

*Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338 (2015) ...................................20

## <u>STATUTES, RULES, AND REGULATIONS</u>

28 U.S.C. § 1291 ...................................................................................................ix

29 C.F.R. § 1630.2 *et seq.* ...........................................................................passim

42 U.S.C. § 12101 *et seq.* .....................................................................................3

42 U.S.C. § 12112 *et seq.* ...................................................................................53

42 U.S.C. § 1981 ...........................................................................................passim

42 U.S.C. § 1983 ...........................................................................................passim

42 U.S.C. § 2000e *et seq.* ......................................................................................3

Fed. R. Civ. P. 56(c).............................................................................................14

Fourteenth Amendment to the United States Constitution .....................................3

Pub. L. No. 110–325, § 2(a)(6), 122 Stat. at 3553................................................32

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*............. passim

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal of a final decision of the United States District Court for the Northern District of Georgia.

## STATEMENT OF THE ISSUES

1.    Whether the District Court, in its adoption of the Magistrate Court's Report and Recommendation, erred in its application of the "nearly identical" comparator standard to its analysis of Ms. Lewis's Title VII race and gender discrimination claims.

2.    Whether the District Court erred in concluding that no jury could find that Defendants treated Ms. Lewis less favorably than any "similarly situated" comparators.

3.    Whether the District Court erred in concluding that no jury could find that Ms. Lewis presented a "mosaic of circumstantial evidence" from which a jury could find a violation of her rights under 42 U.S.C. § 1981, 42 U.S.C. § 1983, Title VII, or the ADA.

4.    Whether the District Court erred in concluding that no jury could find that Ms. Lewis has a "disability" under the Americans with Disabilities Act Amendments Act of 2008 ("ADA").

5.    Whether the District Court erred in concluding that no jury could find Ms. Lewis to be a "qualified individual" as defined by the ADA and the regulations interpreting the ADA.

6.     Whether the District Court erred in concluding that Ms. Lewis failed to show that she could perform the essential functions of her job.

7.     Whether the District Court erred in its failure to consider leave as a reasonable accommodation under the ADA, which leave would have allowed Ms. Lewis to perform the essential functions of her job.

8.     Whether the District Court erred in concluding that no jury could find that an alternative position existed that Ms. Lewis could perform.

9.     Whether the District Court erred in concluding that no jury could find other than that Defendant engaged in the interactive process as required by the ADA.

## STATEMENT OF THE CASE

## I.     COURSE OF PROCEEDINGS AND DISPOSITION BELOW

Appellant Jacqueline Lewis ("Lewis") filed suit on November 19, 2012, asserting claims of race, gender, and disability discrimination as well as failure to accommodate. [Doc. 1.]  She asserted her claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981 through 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution through 42 U.S.C. §1983, and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* [Doc. 1.]

On May 19, 2014, Appellee City of Union City, *et al.*, ("Defendants") moved for summary judgment on all of Ms. Lewis's claims. [Doc. 59.]   Ms. Lewis responded in opposition on June 19, 2014. [Docs. 72, 73, 74, 75.]  Defendants filed their reply brief on July 14, 2014. [Docs. 82, 83.]

On November 26, 2014, the Magistrate Court issued its Final Report and Recommendation, recommending the dismissal of all of Ms. Lewis's claims. [Doc. 84.]  Ms. Lewis' filed objections on December 10, 2014. [Doc. 86.]  The District Court overruled Ms. Lewis's objections, adopted the Magistrate Court's recommendation in full, and granted summary judgment on March 17, 2015. [Doc. 90.]  On March 2015, Ms. Lewis filed her notice of appeal. [Doc. 92.]

## II.     STATEMENT OF FACTS[1]

### A. Introduction

Ms. Lewis began her employment with the Union City Police Department as a Patrol Officer in 2001. [Doc. 72, p. 1.]  In 2008, Ms. Lewis earned a promotion to Detective. [Doc. 59-1, p 1.]  In January 2009, Ms. Lewis suffered a heart attack while at work.  [Doc. 72-1, p. 1.]  Chief Odom witnessed her heart attack.  [Doc. 72-1, p. 1-2.]

As a result of her heart attack, Ms. Lewis suffers from regurgitation of the mitral, tricuspid, and aortic heart valves, a permanent injury to her heart, which creates a greater risk of heart attack in the future. [Doc. 72-1, p. 2.]  She has periodic shortness of breath, a symptom that did not occur prior to her heart attack, and she also takes baby aspirin every day, as prescribed by her doctor, for her heart condition.  *Id*.  Ms. Lewis also suffers from paroxysmal nocturne dyspnea, which means that at night, when she lies flat, she has shortness of breath, which adversely affects her ability to sleep and is directly related to her heart condition. [Doc. 72-1, p. 6.]

---

[1]     While some of these facts are disputed by Defendants, they must be construed in favor of Plaintiff for purposes of summary judgment and this appeal. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1302 (11th Cir. 2011) (citing *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2007)).

**B. Ms. Lewis's Role As a Detective**

Ms. Lewis returned to work as a detective several weeks after her heart attack. In the ordinary course of her duties, and under the direction of Lieutenant Jerry Hester, Ms. Lewis did not respond to calls but instead waited to be called to a scene, if required at all. [Doc. 72-1, p. 3.] Part of the reason for this is because detectives do not have cages in their cars, and as a result, they do not transport suspects. [Doc. 72-4, p. 4.] Moreover, as a matter of practice, Lt. Hester assigned the female detectives cases involving "children or women crimes" and assigned the "more aggressive stuff" to himself or Sergeant Cliff McClure. *Id.* In fact, the majority of Ms. Lewis's duties consisted of interviewing witnesses and suspects at her desk or over the phone and typing up reports. *Id.* If there was ever sufficient evidence for a warrant, the ACE team apprehended the suspect. *Id.*

**C. Weapons and The Force Continuum**

The City requires its officers to have knowledge of weapons, self-defense, and physical restraint methods. [Doc. 72-4, p. 4.] However, the City does *not* require its detectives to carry pepper spray or Tasers, just their guns. *Id.* at 13. As a matter of practice, the City was more lenient with detective's choice of weapons, because the individual detective knows what is necessary to properly do his or her job. [Doc. 72, p. 27.] In fact, Ms. Lewis met all of the Force Continuum

requirements with certifications in less-than-lethal force combat, the ASP baton, and a gun. [Doc. 72-1, pp. 5-6.]

Prior to the implementation of the Taser program in 2010, Union City Officers had various non-lethal force options. [Doc. 72-1, pp. 3-4.] The Force Continuum, in order of level of force, is: (1) verbal commands; (2) soft empty hands; (3) hard empty hands, which "can be anything from manipulating a joint to a takedown to an OC [pepper] spray to an ASP baton to a Taser;" and (4) deadly force. [Doc 72-1, p. 5.] Within the "hard empty hands" umbrella (ASP baton, Taser, pepper spray) the Union City Police Department has no preferred weapon of choice, *the selection is left to the Officer's discretion*. [Doc. 72-4, p. 13.]

Ms. Lewis carried her gun, badge, handcuffs, ASP baton, and a radio on a daily basis. [Doc 72-1, pp. 5-6.] At no time during her employment as a Detective did Ms. Lewis carry pepper spray or become exposed to it. *Id*. at p. 6. Ms. Lewis could have effectively performed her duties as a detective with just an ASP baton. [Doc. 72-1, p. 4.]

### 1. The Taser Gun

In 2010, Chief Odom decided to purchase Tasers for each officer as an additional option in the Force Continuum. [Doc. 59-1, p. 4.] Part of Chief Odom's Taser training required officers to receive a five-second Taser shock. *Id*. As a

general Taser policy though, officers are not required to be exposed to a Taser –
"Exposure during the instructor course is not required, it's voluntary. Taser
International also does not require officers to be exposed to a Taser device to be
certified as a user." [Doc 72-1, p. 6.]  In fact, Union City does not list being
exposed to a Taser shock as a requirement for detectives to perform the essential
functions of their job, and Ms. Lewis had and could have effectively continued
performing her job duties as detective with just an ASP baton. [Doc. 72-1, p. 4.]

### D. Request For Accommodation

Nervous about how a shock of several thousand volts would affect her heart
condition, Ms. Lewis went to her doctor.  While her physician was not concerned
with Ms. Lewis carrying pepper spray or a Taser gun or being in the vicinity of
pepper spray or a Taser gun, she recommended that Ms. Lewis not be exposed to a
Taser shock because the electrical current could cause undue stress to Ms. Lewis's
heart. [Doc. 72-1, pp. 6-7.]  On June 15, 2010, Ms. Lewis requested an
accommodation for her chronic heart condition and submitted her physician's
recommendation that she not be exposed to a Taser shock to the City. [Doc. 72-1,
pp. 6-7.]

Unfortunately, the doctor's note also suggested that Ms. Lewis not be "near"
OC spray [Doc. 59-1, pp. 5-6.], but Ms. Lewis's doctor later clarified that she was

not concerned about Ms. Lewis's exposure to OC spray. [Doc. 72-1, p. 7.] On June 17, 2010, Chief Odom, through Assistant Chief Brown, placed Ms. Lewis on administrative leave, because he allegedly believed that the liability of allowing Ms. Lewis to be in the office was too great, even though Ms. Lewis had worked for years in the office without issue. *Id.* Chief Brown told Ms. Lewis that she would not be allowed to return to work until she was released to full duty. *Id.*

### E. Comparators

That day, Union City forced Ms. Lewis to take "administrative leave" under the same leave policy upon which it placed Sergeant Cliff McClure for failing a balancing test and Officer Walker Heard for failing an agility test. [Doc. 72-1, pp. 7, 12.] Prior to the Taser shock, approximately eight other officers disclosed medical conditions they believed could be exacerbated by exposure to the Taser shock. [Doc. 72, p. 32, Doc. 72-1, p. 13.] However, none of those officers were placed on administrative leave or terminated other than Ms. Lewis. *Id.* The City also provided Hispanic male, Officer Cedeno, a delay in receiving the Taser Shock until after all classes had been completed. *Id.* at 12. This accommodation was contrary to the Police Department's own policy, which required the officers to first receive the Taser shock, then receive instruction, and finally take a written test.

| NAME | JOB | GENDER/RACE | LEAVE PROVIDED |
|------|-----|-------------|----------------|
| Jaqueline Lewis | Detective | Black/Female | Presented doctor's note for heart condition: Forced to take paid time off and vacation days, and then terminated for being absent allegedly without leave after <u>21</u> days. [Doc. 72-1, pp. 7, 10-11.] |
| Cliff McClure | Sergeant | White/Male | Failed Agility Test: provided <u>90</u> days to retake, not terminated for being absent without leave. [Doc. 72-1, p. 12.] |
| Walker Heard | Patrol Officer | White/Male | Failed Agility Test: Provided <u>449</u> days of leave under the same policy that applied to Ms. Lewis. [Doc. 72-1, p. 12.] |
| Francisco Cedeno | Patrol Officer | Latino/Male | Presented doctor's note for heart condition: Not placed on leave, accommodated with delayed Taser shock, and eventually a shock to the leg. [Doc. 72-1, p. 12.] |

## F. Additional Evidence of Pretext

In addition to the disparate treatment between Ms. Lewis and her similarly situated comparators, Defendants violated their own policy in two distinct ways. First, according to the policy, Ms. Lewis should have been allowed 180 days of leave. [Doc. 72-4, p. 20.] However, in direct violation of their own policy,

Defendants allowed Ms. Lewis only three weeks of leave before terminating her employment for allegedly being absent without leave.[2] [Doc. 72-1, pp. 7, 10.]

Second, even if this Court lends credence to the Defendants proffered reason for termination, the reason itself – the number of paid time off and vacation hours available to Ms. Lewis – literally does not add up. Indeed, at the time of the decision to terminate Ms. Lewis, she still had leave available to her. [Doc. 72-4, pp. 23-24.] As of July 1, 2010, she had 25 hours of vacation time and 8.5 hours of sick leave available for her use. *Id*. Thus, even under Defendants' own argument, these 33.5 hours would have carried Ms. Lewis into the day of her termination July 8, 2011.[3] [Doc. 72-4, pp. 25-26.] However, Chief Odom and the City decided, prior to 10:00 A.M. on the eighth, to terminate Ms. Lewis for being AWOL, without a single attempt to contact or notify her of their looming decision. *Id*. Under the very same policy, the City provided other Caucasian, male officers the ability to use between ninety (90 - McClure) and four hundred and forty-nine (449 - Heard) days of leave. [Doc. 72-1, p. 12.]

---

[2] Had Ms. Lewis not had the number of paid time off and Vacation days that she did, she would have had even less time on leave, directly contrary to the purpose of the leave on which the City placed her.

[3] In 2011, the federal holiday, July 4, fell on a Monday, which would not have been counted against Ms. Lewis's hours of paid time off.

### G. Failure to Engage in the Interactive Process

After being forced to take leave that should have allowed her 180 days off per the City's own policy on June 17, Ms. Lewis received FMLA paperwork on June 23, 2010. [Doc. 72-1, p. 7.] On July 1, 2010, Ms. Lewis sent a letter to Chief Odom requesting to resume her duties as a detective and requesting an accommodation on the Taser and OC training until everything was cleared up with her doctor. [Doc. 59-1, p. 7.] Without contacting Ms. Lewis or her physician further, Assistant Chief Lee Brown denied Plaintiff's request for an accommodation. [Doc. 59-1, p. 7; Doc. 72-4, pp. 22-23.]

On July 2, 2010, Ms. Lewis emailed Assistant Chief Brown, told him that she would be meeting with her doctor on July 7, 2010, asked Assistant Chief Brown for his cell phone number so her doctor could call him directly, and told Assistant Chief Brown that she would have her FMLA papers filled-out. [Doc. 72-4, p. 23.] Brown failed to respond to this request, so Ms. Lewis reached out again on July 6, re-requesting Brown's phone number for her doctor. [Doc. 72-1, p. 8.] After four critical days, during which time Ms. Lewis was unaware that the City planned to terminate her employment at the end of her paid time off and vacation days, Brown finally provided Ms. Lewis his phone number. *Id.*

Ms. Lewis met with her doctor on July 7 and left her FMLA paperwork for her doctor to complete. [Doc. 72-1, p. 9.] Her doctor tried to call the City multiple times prior to July 7, 2010 but was unable to reach anyone to discuss Ms. Lewis's matter. *Id.* Finally, Dr. Harris spoke with Assistant Chief Brown on July 8, 2010 and told Chief Brown that she was not as concerned about Ms. Lewis being exposed to pepper spray as she was with her being exposed to a Taser shock. *Id.*

Unfortunately, that morning, against its own leave policy and against the hours it claimed she no longer had for vacation, the City terminated Ms. Lewis without warning. [Doc. 72-1, p. 10.] But Defendants failed to show that Ms. Lewis was even scheduled to work on July 8, 2010. [*See*, Doc. 59-1.] Intuitively, to truly be absent without leave, one would have to be scheduled to be present. Of course this could not have been the case, since Defendants placed Ms. Lewis on leave with instruction not to enter the building and never established a deadline for Ms. Lewis to return to work. [Doc 72-1, p. 11.]

### III.  **STANDARD OF REVIEW**

This Court reviews a summary judgment decision de novo. *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1262 (11th Cir. 2003). Summary judgment is appropriate only when no genuine issue of material fact exists and the defendant,

as a moving party, is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Though the Court should review the record as a whole, "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). At the summary judgment stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251. Summary judgment is improper if there is any genuine issue of material fact, even if it is created by the testimony of a party. *See, e.g., Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012).

## IV.   **SUMMARY OF THE ARGUMENT**

Plaintiff Jaqueline Lewis argues that the lower court erred in holding that no jury could that Defendants discriminated against her because of her race, gender, or disability. The lower court improperly held that Ms. Lewis failed to proffer "similarly situated" comparators, but Ms. Lewis disagrees. Ms. Lewis offered comparators for her placement on leave as well as comparators for her treatment

once placed on that leave.

Moreover, Ms. Lewis demonstrates that a reasonable jury could find pretext due to the mosaic of evidence she has presented, with or without comparators. Specifically, Ms. Lewis demonstrates that the reason provided by Defendants is pretextual on its face because (1) she had 180 days of leave available to her instead of the 21 days provided by Defendants before her termination, and (2) she had vacation hours and paid time off still available to her at the time of her termination.

Next, the lower court erred in its stringent application of the ADA to Ms. Lewis's disability. Ms. Lewis has a heart condition that substantially limits one or more of her major life activities, breathing and pumping blood. Ms. Lewis argues that this conclusion is far beyond the scope of the ADA. By finding that Ms. Lewis is not "disabled," the lower court failed to analyze the Defendants' obligations to engage in the interactive process or to accommodate Ms. Lewis.

Finally, the lower court erred in its analysis of what constitutes an "essential function" for the job of detective in Union City. Ms. Lewis argues and the Eleventh Circuit has held an essential function determination is more properly a fact question left to a jury. Accordingly, Ms. Lewis requests this Court, reverse the District Court's decision, Deny the Defendants' Motion for Summary Judgment, and remand for further proceedings on the facts.

# V. <u>ARGUMENT AND CITATION OF AUTHORITIES</u>

### A. Defendants Discriminated Against Ms. Lewis Because of Her Gender and Race in Violation of Title VII, 42 U.S.C. § 1981 and 42 U.S.C. § 1983[4]

Demonstrating a Title VII or Section 1981 prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).[5] In a case alleging discriminatory discharge, Plaintiff must show that she: (1) is a member of a protected class; (2) was qualified for the position from which she was terminated; (3) was terminated; and (4) was treated less favorably than similarly situated officers outside of her protected class. *Crawford v. Carroll, 529 F.3d 961, 970* (11th Cir. 2008); *see also Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1073 (11th Cir. 1995). Defendants do not dispute: (1) that Ms. Lewis is a

---

[4] At summary judgment, the Court must consider all evidence in the light most favorable to the nonmoving party, *Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983), and must draw all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). "[A]t the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-252.

[5] Courts employ the same analytical framework in evaluating claims brought under Section 1981 as they do in evaluating claims brought under Title VII. *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).

member of a protected class; or (3) that they terminated Plaintiff. [Doc. 84, pp. 41-42.]

### 1. Plaintiff is a qualified individual under Title VII and § 1981.

The Magistrate Court found, and the District Court adopted those findings, that, "in a discharge or demotion case, where a plaintiff has held a position for a significant period of time, qualification for *that* position, sufficient to satisfy the test of a prima facie case can be inferred." [Doc. 84, p. 42.] Thus, the first question is whether the City treated similarly situated employees outside of Ms. Lewis's class more favorably. [Doc. 84, p. 41.] Ms. Lewis, a black female, asserts that the City very clearly treated her less favorably than her white, male comparators.

### 2. The City treated similarly situated non-black, male employees more favorably than Ms. Lewis.

In determining whether employees are similarly situated, the inquiry varies depending upon the type of employee conduct at issue. *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 382–83 (7th Cir. 2000). Where the uncontradicted testimony was that the policy at issue was applied to all employees and nothing in the policy rendered the employer's proffered distinction among the employees meaningful, it is error to conclude that those employees are not similarly situated. *Id*. at 383. Similarly-situated employees, for the purpose of discrimination cases, should include employees covered by a policy, who are unable to perform the

functions required by their job description, but who were treated differently. *Id*. at 383.

In *Smith v. City of St. Martinville*, the Fifth Circuit similarly held that all employees of a police department were similarly situated because they were subject to the same policy, even though they had markedly different jobs. 575 F. App'x 435, 440 (5th Cir. 2014) cert. denied sub nom. *Smith v. City of St. Martinville, La.*, No. 14-8413, 2015 WL 2464151 (U.S. June 1, 2015). The court concluded that because the same policy applied, but was applied differently between the plaintiff and his comparators, there was a genuine issue of fact as to whether they were similarly situated. *Id.*

Here, the Magistrate Court erred in its analysis of Plaintiff by improperly applying a "nearly identical" standard that, under the circumstances of this case, amounts to a completely identical standard. [Doc. pp. 45-47.] The District Court acknowledged the Magistrate Court's error, but nevertheless erred in its application of the "similarly situated" standard. [Doc. 90, p. 4.] The lower court's error came from analyzing the reason for placement on administrative leave and not the City's treatment of those employees once placed on that leave. [*See generally*, Doc. 90.] This is a critical distinction requiring reversal of the District Court's conclusion.

The lower court improperly latched on to the OC spray as a distinguishing factor between Ms. Lewis and Mr. McClure and Mr. Heard [Doc. 90, p. 4.] However, the lower court failed to acknowledge that once on leave for any kind of physical deficiency, the City failed to meet its obligation to uniformly apply that leave and provide Ms. Lewis with 180 days of leave, per the policy. [Doc. 72-4, p. 20]

Indeed, the issue is not whether Ms. Lewis could or could not have been in the building due her doctor's note concerning about OC Spray as the lower courts found. [Doc. 90.] The issue here revolves around the different treatment Ms. Lewis received once placed on leave. In fact, had the City given Ms. Lewis the full leave to which she was entitled under its policy like it did its Caucasian, male employees, it would have learned that Ms. Lewis, in fact, could be exposed to OC spray.

Mr. McClure failed a balance test [Doc. 72-1, p. 12]; Mr. Heard failed a physical agility test [Doc. 72-1, p. 12]; and it was initially believed that Ms. Lewis could not receive a Taser shock or OC spray.[6] [Doc. 72-1, pp. 6-7]. The City placed all three on administrative leave under the same policy that provides for the

---

[6] Ms. Lewis notes that as of her termination date, Dr. Harris communicated that she was not as concerned about the OC spray. [Doc. 72-1, p. 7.] Notably, Ms. Lewis worked for years as a detective without any exposure to OC spray. *Id*. at p. 6.

same amount of days to address whatever deficiency may be unique to that individual.[7] [Doc. 72-1, pp. 10, 12; Doc. 72-4, p. 20.] Thus, Ms. Lewis was similarly situated to Officers McClure and Heard in her right to receive 180 days of leave for a physical deficiency. The City's differential application of that leave policy to Ms. Lewis as compared to McClure and Heard creates a genuine issue of material fact mandating that she is entitled to a trial on her race and gender claims.

However, under the lower court's faulty analysis, the City's interpretation of Ms. Lewis's unique physical deficiency absolved it from then uniformly applying its leave policy. [Doc. 90, 4-5.] The implication of such a holding is scary. Were an employer to wish to circumvent its obligation to uniformly apply a leave policy and terminate an employee, now, that employer, pursuant to the lower court's order, would only need to articulate some difference in its perception of the targeted employee's deficiency. But the reality is courts around the country have continually ruled that the reason the City deemed Ms. Lewis physically deficient is of little consequence to the City's obligation to uniformly apply its leave policy. *See, e.g., supra*, *City of St. Martinville*, at 440; *Madison Metro. Sch. Dist.*, at 382–83.

---

[7] The reality of physical deficiencies is that they will almost always be unique to that individual.

Recently, the Supreme Court, in *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1346 (2015), addressed the issue of policy application to comparators. While the Court in *Young* discussed pregnancy discrimination, the Title VII, § 1981, and § 1983 applications remain the same relevant to the analysis here.

In *Young*, the plaintiff worked as a UPS driver, picking up and delivering packages carried by air. *Id*. at 1345-46. The plaintiff was pregnant, and her doctor recommended that she "not be required to lift greater than 20 pounds for the first 20 weeks of pregnancy and no greater than 10 pounds thereafter." *Id*. at 1346. The plaintiff's manager determined that she did not qualify for a temporary alternative work assignment under the company's policy. *Id*. However, the plaintiff proffered evidence of several employees who received accommodations while suffering various disabilities incurred on the job and some employees who were accommodated despite the fact that their disabilities had been incurred off the job. *Id*. at 1346-47. The court examined UPS's application of the policy and found Young's comparator evidence sufficient to create genuine issue of material fact between her and those proffered comparators, even though the comparators' reasons for being placed on leave varied greatly. *Id*. at 1346-47, 1354-55.

Had the Supreme Court applied the lower court's analysis to comparators here, it would have found that Young's proffered comparators were not similarly

situated because of their different physical maladies.  Fortunately, the Court

recognized that it is not the nature of the physical affliction that distinguished

Young from her comparators, but the company's disparate application of that

policy that provided evidence of disparate treatment and created a genuine issue of

material fact. *Id*.

Here, because the City deemed Ms. Lewis physically deficient, just as it did

with McClure and Heard, the question becomes *how* the policy was applied and

not *why* the policy was applied.  The City placed all three employees on the same

leave with the same available days, the differing treatment is evidenced by the

number of days provided to each employee (Lewis - 21 days) (McClure - 90 days)

(Heard - 449 days).  [Doc. 72-1, pp. 7, 12.]  Thus sufficient evidence has been

presented to create a genuine issue of material fact for a jury.

The Seventh Circuit has also offered additional illustrative opinions on

"similarly situated" analysis.  Where an employee fails to meet certain

expectations and claims that she has been treated differently from other employees,

who similarly failed to meet expectations, the second element merges into the

fourth. *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014); citing *Peele v.*

*Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (merging the elements

"[w]hen a plaintiff produces evidence sufficient to raise an inference that an

employer applied its legitimate employment expectations in a disparate manner"). A plaintiff who believes another individual is "similarly situated" must at least show that this "comparator" (1) "dealt with the same supervisor," (2) "w[as] subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Id*. quoting *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (citation omitted).

Here, (1) the City and Chief Odom placed Ms. Lewis, Mr. McClure, and Mr. Heard leave, (2) the leave was supposed to be the same for all three employees – 180 days, and (3) the leave was for the physical deficiencies of all three. [Doc. 72-1, p. 7, 12.] However, the lower court failed to acknowledge that Ms. Lewis does not question her placement on administrative leave but the disparate treatment thereafter. [Doc. 90.] The distinguishing behavior here is not the placement on leave but how the City disproportionately applied the same leave to McClure and Heard.[8] The City has not offered any reason for placing Ms. Lewis on 21 days of

---

[8] Appellant acknowledges that Officer Cedeno did not have the same OC spray restriction as she did and this may distinguish Cedeno as a comparator for purposes of the placement on administrative leave. However, it does not distinguish McClure or Heard as comparators concerning the application of that leave once the City placed them on it.

leave before terminating her employment, while providing McClure and Heard far greater amounts of time on leave. [Doc. 59-1.]

Finally, Officer Cedeno (Latino, male), who received the Taser training, was able to do so because he was not placed on administrative leave or terminated even though he requested a similar accommodation. [Doc 72-1, p. 12.] Defendants even provided Cedeno with information on the Taser training to provide to his physician, but did not provide any information to Ms. Lewis. [Doc. 72, pp. 31-32.] Even the Police Department's training coordinator states that Ms. Lewis could have been allowed to complete the classroom portion of the training before being Tased or sprayed with OC spray. [Doc. 72, p. 32.] Approximately eight other (non-black, male and female) officers also disclosed conditions they believed could be exacerbated by exposure to the Taser shock but were not placed on leave or terminated. *Id.* Thus, Ms. Lewis maintains that she has proffered a host of similarly situated comparators and requests this Court find that sufficient evidence exists to create a genuine issue of material fact as to whether Ms. Lewis has met the fourth prong of her prima facie case and deny Defendants motion for summary judgment accordingly.

### 3. Defendants' failure to follow its own policy is further evidence of pretext.

An employer's deviation from its own standard procedures serves as evidence of pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (citing *Bass v. Bd. of County Com'rs, Orange County, Fla.,* 256 F.3d 1095, 1108 (11th Cir. 2001)); *see also Keaton v. Cobb Cnty.*, 545 F. Supp. 2d. 1275, 1292 (N.D. Ga. 2008) (quoting *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002) ("The bending of established rules may, of course, be suggestive of discrimination.")) Here, Ms. Lewis's separation notice stated that she had been terminated for violating Union City's leave policy, Chapter 6, Section 1C, Leave of Absence: An unapproved leave of absence will be cause for dismissal – even though the City placed her on administrative leave.  [Doc. 72-1, p. 10.]  According to that policy as it applied to Ms. Lewis, she should have been allowed 180 days of leave, and whether that leave is paid or unpaid is irrelevant. [Doc. 72-4, p. 25.]

As previously discussed, Ms. Lewis could not have been absent without leave because she had 180 days of leave available to her per the City's own policy. *See, supra*. Moreover, even applying the City's improper vacation and paid time off excuse for termination, she had available hours to her at the time of termination. *See, supra*.  This is the essence of pretext and reasonable jury could

find as such.  Therefore, Ms. Lewis requests this Court reverse the lower court's

ruling and deny Defendants' Motion for Summary Judgment as it applies to Ms.

Lewis's race and gender discrimination claims.

> **4. The Lower Court erred in failing to acknowledge that Ms. Lewis established a genuine issue of material fact for her § 1981, § 1983, and Title VII race and gender claims through the presentation of a mosaic of circumstantial evidence.**

The plaintiff will always survive summary judgment if [s]he presents

circumstantial evidence that creates a triable issue concerning the employer's

discriminatory intent. *Smith v. Lockheed-Martin*, 644 F.3d 1321, 1328 (11th Cir.

2011).  A triable issue of fact exists if the record, viewed in a light most favorable

to the plaintiff, presents "a convincing mosaic of circumstantial evidence that

would allow a jury to infer intentional discrimination by the decision maker."  *Id.*

A plaintiff may raise a reasonable inference of the employer's

discriminatory intent through various forms of circumstantial evidence.  *Rioux v.

City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008) (holding that the plaintiff

established a prima facie case of racial discrimination when he did not present

evidence of a comparator but presented other circumstantial evidence that was

sufficient); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264

(11th Cir. 2010) (stating that the circumstantial evidence necessary to present a

Title VII case of discrimination under *McDonnell Douglas* is "flexible and

depend[s] on the particular situation" (citations omitted)).  No matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper. *Lockheed-Martin*, 644 F.3d at 1328; *See also Torres-Skair v. Medco Health Solutions, Inc.*, No. 13-14476, 2014 WL 6805113, at *5 (11th Cir. Dec. 4, 2014) (holding that a plaintiff need not identify specific individuals treated differently from her, if the employer violated its own policy in terminating her.)

As discussed *supra*, Ms. Lewis presents a sufficient mosaic of circumstantial evidence from which a jury could determine that the City discriminated against her because of her race and/or gender.  However, the lower court failed to engage in any analysis under *Smith v. Lockheed-Martin*. [Doc. 90.]  Similar to the plaintiff in *Torres-Skair*, the City blatantly violated its own policy by terminating Ms. Lewis for being "absent without leave" after 21 days, when the policy under which she was placed on leave allowed for 180 days of leave, while allowing other employees outside of her protected group the full, or greater, time for leave. [Doc. 72-4, p. 20.]  Additionally, at the time of her termination, Ms. Lewis actually had leave available to her. [Doc. 72-4, pp. 21-11.] These violations add to the mosaic of comparator evidence previously discussed and create a genuine issue of material

fact, from which a jury could find that the City discriminated against Ms. Lewis because of her gender and/or race.

### B. The Lower Court Erred in Its Finding That the City is Immune from Municipal Liability under § 1981 and the Equal Protection Clause of the United States Constitution, via § 1983.

In analyzing whether Union City is subject to liability for purposes of § 1983, the Magistrate Court noted that, "[a] plaintiff seeking to impose liability on a municipality through the conduct of an official must show that he or she was the final policymaker over the relevant subject matter." [Doc. 84, at p. 52.] "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

Here, the District Court clearly erred because: (1) a reasonable jury could find that Chief Odom had final policymaking authority over the placement of Ms. Lewis on leave, which was not reviewed by Steve Rapson or analyzed by the Magistrate Court; and (2) a jury could find that Odom had final policymaking authority concerning Ms. Lewis's termination, since it not subject to a "meaningful administrative review."

First, the District Court erred in failing to address Chief Odom's final policymaking authority as it applied to his decision to place Ms. Lewis on leave. [Doc 84, at p. 51.] It is undisputed that Chief Odom placed Ms. Lewis on leave. [Doc. 72-4, p. 30.] However, no information regarding Ms. Lewis's ability to be near OC spray was ever presented to Steve Rapson during his review of her termination. [Doc 72-4, pp 26-27.] The City claims that the OC spray issue was the main reason for not allowing Ms. Lewis in the building at all. [*See* Doc. 59-2, at p. 5-6.] But Rapson testified that OC spray was not discussed during the appeals process at all and would not have affected Rapson's decision either way, as he was only focused on the Taser and *supporting the police chief's decision*. [Doc 72-4, pp 26-27.]

The lower court claimed, without citation to authority, that it was Ms. Lewis's responsibility to present the leave issue to Rapson on appeal. [Doc. 84, at pp. 53-54.] However, the lower court erred in its failure to acknowledge the realities of Rapson's review in this situation, which fell far short of "meaningful." The lower court cited Rapson's testimony regarding the leave issue: "If [Ms. Lewis] had brought the issue up…, it may have been in my consideration. But she didn't …. None of that was contested." [Doc. 84, at p. 53.] This testimony proves only one thing: Rapson did not review the leave issue, which means there was no

review of Chief Odom's action in placing Ms. Lewis on leave or in his decision to terminate her for being absent without leave. Thus, because there was no actual review of the reason for which she was placed on leave or the reason for her termination, a jury could easily find Union City liable through § 1983 for violations of 42 U.S.C. §1981 and the Equal Protection Clause. Ms. Lewis objects to the District Court's conclusion that her termination was subject to meaningful review and asks the this Court to reverse the lower court and find liability against Union City.

Second, the lower court erred in its deference to the Defendants' facts with regard to a "meaningful administrative review" of Ms. Lewis's termination. [Doc. 84, at p. 52.] The Eleventh Circuit in *Morro v. City of Birmingham*, elaborated on "meaningful administrative review" and explained that "a mere "rubber stamp" by a supervisory body will not suffice." 117 F.3d 508, 514–15 (11th Cir. 1997).

Here, the reason given by Defendants for Ms. Lewis's termination is well established: Absence without Leave. Yet, Rapson never checked to see if Ms. Lewis had truly exhausted her leave, and he neglected to review her available hours of leave. [Doc. 72-4, p. 30.] Rapson assumed McCord or Odom had done the calculations and assumed that when they told him Ms. Lewis was out of hours, she was out of all of her hours. [Doc. 72-4, p. 27.] Rapson never reviewed whether

Ms. Lewis could continue her leave without pay under the City's policy. *Id.* In fact, Rapson even admitted that the number of days an employee gets, according to the policy that applied to Ms. Lewis, is 180 days, which he knew had not been afforded to Ms. Lewis. [Doc. 72-4, p. 20.] To call such a review of the actual reason for termination "meaningful" is a stretch of any imagination.

Consequently, it is plain to see that Rapson merely accepted the information presented to him by Chief Odom and the review of the termination could not have been "meaningful."[9] Contrary to the Lower Court's assertion, it is not Ms. Lewis's responsibility to make the review of her own termination "meaningful." And Rapson even admitted that it was *not* Ms. Lewis's responsibility, but Chief Odom's, to bring up whether leave without pay was an option [Doc. 72-4, p. 27.] This testimony directly contradicts the District Court's conclusion that Ms. Lewis is somehow responsible for making Rapson's review "meaningful."

Moreover, even if Ms. Lewis had presented certain evidence to Rapson, it would not have affected his decision either way, since he was only focused on supporting the police chief's decision. [Doc. 72-4, p. 27.] Indeed, Rapson never

---

[9] Causation may be established if the decision maker followed biased recommendations without independent investigation. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)

reviewed whether Lewis could continue her leave without pay, the very pretextual behavior applied to Ms. Lewis. *Id*.

Accordingly, Ms. Lewis requests this Court reverse the District Court's decision that Rapson conducted a "meaningful administrative review" of Chief Odom's termination decision and hold that a reasonable jury could find that her termination was without "meaningful administrative review" and the City should be held liable for Odom's discriminatory actions under § 1981 and §1983.

### C. The District Court Erred in Dismissing Ms. Lewis's ADA claims.

#### 1. The Lower Court erred in concluding that Ms. Lewis does not have a disability as defined by the ADA.

The lower court correctly concluded that a jury could find that Ms. Lewis has a chronic heart condition, which constitutes a physical impairment under the ADA. [Doc. 84, at p. 20.] The Court arrived at this conclusion because Ms. Lewis's heart condition has an effect on her respiratory and cardiovascular systems. [Doc. 84, p. 21.] Then, the lower court improperly held that a reasonable juror could not conclude that Ms. Lewis's cardiovascular impairment substantially limits a major life activity. *Id.* at pp. 21-22.

In 2008, Congress explicitly lowered the standard under the ADA regarding what impairments substantially limit major life activities noting that "lower courts have incorrectly found in individual cases that people with a range of substantially

limiting impairments are not people with disabilities" and that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, ... the question of whether an individual's impairment is a disability under the ADA should *not* demand extensive analysis." Pub. L. No. 110–325, § 2(a)(6), 122 Stat. at 3553 (emphasis added).

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added). Again, "the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2 (j)(1)(iii); *See also Hawkins v. Schwan's Home Serv., Inc.*, No. CIV-12-0084-HE, 2013 WL 2368813, at *4 (W. D. Okla. May 28, 2013) (finding that in light of the much broadened definition of disability, plaintiff with a heart condition was disabled under the ADA, as amended.)

In *Nichols v. City of Mitchell*, the court analyzed the disabilities of three plaintiffs. 914 F. Supp. 2d. 1052, 1057-58 (D.S.D. 2012). Plaintiff Nichols lived

with type 2 diabetes, controlled by medication, and a heart condition. *Id*. Plaintiff

Robertson lived with diabetes, controlled by medication, and sleep apnea. *Id*.

Plaintiff Dumas lived with a heart condition, which included stent placement in

January 2010. *Id*. The court held that, due to the amended ADA's broad definition

of disability, a jury could find that each plaintiff has an impairment which

substantially limits a major life activity. *Id*.

Yet, while the lower court acknowledged the Congressional intent through

its citation to the post-2008 ADA amendments and regulations, it improperly

construed testimony regarding the limiting effect of Ms. Lewis's heart condition in

favor of the Defendants and failed to cite any case law supporting its stringent

interpretation of "substantially limits." [Doc. 84, at p. 22. at pp. 22-24.]

Specifically, the Lower Court weighed testimony regarding the impact of Ms.

Lewis's heart condition heavily in favor of the Defendants. *Id*. The lower court

inferred in Defendants' favor that "mild aortic insufficiency" and "mild tricuspid

regurgitation" meant that Ms. Lewis was not substantially limited in major life

activities *Id*. at p. 22. Simultaneously, the lower court disregarded testimony from

the same medical professionals that Ms. Lewis was substantially limited in major

life activities. *Id*.

Through her doctors, Ms. Lewis presented ample evidence of a permanent injury to her heart, a greater risk of heart attack in the future, and a heart condition that she will have for the rest of her life. [Doc. 72-4, pp. 6-8.] A reasonable jury could easily find that even a mildly compromised heart substantially limits the major life activity of pumping blood as compared to most people in the general population.

When properly viewed in a light most favorable to the Ms. Lewis as the non-movant, Ms. Lewis more than meets the less stringent amended ADA standard to establish that she is disabled. In fact, courts around the country have concluded that far less severe maladies are disabilities under the amended ADA. Under the new regulations, a person afflicted with a common or minor condition is "just as disabled as a wheelchair-bound paraplegic—if only for the purposes of disability law." *Lloyd v. Montgomery Hous. Auth.*, 857 F. Supp. 2d 1252, 1263 (M.D. Ala. 2012). Indeed, the case law is illuminating when applied using the post-2008 regulations. *Id*. at 1264 (holding that a plaintiff with asthma and high blood pressure sufficiently established disability for purposes of summary judgment under the ADAAA).

In *E.E.O.C. v. Res. for Human Dev., Inc.*, the court held that the plaintiff's obesity alone created a sufficient issue of fact precluding summary judgment and

allowing a jury to determine whether the plaintiff was substantially limited under ADA as amended. 827 F. Supp. 2d 688, 693 (E.D. La. 2011). While, Ms. Lewis is not severely obese, her heart condition likens her to someone with similar physical ailments, including her higher risk of heart attack, circulatory issues via tricuspid regurgitation and aortic insufficiency, and trouble breathing while sleeping (paroxysmal nocturne dyspnea), as compared to the general population. [Doc. 72-4, pp. 6-8.]

In *Moore v. Jackson Cnty. Bd. of Educ*, the plaintiff suffered from a broken ankle, but she continued to maintain mobility through the use of crutches or a cane. 979 F. Supp. 2d 1251, 1259-61 (N.D. Ala. 2013). The Court concluded, "in light of the stated purpose of the ADAAA to broaden the coverage of the ADA and especially the definition of the phrase "substantially limits," that even a plaintiff with a temporary ankle impairment was substantially limited in a major life activity. *Id*.

The ADA, as amended, provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D); *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 210 (D. Conn. 2012); *see also Haley v. Cmty. Mercy Health Partners*, No. 3:11-CV-232, 2013 WL 322493, at *10 (S.D. Ohio Jan. 28, 2013)

(finding plaintiff "disabled" even though plaintiff's cancer was in remission, but could potentially, upon its return, limit a major life activity of cell production.); *see also Katz v. Adecco USA, Inc.*, 845 F. Supp. 2d 539, 548 (S.D.N.Y. 2012) (holding that as "a result of the amendments to the ADA, it appears not to matter that [the plaintiff's] cancer was in remission at the time of the alleged discrimination"); *Hoffman v. Carefirst of Fort Wayne, Inc.*, 737 F. Supp. 2d 976, 985 (N. D. Ind. 2010) (cancer in remission constitutes disability based upon the "clear language" of 42 U.S.C. § 12102(4)(D)). Ms. Lewis suffered a heart attack in 2009. [Doc. 72-1, p. 1.] Just like a patient with cancer in remission, her prior diagnosis of a heart condition increases her risk of having another heart attack in the future and for the rest of her life. [Doc. 72-1, p. 2.] Both Ms. Lewis's cardiologist and her primary care physician found that she suffered from a permanent injury to her heart and continues to suffer regurgitation of the mitral, tricuspid, and aortic heart valves. [Doc. 72-1, p. 2.] Were her condition to flare-up, certainly another heart attack and the serious prospect of death could be viewed as a disability under the amended ADA by a reasonable jury.

The District Court also erred in its adoption of the Magistrate Court's conclusion that no jury could find that Ms. Lewis's paroxysmal nocturne dyspnea substantially limited the major life activity of breathing as compared to most

people in the general population. [Doc. 84, p. 24.] To this day, Ms. Lewis continues to have periodic shortness of breath, a symptom that did not occur prior to her heart attack, and takes baby aspirin every day as prescribed by her doctor to control the symptoms of her heart condition. [Doc. 72-1, p. 2.] Her shortness of breath, which occurs when she lies flat, substantially limits both the major life activities of breathing and sleeping as compared to most people in the general population. *Id.* at pp. 2-3.

Thus, when viewed in a light most favorable to Ms. Lewis and through application of the broader amended ADA standards, a reasonable jury could easily find that Ms. Lewis's heart condition substantially limited one or more major life activities, making her "disabled" under the ADA. As such, Ms. Lewis requests this Court find that the District Court erred in its conclusion that no jury could find her to be disabled under the more lenient standards of the ADAAA.[10]

---

[10] Due to the lower court's ruling that no jury could find Ms. Lewis to be disabled, the court failed to analyze Ms. Lewis's disability claim under the *McDonnell-Douglas* or *Smith v. Lockheed-Martin* framework. It also failed to analyze the City's failure to engage in the interactive process with Ms. Lewis. Ms. Lewis renews those claims here and asks this Appellate Court to hold that she is disabled and vacate and remand the lower court's opinion for findings consistent with that holding.

## 2. The Lower Court erred in its conclusion that Ms. Lewis is not a "qualified individual" because she could not perform the essential tasks of her job.

Because the District Court concluded that Ms. Lewis is not disabled under the amended ADA, it failed to analyze her failure to accommodate claim. After finding an employee to be "disabled" under the ADA, the subsequent analysis is broken into two steps: (1) whether the employee could perform the essential functions of the job; and (2) if not, whether any reasonable accommodation by the employer would enable her to perform those functions. *Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 33-34 (1st Cir. 2000) (citations omitted).

The Magistrate Court incorrectly concluded, and the District Court adopted, that Ms. Lewis "ask[ed] the court to find that being trained and certified to carry certain weapons are not essential functions of an officer's job… ." [Doc. 84, at p. 33; *see generally* Doc. 90.] She did not. Rather, Ms. Lewis contends that she meets the qualified individual standard in three ways and that a reasonable juror could find that: (1) carrying a Taser is not an essential function of a Detective's job; (2) even if it was, Ms. Lewis could carry a Taser because she could be certified to do so without actually being exposed to the Taser shock; or, in the

alternative; (3) she could have been accommodated though transfer to an administrative role.

        i.     Ms. Lewis performed, and could continue performing, the essential functions of a detective.

Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Rorrer v. City of Stowe*, 743 F.3d 1025, 1038-39 (quoting *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013)). "Essential functions" should not be confused with "qualification standards" for a certain position. "'Essential functions' are basic 'duties,' 29 C.F.R. § 1630.2(n)(1), 'qualification standards' are 'personal and professional attributes' that may include 'physical, medical [and] safety' requirements. Id. § 1630.2(q)." *Toole v. Metal Servs. LLC*, No. CIV.A. 13-00145-KD-B, 2014 WL 1760955 (S.D. Ala. May 2, 2014).

In the Eleventh Circuit, the employer's judgment is merely one piece of the total circumstances a jury should analyze in determining whether an employee can perform the essential functions of her job. This Court established that, in addition to the employer's judgment, courts in this circuit shall consider: "(1) the amount of time spent performing the particular function; (2) the consequences of not requiring the individual to perform the function;… (4) the work experience of individuals who held the job in the past; and (5) the work experience of

individuals currently in similar jobs." *See Anderson v. Embarq/Spring*, 379 Fed. Appx. 924, 927-28 (11th Cir. 2010). Yet while the District Court initially acknowledged these requirements, its analysis disregarded every other criteria, even though Chief Odom's testimony is directly controverted by other officers in the department. [Doc. 84, at pp. 32-33.]

Ms. Lewis objected to the deference given by the Magistrate Court to Chief Odom's newly created requirements and his self-serving affidavit, which were not in existence until created for this litigation. [Doc. 84, at pp. 32-35; Doc. 90.] However, Ms. Lewis provided sufficient evidence to directly rebut Chief Odom's affidavit and for a jury to conclude that the act of carrying a Taser or, in the alternative, receiving a Taser shock, is not an essential function of a Union City Police Detective:

- Ms. Lewis's duties as a Detective consisted of interviewing suspects at her desk or over the phone and typing up reports, and the majority of the time, Ms. Lewis performed her duties in the office;

- When Ms. Lewis received a case to investigate, she would call and interview the victim, run criminal background checks on any suspects, interview suspects if possible, and if there was sufficient evidence for a warrant, then the ACE team would apprehend the suspect;

- On the whole, Patrol Officers are more likely to encounter situations with fighting than Detectives, because Detectives do not generally answer routine calls for service;

- The Detective job description, which was drafted by Assistant Chief Lee Brown, does not list as a requirement for Detectives that they be able to receive a Taser shock to perform the essential functions of their job, and Ms. Lewis could have effectively performed her job duties as Detective with just an ASP baton;

- Detectives are required to carry their guns but not pepper spray or Tasers;

- Lieutenant Hester was more lenient with his Detectives and left it up to the Detectives' judgment what non-deadly force implements they needed to be carrying at different times, because the Detective is ultimately going to know what is necessary to properly do his or her job;

- Ms. Lewis did not carry pepper spray because she was not licensed by Union City to carry it and it was not issued to her. [Doc. 72-1, pp. 3-6; Doc. 72-4, pp. 4-5.]

To support its analysis, the Magistrate Court relied heavily, and the District Court adopted, nonbinding authority from the Southern District of Indiana. [*See* Doc. 84, at pp. 34-35 (citing *Robert v. Carter*, 819 F. Supp. 832, 844-45 (S.D. Ind.

2011.)] In *Robert*, however, the plaintiff failed to argue that forgoing the Taser

shock could be a reasonable accommodation and failed to proffer the host of

available alternatives that Ms. Lewis has.[11] *Id*.

When analyzed under proper Eleventh Circuit authority, a jury could easily

find that neither carrying a Taser, nor receiving a Taser shock, are essential

functions of a detective. Applying the facts to the test outlined by the Eleventh

Circuit in *Anderson* reveals that: (1) Detectives were much less likely to ever use a

Taser because, unlike officers, they did not respond to routine calls [Doc. 72-1,

p.4]; (2) Ms. Lewis could still be certified to use and carry a Taser, and even

instruct a Taser course, if allowed to forgo the Taser shock [Doc. 72-1, p. 6.]; (4)[12]

Ms. Lewis, and all other Union City Police Officers and Detectives, effectively

performed their duties for years without the use of Tasers[Doc. 72-1, p. 4]; and (5)

other police departments do not require officer exposure to Taser shocks to receive

certification. [Doc. 72-4, p.13.]

Additionally, the lower court failed to consider testimony from numerous

high-level officers with the Union City Police Department, which cuts against

Chief Odom's affidavit and weighs in Ms. Lewis's favor that carrying a Taser is

---

[11] Ms. Lewis's addressed forgoing the Taser shock as a reasonable accommodation fully in section b.

[12] Plaintiff's enumeration mirrors those factors outlined in *Anderson;* factor (3) is related to Collective Bargaining Agreements, which is not at issue in this matter.

not an essential function under the law.  For instance, Ms. Lewis's direct supervisor, Sergeant McClure, testified that he had no concerns about her ability to serve a search or arrest warrant or her ability to back up another officer, because she had personally backed him up in the past. [Doc. 86, p. 13.]

As established by record evidence, effectively performing duties when engaging a suspect involves a Force Continuum policy, which, in order of escalation, includes:  (1) verbal commands; (2) soft empty hands; (3) hard empty hands, which "can be anything from manipulating a joint to a takedown to an OC [pepper] spray to an ASP baton to a Taser;" and (4) deadly force.  [Doc. 72-4, pp. 12-13.]  Within the "hard empty hands" umbrella (ASP baton, Taser, pepper spray) the Union City Police Department has no preferred weapon of choice and the selection is left to the Police Officer's discretion.  *Id*.  Detectives are provided even more discretion with their weapon selection than regular officers, and they are only required to carry their guns but not pepper spray or Tasers.  *Id*.

Ms. Lewis was certified to carry the ASP baton, a gun, was trained in the use of less-than-lethal force, and she carried her gun, badge, handcuffs, ASP baton, and a radio on a daily basis.  [Doc. 72-1, pp. 5-6.]   Thus, even without the Taser or OC spray, Ms. Lewis was equipped to perform all of her duties and all of the requirements within the City's own force continuum.

Finally, the lower court wholly disregarded the availability of less-than-lethal beanbag shotguns, which can also be used to engage someone from a distance. [Doc. 84, p. 14.]  This is just one more tool Ms. Lewis could use to perform the same functions as a Taser or OC spray.  Accordingly, Ms. Lewis asks this Court to hold that the lower court erred in holding that no jury could find that she could continue performing the essential functions of her job with a reasonable accommodation, and she asks this court vacate the lower court's decision.

    ii.    Even if this Court agrees with the District Court that carrying a Taser is an essential function of a Union City detective, Ms. Lewis could carry a Taser without being exposed to a Taser shock.

Police Officers can be certified to carry a Taser, can carry a Taser, and can use a Taser without being exposed to a Taser shock.  [Doc. 86, p. 15.]  The Taser website itself states, "Exposure during the instructor course is not required, it's voluntary.  Taser International also does not require officers to be exposed to a Taser device to be certified as a user."  *Id.*

To rebut Ms. Lewis's evidence that exposure to a Taser shock is not an essential function of her job as a Police Detective, Chief Odom created a self-serving affidavit. [*See* Doc. 84, at pp. 32-33.]  In fact, much of Odom's affidavit conspicuously mirrors the Indiana court's considerations.  [*Comp*. Doc. 59-16; to *Robert*, F. Supp. 2d at 839.]  Ms. Lewis objected to the Magistrate Court's over

reliance on nonbinding authority from *Robert* and the deference given to Defendants' proffered facts, which Ms. Lewis directly disputed. *See supra*. Indeed, if the shock itself was truly "essential," then every police department would require it, but they do not. [Doc. 86, p. 16.]

Unlike the plaintiff in *Robert*, Ms. Lewis contended, and established for the court, that she could be certified to carry a Taser without being exposed to a Taser shock. [Doc. 86, p. 16.] Had the Police Department allowed Ms. Lewis to forgo the actual Taser shock, she would still have been eligible to be Taser certified, and she could have carried and used the Taser the same way she carried her firearm. *Id*. In addition, had the Police Department engaged in any kind of interactive process, they might have discovered that Ms. Lewis could have been shocked in the leg, like the accommodation given to Officer Cedeno. *Id*.

The plaintiff in *Robert* provided no evidence that tools other than the Taser were available to him, that he could be certified to carry a Taser without being exposed to a Taser shock, or that he could perform the essential functions of his job without a Taser. *Robert* 819 F. Supp. 2d at 837-840. Contrary to *Robert*, Ms. Lewis established a plethora of tools at her disposal, and her supervisor even testified that she could effectively perform her job duties with just an ASP baton. [Doc. 86, p. 17.] But the District Court failed to acknowledge or give any weight

to Hester's testimony, and instead, singularly gave deference to Odom's affidavit without acknowledging Ms. Lewis's rebuttal. [*See* Doc. 84, pp. at 34-35.]

The Taser course, even without the shock, provided officers the same skills Odom claimed to be available only through exposure to a Taser shock. For instance, through taking the course without being exposed to a shock, Ms. Lewis could still: (1) evaluate the appropriate circumstances under which to deploy the Taser; (2) testify in court about the effects of the Taser; (3) know that she could go "hands-on" with an uncooperative subject without being shocked; and (4) learn how to defend herself if threatened with a Taser or similar devise. [Doc. 86, p. 17.]

Thus, Ms. Lewis could still use the Taser effectively without receiving the Taser shock, making the shock itself non-essential. Officers are required to get their Taser certifications renewed each year, but are not required to be re-exposed to the Taser shock. *Id.* at 18. Logically then, the effectiveness of receiving the shock lies in the memory of the shock itself. But like any memory, it fades with time, and an officer who was shocked by a Taser five years ago for five quick seconds will barely remember what that shock felt like. Of course, this lapse in memory would not make an officer, who has received the shock but no longer remembers what it felt like, incapable of performing the essential functions of his or her job.

Indeed, detectives have existed for centuries without the use of Tasers, and Ms. Lewis performed the essential functions of her job for years prior to the implementation of Union City's Taser policy. As such, and because so many options existed within the continuum of force, Ms. Lewis asks this court to hold that a reasonable jury could find that being shocked by a Taser is not an essential function of a Union City Detective.

      iii.        Working around Tasers and OC Spray did not pose a significant risk of substantial harm to Ms. Lewis.

The District Court also erred in concluding that, even if Defendants had allowed Ms. Lewis to forgo carrying a Taser or OC Spray, "she still would not have been able to perform the essential functions of a Detective" because the doctor mistakenly put the word "near" in Ms. Lewis's note to Odom. [Doc. 84, p. 36.] To support this conclusion, the Magistrate Court exclusively gave deference to Odom's affidavit while failing to acknowledge a single fact proffered by Ms. Lewis to the contrary, except in one footnote. [*See* Doc. 84, p. 36.]

In her many years as an officer, Ms. Lewis was exposed once, in proximity only, to OC spray and never as a Detective. [Doc. 86, p. 19.] Had Odom properly engaged in any kind of interactive process, he would have learned that there was not actually a concern about Ms. Lewis being in the vicinity of either a Taser or the OC Spray. [Doc. 86, p. 19] But the lower court failed to engage in an interactive

process analysis, and instead, it commented that Union City had no legal obligation to engage in the interactive process because the City merely regarded Ms. Lewis as disabled. [Doc. 84, p. 38; Doc. 90.]

To support its conclusion that no jury could find that Ms. Lewis could perform the essential functions of the Detective job because her doctor's note contained the word "near," the Magistrate Court cited to *Dickerson v. Sec'y, Dep't of Veterans Affairs*, 489 F. Appx. 358, 360 (11th Cir. 2012). [Doc. 84, p. 36.] The plaintiff, Dickerson, worked as a nurse and suffered from a serious asthma and chemical sensitivity. *Id.* According to Dickerson's doctors, any of the chemicals commonly used by the VA were more likely than not to trigger an allergic reaction, and Dickerson "must NOT be within less than one foot of" certain chemicals or solvents. *Id.* at 361. Also, it is was undisputed that during one of Dickerson's allergic reactions, she would be unable to concentrate, react to an emergency, make clinical judgments, or deliver patient care. *Id.* Dickerson's allergic reactions also frequently forced her to leave the workplace and not return for extended periods of time. *Id.*

Unlike *Dickerson* however, Ms. Lewis could be around and carry both a Taser and the OC Spray. [Doc. 86, p. 20.] Indeed, she had worked around OC spray for years. Applying the significant risk of harm standard used by the court in

*Dickerson* would effectively make every officer unable to perform the essential functions of his or her duties under the law simply by being near Tasers or OC spray. First, the job itself comes with significant risk of harm to all officers each and every day. Second, the harm Ms. Lewis could experience by being in the vicinity of a Taser or OC spray was actually not a concern according to her doctor. [Doc. 86, p.20] Finally, the District Court's adoption of the Magistrate Court's conclusion that, if actually exposed to a Taser or OC spray Ms. Lewis would be unable to perform the essential functions of her job without risk of harm to herself, effectively makes every officer, who would also be incapacitated as a result of exposure to a Taser shock or OC Spray, incapable of performing the essential functions of their jobs. The logic cannot hold.

Consequently, Ms. Lewis requests this Court vacate the lower court's findings that Ms. Lewis could not work as a Detective without significant risk of substantial harm to herself and asks the Court to recognize that a reasonable jury could find that she could perform the essential functions of her job because: (1) the reality was that she could work around OC spray and Tasers according to her doctor; (2) she worked for years around pepper spray without issue; (3) she had, in fact, been exposed to pepper spray in the past without substantial harm; (4) the odds of exposure to either OC spray or a Taser are so marginal so as to not make

the risk of exposure significant; and (5) working as a police officer comes with an inherent risk of substantial harm that the officers knowingly enter every day. [Doc. 86, p. 21.]

> iv.     Working near Tasers or OC spray did not pose a "direct threat" to Ms. Lewis.

Next, in a footnote, the Magistrate Court stated that "… Defendants would be entitled to summary judgment due to the "direct threat" defense." [Doc. 84, at p. 37.] However, other than the single doctor's note discussed *supra*, Defendants proffered no evidence that Ms. Lewis's presence at Union City as a Detective posed any threat to herself or any other officer. Indeed, Defendants cannot because they failed to engage in the interactive process. Like with its "significant risk of substantial harm analysis," the lower court failed to apply the interactive process analysis to the "direct threat" defense because it improperly found that a jury could not find Ms. Lewis "disabled" under the amended ADA. *Id*. Ms. Lewis objected to this conclusion and asks this Court to vacate and remand the District Court's holding.

The lower court improperly integrated the "direct threat" defense into its analysis while ruling that Ms. Lewis was only "regarded as" disabled by Defendants. However, "whether the employer has a defense (*e.g.*, that the employee posed a direct threat to himself or coworkers) is a separate inquiry."

*E.E.O.C. v. Am. Tool & Mold, Inc.*, No. 8:12-CV-2772-T-35EAJ, 2014 WL 2185013, at *6 (M.D. Fla. Apr. 16, 2014).  "The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Id.* at 19, (citing 29 C.F.R. § 1630.2(r); *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86, (2002) ("The direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended") (quoting 29 C.F.R. § 1630.2(r) (2001)).  Thus, the "direct threat" defense relies on the complete exploration of a plaintiff's health circumstances, not a defendant's knee-jerk reaction to one adjective in a note.

In fact, Ms. Lewis could have, performed the essential functions of her job as a Detective around Tasers and OC spray as she had been doing for years. *See*, *supra*.  Should the District Court find that Ms. Lewis is disabled under the ADA, then the City did have a duty to engage in the interactive process, and the "direct threat" defense fails because Ms. Lewis's doctor subsequently clarified her note.

[Doc. 84, p. 23-24.] Indeed, the City knew within hours of Ms. Lewis's termination (and would have learned prior to the termination had they engaged in the interactive process) that Dr. Harris was not concerned about the OC spray, but Defendants did not take any steps to rescind the termination or to try to find an accommodation for Ms. Lewis. [Doc. 84, p. 24.]

Chief Odom never personally made any efforts to engage in an interactive process with Ms. Lewis or her doctor. [Doc. 72-1, pp. 9-10.] He never attempted to talk to Ms. Lewis's doctor, and he never sent anything in writing to Ms. Lewis's doctor requesting clarification of the note. *Id.* Nor did Odom make any efforts to engage in an interactive process with Ms. Lewis. *Id.* Rather, after Ms. Lewis requested an accommodation on June 30, 2010, neither Brown nor Odom attempted to determine a reasonable accommodation for Ms. Lewis. [Doc. 72-4, p. 17.] Thus, it is clear that no individualized assessment was made and the "direct threat" defense must fail.

> v.      Even if this Court agrees with the District Court that Ms. Lewis could not perform the essential functions of a Police Detective without being exposed to a Taser shock, she could still perform the essential functions of an available position with an accommodation.

Under the ADA "discriminate," includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability who is an . . . employee, unless such covered

entity can demonstrate that the accommodation would impose an undue hardship

on the operation of the business of such covered entity." 42 U.S.C.

§ 12112(b)(5)(A). As examples of reasonable accommodations, the ADA lists

"job restructuring, part-time or modified work schedules, reassignment to a vacant

position, acquisition or modification of equipment or devices, . . . and other similar

accommodations for individuals with disabilities." *Id*. § 12111(9)(B); *see* 29

C.F.R. § 1630.2(o)(2)(ii). As the list indicates, the ADA may require the employer

to reassign or transfer the employee to a vacant position as a reasonable

accommodation, but the employer does not have to remove another employee from

a position to do so, or promote a disabled employee. *Lucas v. W.W. Grainger, Inc.*,

257 F.3d 1249, 1256 (11th Cir. 2001).

Ms. Lewis could have been accommodated by being placed in an

administrative role, like Officer Phil Frieder, or on unpaid administrative leave for

longer than three weeks, like Officers McClure and Heard. [Doc. 72-1, p. 12.][13]

Instead of accommodating Ms. Lewis, Chief Odom and Union City placed Ms.

Lewis on leave and then terminated her before her leave expired. [Doc. 72-4, p. 30;

Doc. 72-1, p. 10.]

---

[13] The City also offered Heard a position in dispatch, establishing the availability
of positions for transfer.

The District Court erred in failing to analyze the viability of the reasonable accommodation of transferring Ms. Lewis into an available position. Accordingly and a upon a finding that a reasonable jury could find the Ms. Lewis meets the definition of disabled under the ADA, Ms. Lewis requests this Court also find that Ms. Lewis could have performed the essential function of her job with the accommodation of: (1) being allowed to forgo the Taser training; (2) being allowed to forgo the Taser shock; or (3) transferring to dispatch or another available administrative position.

### D. Defendant's reason for terminating Ms. Lewis is pretextual

To show pretext, a plaintiff must "'come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000). Ms. Lewis easily meets this burden.

### 1. Defendant treated non-disabled officers more favorably

A typical means of establishing pretext is through comparator evidence. *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 889 (11th Cir. 2013) (citing *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir.

2001); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1563 n. 20 (11th Cir. 1987)).  As previously discussed, Ms. Lewis has shown ample evidence of how the City provided McClure and Heard, two non-disabled employees, with leave while failing to provide the same amount of leave to Ms. Lewis.  *See supra.*  This evidence continues to point to the disparate treatment applied to Ms. Lewis through the effectuation of its administrative leave policy.  Accordingly, and as shown above, Ms. Lewis has demonstrated a genuine issue of material fact from which a reasonable jury may conclude that she was treated differently than McClure and Heard because of her race, gender, or disability. *See supra.*

## VI.    CONCLUSION

The District Court construed the facts in favor of Defendants in violation of Fed. R. Civ. P. 56.   The District Court erred in its application of the "similarly situated" comparator standard as it applies to employees subject to the same policy. The District Court also erred in its interpretation of the amended ADA's more lenient standard for what constitutes a disability, thereby additionally erring in its conclusion that the City did not need to engage in the interactive process. Finally, the District Court erred in ruling that Ms. Lewis was not a qualified individual who could perform the essential functions of her job with a reasonable accommodation. Accordingly, the District Court's decision should be reversed and this case should

be remanded for a jury trial on all issues brought by Ms. Lewis under Title VII, 42

U.S.C. § 1981, 42 U.S.C. § 1983, and the ADA.

Respectfully submitted,

s/ Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com

LEGARE, ATTWOOD &
WOLFE, LLC
400 Colony Square, Suite 1000
1201 Peachtree Street NE
Atlanta, Georgia  30361
Telephone: (470) 823-4000
Facimile:  (470) 201-1212

s/ Paulding Chichester IV
Georgia Bar No. 189958
pchichester@buckleylawatl.com

THE BUCKLEY LAW FIRM
1230 Peachtree Street NE, Suite 900
Atlanta, Georgia  30309
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

Counsel for Appellant

# CERTIFICATE OF COMPLIANCE

Counsel for Appellant hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).  This brief contains 12,841 words.

s/ Paulding Chichester IV
Georgia Bar No. 189958

THE BUCKLEY LAW FIRM
1230 Peachtree Street NE, Suite 900
Atlanta, Georgia  30309
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

Counsel for Appellant

# CERTIFICATE OF SERVICE

This is to certify that I have this 1st day of July, 2015, served a copy of the

**Initial Brief of Appellant Jacqueline Lewis** upon the parties listed below by

depositing same in the United States mail, with sufficient postage thereon,

addressed to:

      Tracy Lynn Glanton
      Sharon P. Morgan
      Elarbee Thompson Sapp & Wilson LLP
      229 Peachtree Street NE
      800 International Tower
      Atlanta, Georgia  30303

                        s/ Paulding Chichester IV
                        Georgia Bar No. 189958

THE BUCKLEY LAW FIRM
1230 Peachtree Street NE, Suite 900
Atlanta, Georgia  30309
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101

Counsel for Appellant