_____

## CASE NO. No. 15-11362-GG
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

## JACQUELINE LEWIS,

Plaintiff-Appellant

## v.

## CITY OF UNION CITY, GEORGIA, CHIEF OF POLICE CHARLES ODOM, in his official and individual capacities,

Defendants-Appellees.
_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION
## CASE NO. 1:12-cv-04038-RWS
_____

## APPELLEES' PETITION FOR REHEARING AND
## PETITION FOR REHEARING EN BANC
_____

*Respectfully Submitted by Attorneys for Appellees:*

Sharon P. Morgan, Georgia Bar No. 522955
Tracy L. Glanton, Georgia Bar No. 415008
ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
(404) 659-6700 (Telephone)
(404) 222-9718 (Facsimile)

Case No. 15-11362-GG
*Lewis v. City of Union City*

## APPELLEES' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the <u>Federal Rules of Appellate Procedure</u> and 11th Cir R. 26.1-2(c), the undersigned counsel of record for Defendants-Appellees hereby certifies that the following persons or entities may have an interest in the outcome of this case:

1. Buckley Beal, LLP, Attorneys for Plaintiff-Appellant;

2. Chichester, Paulding IV, Attorney for Plaintiff-Appellant;

3. City of Union City, Georgia, Defendant-Appellee;

4. Elarbee Thompson, Sapp & Wilson, LLP, Attorneys for Defendants-Appellees;

5. Glanton, Tracy L., Attorney for Defendants-Appellees;

6. King, Hon. Janet F., United States Magistrate Judge;

7. Legare, Attwood & Wolfe, LLC, Attorneys for Plaintiff-Appellant;

8. Legare, Cheryl, Attorney for Plaintiff-Appellant;

9. Lewis, Jacqueline, Plaintiff-Appellant;

10. Morgan, Sharon P., Attorney for Defendants-Appellees;

11. Odom, Charles, Defendant-Appellee;

12. Story, Hon. Richard W., United States District Judge;

13. Sutherland, Brian J., Attorney for Plaintiff-Appellant;

Case No. 15-11362-GG
*Lewis v. City of Union City*

14.    The Buckley Law Firm, LLC, Attorneys for Plaintiff-Appellant;

15.    The Georgia Interlocal Risk Management Agency ("GIRMA"), an identifiable legal entity with a potential interest in the outcome of this appeal. GIRMA is a statutory association of municipalities and other local government organizations, including City of Union City, formed to establish a group self-insurance fund to pool the risks of general liability. <u>See</u> O.C.G.A. § 36-85-1, <u>et seq.</u>;

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned certifies that there are no corporate entities that require disclosure pursuant to Federal Rule of Appellate Procedure 26.1 or 11th Cir. R. 26.1.

Respectfully submitted, this 5th day of January, 2018.

 s/ Sharon P. Morgan          
Sharon P. Morgan
Georgia Bar No. 522955
morgan@elarbeethompson.com
Tracy L. Glanton
Georgia Bar No. 415008
glanton@elarbeethompson.com

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718
Attorneys for Defendants-Appellees

Case No. 15-11362-GG
*Lewis v. City of Union City*

## STATEMENT OF COUNSEL REGARDING EN BANC CONSIDERATION

**1.      I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance:**

The City of Union City determined, in its judgment, that its police officers, including detectives, should be required to carry a Taser and undergo training on its use, which includes exposure to a Taser shock.  There is no expert testimony in this case that such training is improper.  There is also no evidence that the City's policy or job requirement regarding Tasers was implemented with discriminatory motive or applied in a discriminatory manner.   But when analyzing whether Plaintiff was a "qualified individual" under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the majority failed to accord any weight to the City's judgment as to the essential functions of a police detective.   Under the ADA, an employer's judgment of essential job functions is to be accorded substantial weight, and this is especially called for in the law enforcement context when the functions at issue involve weapons and officer safety.  The majority's failure to accord any weight, let alone substantial weight, to the City's judgment in this regard improperly shifted the primary focus of the "qualified individual" analysis under the ADA from whether Plaintiff is able to perform the essential functions of the job, to whether a jury in this case believes the City's uniformly-

Case No. 15-11362-GG
*Lewis v. City of Union City*

applied Taser policy is prudent.  In light of the public safety issues in this case, the City requests that the Court review the panel decision on this issue of exceptional importance.

**2.    I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:**

A.    The divided panel decision eliminates this Court's binding precedent requiring that a proper comparator for purposes of establishing a prima facie case of employment discrimination under Title VII be "nearly identical" to the plaintiff when the challenged employment action does not involve the plaintiff's misconduct.  Trask v. Sec'y, Dep't of Veterans Affairs, 822 F.3d 1179 (11th Cir. 2016); Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327 (11th Cir. 2015); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11th Cir. 2004); Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253 (11th Cir. 2001); Maniccia v. Brown, 171 F.3d 1364 (11th Cir. 1999); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185 (11th Cir. 1984).  The majority held that "the 'nearly identical' test does not apply in this case," which involves the City's placement of Plaintiff on unpaid administrative leave upon receiving a note from her doctor stating that she

Case No. 15-11362-GG
*Lewis v. City of Union City*

"would not recommend that a Taser gun or OC [Oleoresin Capsicum/pepper] spray be used on or near" Ms. Lewis "secondary to her chronic conditions," and Plaintiff's termination three weeks later for being absent without leave.  Instead of applying this circuit's binding precedent, the panel relied on Second and Fifth Circuit case law to determine what "characteristics are 'relevant'" to the "similarly situated" comparator analysis.  (11th Circuit Opinion ("Op."), pp. 33-34 & n.11.) Review of the panel decision is necessary to maintain uniformity of this circuit's decisions, and to prevent confusion in the lower courts as to the proper standard to apply when conducting the similarly situated analysis.

B.    The majority erred in finding that Plaintiff can establish a "mosaic of circumstantial evidence" of unlawful discrimination under Title VII by merely calling into question the City's legitimate, non-discriminatory reasons for the challenged employment decisions.  This Court's precedent requires a Title VII plaintiff to put forth "additional" evidence that would support an inference of unlawful discrimination, particularly when, as here, the only evidence "that even touches on" race or gender is the difference in race and gender between Plaintiff and her proposed comparators.  Flowers v. Troup Cty. Sch. Dist., 803 F.3d 1327, 1338 (11th Cir. 2015); Smith v. Lockheed-Martin Corp., 644 F.3d 1321 (11th Cir. 2011); cf. King v. Ferguson Enters., 568 F. App'x 686, 689 (11th Cir. 2014) (noting that under the *McDonnell Douglas* burden-shifting framework, "[t]he

Case No. 15-11362-GG
*Lewis v. City of Union City*

plaintiff must show that a proffered reason---to amount to pretext---is false, and that discrimination was the real reason for the adverse action." (citing Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006)).) Review of the panel decision is necessary to maintain uniformity of this circuit's decisions, and to prevent confusion in the lower courts as to the proper standard to apply when analyzing whether a plaintiff established a mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.

## STATEMENT OF COUNSEL REGARDING
## PANEL REHEARING CONSIDERATION

In addition to the reasons supporting Defendants' petition for rehearing *en banc*, I express a belief, based on a reasoned and studied professional judgment, that this appeal involves the following additional points of law and fact that the panel overlooked:

1.    In analyzing whether Plaintiff is a "qualified individual" under the ADA, the panel focused solely on whether carrying and being exposed to a Taser during training are essential functions of a detective.  The panel overlooked other undisputed evidence of Plaintiff's essential job functions, consideration of which would not allow a reasonable jury to conclude that Plaintiff was able to perform the essential functions of her job without serious risk of harm.

Case No. 15-11362-GG
*Lewis v. City of Union City*

2.    The panel overlooked, misstated, and failed to credit undisputed, material evidence in finding a triable issue as to whether Plaintiff's co-workers (Officer Heard and Sergeant McClure) are proper comparators, and whether Plaintiff established a "convincing mosaic" of intentional discrimination under Title VII.

Respectfully submitted, this 5th day of January, 2018.

s/ Sharon P. Morgan
Sharon P. Morgan
Georgia Bar No. 522955
Tracy L. Glanton
Georgia Bar No. 415008

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718
morgan@elarbeethompson.com
glanton@elarbeethompson.com

Attorneys for Defendants-Appellees

Case No. 15-11362-GG
*Lewis v. City of Union City*

## TABLE OF CONTENTS

PAGE

**CERTIFICATE OF INTERESTED PERSONS AND**

    **CORPORATE DISCLOSURE STATEMENT ............................ C-1, C-2**

**STATEMENT OF COUNSEL REGARDING EN BANC CONSIDERATION i**

**STATEMENT OF COUNSEL REGARDING PANEL REHEARING**

    **CONSIDERATION ....................................................................iv**

**TABLE OF CONTENTS .....................................................................vi**

**TABLE OF AUTHORITIES ...............................................................ix**

**I.**    **STATEMENT OF THE ISSUES ASSERTED TO MERIT EN BANC**

    **CONSIDERATION .......................................................................1**

**II.**    **STATEMENT OF THE COURSE OF PROCEEDINGS AND**

    **DISPOSITION OF THE CASE .....................................................1**

**III.**    **STATEMENT OF FACTS NECESSARY TO ARGUMENT**

    **OF THE ISSUES...........................................................................2**

**IV.**    **ARGUMENT AND AUTHORITIES ...........................................4**

    **A.**    **The panel erroneously reversed the District Court's Order**

        **granting the City's Motion for Summary Judgment on**

        **Plaintiff's claim for disability discrimination under the ADA .......4**

Case No. 15-11362-GG
*Lewis v. City of Union City*

1.    *The panel failed to give any deference to the City's judgment as to what functions of a detective are essential, leaving it to a jury to decide the prudence of a uniformly applied job requirement.* ................................... 4

2.    *The panel overlooked undisputed evidence of Plaintiff's essential job duties in finding a triable issue as to whether Plaintiff is a "qualified individual" under the ADA.* ............... 7

B.    **The majority erroneously reversed the District Court's Order granting the City's Motion for Summary Judgment on Plaintiff's Title VII claims for race and gender discrimination** ....................................................................... 8

1.    *The majority failed to apply the "nearly identical" standard for establishing a similarly situated comparator to Plaintiff, holding that the standard "does not apply in this case."* ................................................................... 8

2.    *The majority erroneously found a "convincing mosaic" of circumstantial evidence by merely calling into question the City's legitimate, non-discriminatory reasons for the challenged employment actions.* ............................................... 10

Case No. 15-11362-GG
*Lewis v. City of Union City*

**3.    *The panel overlooked, misstated and failed to credit undisputed, material evidence in finding a triable issue as to whether Plaintiff's co-workers are proper comparators, and whether Plaintiff established a "convincing mosaic" of intentional discrimination under Title VII.*.............................................12**

**V.    CONCLUSION** ...........................................................................**16**

Case No. 15-11362-GG
*Lewis v. City of Union City*

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.,
    446 F.3d 1160, 1163 (11th Cir. 2006) ................................................iv, 11, 12

Dickerson v. Sec'y, Dep't of Veterans Affairs Agency,

    489 F. App'x 358, 360 (11th Cir. 2012) ........................................................4

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1126 (11th Cir. 1993) ...........................5

Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327

    (11th Cir. 2015) ........................................................... ii, iii, 11, 12

Hennagir v. Utah Dep't of Corrs., 587 F.3d 1255, 1262-63

    (10th Cir. 2009) ...........................................................6, 7

King v. Ferguson Enters., 568 F. App'x 686, 689 (11th Cir. 2014) ...................iii, 11

Maniccia v. Brown, 171 F.3d 1364 (11th Cir. 1999) .......................................ii, 8, 9

Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185

    (11th Cir. 1984) ...................................................................ii, 8, 9

Samson v. Fed. Exp. Corp., 746 F.3d 1196, 1201 (11th Cir. 2014) .........................5

Robert v. Carter, 819 F. Supp. 2d 832, 844-845 (S.D. Ind. 2011) ...........................5

Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253 (11th Cir. 2001) ...........................ii

Slater v. U.S. Steele, 820 F.3d 1193, 1196 n.3 (11th Cir. 2016) ..............................9

Smith v. Lockheed-Martin Corp., 644 F.3d 1321, (11th Cir. 2011) .......iii, 10, 15, 16

Case No. 15-11362-GG
*Lewis v. City of Union City*

Trask v. Sec'y, Dep't of Veterans Affairs,

    822 F.3d 1179 (11th Cir. 2016) .............................................................ii, 9, 10

Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11th Cir. 2004) ............................ii

**<u>Statutes</u>**

42 U.S.C. § 1981 ....................................................................................ii

U.S.C. § 12101 <u>et</u> <u>seq</u>....................................................................................i

42 U.S.C. § 12111(8) .................................................................................4

Case No. 15-11362-GG
*Lewis v. City of Union City*

## I.    STATEMENT OF THE ISSUES ASSERTED TO MERIT EN BANC CONSIDERATION

1.    In determining whether Plaintiff is a "qualified individual" under the ADA, whether the panel erred by failing to give substantial weight to the City's judgment as to what functions of a detective are essential when there is no evidence that the new job requirement was implemented with a discriminatory motive or applied in a discriminatory manner.

2.    Whether the majority erred by limiting the application of the "nearly identical" test for establishing a proper comparator under Title VII to employment actions involving employee misconduct, such that it would not apply to employment actions involving leave, performance issues, attendance, etc. when those actions are unrelated to an employee's misconduct.

3.    Whether the majority erred in finding a "convincing mosaic of circumstantial evidence" by merely calling into question the City's legitimate, non-discriminatory reasons for the challenged employment actions, or whether there must also be evidence of intentional discrimination on the basis of race and gender.

## II.    STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

Plaintiff Jacqueline Lewis, a former Union City police detective, commenced this action on November 19, 2012 against the City and former Chief of Police, Charles Odom, in his official and individual capacities, alleging claims

-1-

Case No. 15-11362-GG
*Lewis v. City of Union City*

for disability, race, and gender discrimination under the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and the Equal Protection Clause of the Fourteenth Amendment. (Doc. 1.)  Defendants filed a Motion for Summary Judgment on May 19, 2014. (Doc. 59.)  On November 26, 2014, Magistrate Judge Janet F. King issued a Final Report and Recommendation (R&R), recommending that summary judgment be granted on each of Plaintiff's claims.  (Doc. 84.)  On March 17, 2015, District Judge Richard W. Story issued an Order adopting the R&R, and judgment was entered against Plaintiff on March 18, 2015.  (Docs. 90, 91.)

Plaintiff filed her Notice of Appeal on March 31, 2015.  (Doc. 92.)  The Eleventh Circuit heard oral argument on March 15, 2016.  On December 22, 2017, the Eleventh Circuit panel, in a 2-1 decision, affirmed the District Court's dismissal of Plaintiff's Section 1981 and Equal Protection claims against the City and Chief Odom, and reversed the District Court's Order "in all other respects." The City seeks review of the panel's Opinion for the reasons set forth herein.

### III.   STATEMENT OF FACTS NECESSARY TO ARGUMENT OF THE ISSUES

On June 1, 2010, Chief Odom implemented a policy requiring any officer who is in a position to make an arrest or supervise an arrestee, which includes detectives, to carry a Taser in an effort to reduce the risk of injury to officers in the

Case No. 15-11362-GG
*Lewis v. City of Union City*

field.  (Docs. 59-1 at ¶ 13; 59-16, ¶ 5, Ex. C; 59-12 at 2.)  As part of the City's

training to become Taser certified, officers must receive a five-second Taser shock.

(Doc. 59-16, ¶ 7.)  Chief Odom articulated at least five reasons for requiring the

Taser shock, which are supported by the Taser manufacturer.  (Doc. 59-16, ¶ 7 &

Ex. D.)  The City also requires all sworn officers to be certified to carry Oleoresin

Capsicum ("OC") spray, and requires exposure to the spray as part of the training

and certification process.  (Doc. 59-16, ¶ 5; Doc. 59-7 at 33.)  The City has never

waived any of these requirements.  (Doc. 59-16, ¶¶ 5, 7.)

When auditing officers' training files in June 2010, the City discovered that

Plaintiff was the only officer who was not certified to carry OC spray.  (Doc. 59-

16, ¶ 8.)  Plaintiff was scheduled for OC training on June 17, 2010, but had not yet

been scheduled for Taser training, when she brought in a doctor's note on June 16,

2010 which recommended that a Taser gun and OC spray not be used "on ***or near***"

her "secondary to her chronic conditions."  (Docs. 59-3 at 65-66; 59-4 at 100-101;

59-16, ¶ 9; emphasis added.)  Since Plaintiff's co-workers carried OC spray and

would soon be carrying the Taser, her doctor's proximity restrictions prevented her

from performing all field assignments where she would be around other officers

carrying and potentially using these weapons; her mere presence at work also

placed her at risk of having the weapons used on or near her.  Plaintiff was

therefore placed on unpaid administrative leave until her doctor cleared her to

Case No. 15-11362-GG
*Lewis v. City of Union City*

return to work.  (Doc. 59-16, ¶ 10.)  She was told she could use her accrued leave and was advised to contact Human Resources to complete necessary FMLA paperwork for purposes of protecting her job once she exhausted her leave.  (Docs. 59-3 at 67; 59-4 at 102; 59-7 at 2-3, 21.)

By July 8, 2010, when Plaintiff had exhausted all of her accrued leave, and had not submitted her FMLA paperwork requesting additional leave or presented any information from her doctor indicating she could return to work, the City terminated her employment for being absent without leave.  (Docs. 59-4 at 121; 59-16, ¶ 11.)

## IV.  ARGUMENT AND AUTHORITIES

### A.  The panel erroneously reversed the District Court's Order granting the City's Motion for Summary Judgment on Plaintiff's claim for disability discrimination under the ADA.

#### 1.  *The panel failed to give any deference to the City's judgment as to what functions of a detective are essential, leaving it to a jury to decide the prudence of a uniformly applied job requirement.*

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show, in part, that he or she is a "qualified individual" with a disability.  A "qualified individual" is one who, with or without reasonable accommodation, can perform the essential functions of the job without risk of serious physical harm to oneself or others.  42 U.S.C. § 12111(8); see Dickerson v. Sec'y, Dep't of Veterans Affairs Agency, 489 F. App'x 358, 360 (11th Cir. 2012)

-4-

Case No. 15-11362-GG
*Lewis v. City of Union City*

(citing <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1126 (11th Cir. 1993)).  The

majority states the correct legal standard that when deciding what functions are

essential, "the employer's judgment is entitled to substantial weight in the

calculus," even though this factor alone is not conclusive.  (Op., pp. 23-24 (citing

<u>Samson v. Fed. Ex. Corp.</u>, 746 F.3d 1196, 1201 (11th Cir. 2014)).)  As the district

and magistrate judges observed, this is particularly important in the law

enforcement context when the functions at issue involve weapons and officer

safety because "law enforcement officials, not judges, are experts in making

determinations about issues involving weapons, certifications, training, and

safety."  (Docs. 90 at 3 & 84 at 34 (citing <u>Robert v. Carter</u>, 819 F. Supp. 2d 832,

844-845 (S.D. Ind. 2011)).)

Despite the panel's recitation of the correct legal standard, it failed to give

*any* weight to the City's judgment as to the weapons and training required for

detectives.  The panel's failure to accord substantial weight to the City's judgment

eliminates the right of an employer to set its own policies and job requirements and

places those decisions into the hands of a jury.  Here, there is no factual dispute

that these requirements were adopted prior to, and were in place during, the

relevant time period, and that they were uniformly applied.  Plaintiff has not

introduced any expert testimony calling into question Chief Odom's judgment

Case No. 15-11362-GG
*Lewis v. City of Union City*

about what training and weapons he believed were essential.[1]  As the dissent

notes, it is important for the Court not to "substitute [its] judgment for that of

employers," particularly as it relates to decisions made by those individuals

"responsible for ensuring public safety."  (Op., p. 46, n.4.)

Furthermore, the majority's failure to give substantial weight to the City's

judgment permits employees to challenge newly-implemented, uniformly applied

policies and job requirements on the grounds that the new requirements are not

"essential" if the individual had previously performed the job without the

requirements.  The focus of the "qualified individual" inquiry under the ADA

should be whether the employee is able to perform the job as it exists at the time of

the challenged employment decision, and in the absence of evidence that the job

requirement was implemented with a discriminatory motive or applied in a

discriminatory manner, the employer's judgment should be given "substantial

weight."[2]  For the reasons stated herein, Defendants request that the panel decision

be reviewed *en banc* on this issue of exceptional importance.

---

[1]  While Taser International does not "require" the shock to become
certified and leaves that decision to the certifying department, it does support
Odom's reasons for requiring the shock.  (Doc. 59-20 at 2-3.)

[2]  See e.g., Hennagir v. Utah Dep't of Corrs., 587 F.3d 1255, 1262-63
(10th Cir. 2009) ("The ADA does not limit an employer's ability to establish or
change the content, nature, or functions of a job."); id. (essential function analysis
"is not intended to second guess the employer or to require him to lower company

Case No. 15-11362-GG
*Lewis v. City of Union City*

**2.    The panel overlooked *undisputed* evidence of Plaintiff's essential job duties in finding a triable issue as to whether Plaintiff is a "qualified individual" under the ADA.**

In analyzing whether Plaintiff is a "qualified individual" under the ADA, the majority focused solely on whether carrying and being exposed to a Taser during training are essential functions of Plaintiff's job.   The panel overlooked other *undisputed* evidence of Plaintiff's essential job functions, consideration of which would not permit a reasonable jury to conclude that Plaintiff was able to perform the essential functions of her job without significant risk of harm.

As a detective, Plaintiff is required to work around other officers in potentially dangerous and life-threatening situations that may require the use of a Taser or OC spray, which Plaintiff's co-workers carried and used.[3]   Dr. Harris's recommendation that a Taser gun or OC spray not be used "on or near" Plaintiff secondary to her chronic conditions prevents her from performing her duties because she will necessarily be around other officers and detectives who may have to use these weapons.   Dr. Harris testified that the risk of harm if Plaintiff is exposed, even secondarily, is another heart attack.   (Doc. 73 at 66-68, 74.)

---

standards. . . . Provided that any necessary job specification is job-related, uniformly enforced, and consistent with business necessity, the employer has a right to establish what a job is and what is required to perform it.").

[3]   Since implementation of the Taser, detectives have used them in the performance of their job.  (Docs. 65 at 35-38; 71 at 40-42; 66 at 37-39.)

Case No. 15-11362-GG
*Lewis v. City of Union City*

Therefore, as articulated by the dissent, "[n]o reasonable jury could find that a detective who cannot risk exposure to OC spray and Tasers could satisfy the essential functions of her job," even if she is not required to carry them, or be exposed to them as part of her training.   (Op., p. 44.)   Upon consideration of Plaintiff's other *undisputed* essential job duties, no reasonable jury could find Plaintiff was a qualified individual, and that she did not pose a "direct threat."   The panel decision should be reviewed to correct these errors.

**B.**     **The majority erroneously reversed the District Court's Order granting the City's Motion for Summary Judgment on Plaintiff's Title VII claims for race and gender discrimination.**

      **1.**     ***The majority failed to apply the "nearly identical" standard for establishing a similarly situated comparator to Plaintiff, holding that the standard "does not apply in this case."***

For more than 30 years, this Court has held that a proper comparator for purposes of establishing a prima facie case of employment discrimination must be "nearly identical" to the plaintiff.   See <u>e.g.</u>, <u>Nix v. WLCY Radio/Rahall Commc'ns</u>, 738 F.2d 1181, 1185 (11th Cir. 1984).   The reason for this standard is to "prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."   <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999).   Despite this long-standing precedent, the panel's majority refused to apply the "nearly identical" test, stating that it was intended only to apply in cases

-8-

Case No. 15-11362-GG
*Lewis v. City of Union City*

involving workplace misconduct.  (Op., p. 34, n.11.)  As the dissent notes, there is

no foundation on which the majority's conclusion rests.  (Op., p. 46.)

Whether the circumstance involves employee misconduct, the employee's

inability to work due to a medical condition, poor performance, attendance, etc.,

the rationale for applying the "nearly identical" test is the same.  See Maniccia,

171 F.3d at 1368.  Indeed, while the "majority" of cases applying this test involve

employment decisions based on the plaintiff's "misconduct," this Court has not

limited its application to cases involving misconduct.  See Trask v. Sec'y, Dep't of

Veterans Affairs, 822 F.3d 1179, 1192 (11th Cir. 2016) (alleging disparate

treatment related to denial of job classification and related training); Slater v. U.S.

Steel Corp., 820 F.3d 1193, 1196 n.3 (11th Cir. 2016) (alleging disparate treatment

related to the credit of service time towards seniority status), *vacated on other*

*grounds to be heard en banc*.  There is no rational reason – nor has the majority

articulated one – for limiting the nearly identical test to "misconduct" cases.

Accordingly, review of the panel decision is necessary to maintain uniformity of

this circuit's precedent, and to prevent confusion in the lower courts as to the

proper standard to apply.[4/]

---

[4/] Eliminating the test outside of the misconduct context will also result in court's having to decide whether the challenged employment action involves "misconduct."

Case No. 15-11362-GG
*Lewis v. City of Union City*

**2.    *The majority erroneously found a "convincing mosaic" of circumstantial evidence by merely calling into question the City's legitimate, non-discriminatory reasons for the challenged employment actions.***

The majority found a "mosaic of circumstantial evidence" sufficient to create a triable issue as to whether the City's reasons for Plaintiff's termination are pretext for race or gender discrimination.  (Op., pp. 35-38.)  The "convincing mosaic" test has been adopted by this circuit as an additional method to the *McDonnell Douglas* three-step burden shifting framework for determining whether a plaintiff has created an issue of fact as to the employer's discriminatory intent sufficient to defeat summary judgment.  See Smith v. Lockheed-Martin Corp., 644 F.3d 1321 (11th Cir. 2011).  To make this showing, a plaintiff who cannot identify a proper comparator can avoid summary judgment if there is sufficient evidence that would allow a reasonable jury to infer "*intentional discrimination*."  Id. at 1328.

Here, the majority found sufficient evidence to controvert the City's reasons for Plaintiff's termination, but failed to point to any evidence from which a reasonable jury could conclude that Plaintiff was terminated on the basis of her race or gender.[5/]  But, "[c]ontradicting [an employer's] asserted reason alone,

---

[5/]    As noted in Sections IV.B(1) and (3), the majority erred in finding that Plaintiff's two, white male co-workers are proper comparators. Therefore, their differential treatment does not infer intentional discrimination.

Case No. 15-11362-GG
*Lewis v. City of Union City*

though doing so is highly suggestive of pretext, no longer supports an inference of unlawful discrimination." Flowers v. Troup Cty., 803 F.3d at 1339 (11th Cir. 2015); see King v. Ferguson Enters., 568 F. App'x 686, 689 (11th Cir. 2014) (noting that under the *McDonnell Douglas* burden-shifting framework, "[t]he plaintiff must show that a proffered reason---to amount to pretext---is false, and that discrimination was the real reason for the adverse action." (citing Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006)).).[6] As the dissent observed, Plaintiff "may have put forth a mosaic of circumstantial evidence that would allow a jury to infer *something*. But there is no evidence that something would be *intentional discrimination.*" (Op., p. 47.) For this reason, review of the panel decision is necessary to prevent the creation of a new evidentiary test that is in conflict with the precedent of this circuit.

---

[6] Under the *McDonnell Douglas* framework, the establishment of a prima facie case creates at least an inference of discrimination, but under the "mosaic" framework, a prima facie showing is not required. There is no rational reason why the same pretext standard applied in the burden-shifting analysis should not be applied when attempting to establish a mosaic of circumstantial evidence that would allow a reasonable jury to infer intentional discrimination.

-11-

Case No. 15-11362-GG
*Lewis v. City of Union City*

**3.**     ***The panel overlooked, misstated and failed to credit undisputed, material evidence in finding a triable issue as to whether Plaintiff's co-workers are proper comparators, and whether Plaintiff established a "convincing mosaic" of intentional discrimination under Title VII.***

The majority erred in finding a triable issue as to whether Plaintiff's co-workers, Officer Heard and Sergeant McClure, are proper comparators such that their more favorable treatment with respect to the amount of unpaid leave provided to them as compared to Plaintiff raises an inference of intentional discrimination. (Op., p. 33.)  The errors are as follows:

**First error:**    The majority rejected the magistrate judge's finding that Plaintiff and her proposed comparators were not similarly situated because, "pursuant to [Plaintiff's] physician's recommendations, [Plaintiff] could not work with other officers who carried OC spray and Tasers without serious risk of harm." (Op., 29.)  The majority held that "[t]his distinction is not so indisputably well founded, however, as to warrant the rejection of the comparators as a matter of law on a summary judgment motion."   (Op., pp. 29-30.)   This conclusion fails to consider language in Dr. Harris's letter recommending that a Taser and OC spray not be used "**near**" Plaintiff.  In failing to consider this language, the majority erroneously concluded that (1) "Dr. Harris's letter to the [police department] made no mention of Ms. Lewis being at risk from her mere presence around other officers carrying those weapons," and (2) Dr. Harris's letter is "silent with respect

-12-

Case No. 15-11362-GG
*Lewis v. City of Union City*

to accidental exposure."[7]   (Op., p. 30 & n.8.)   There is no evidence that the undisputed use of the word "near" by Dr. Harris was not to be given its common meaning as "close; to a point or place not far away."   See Dictionary.com, http://www.dictionary.com/browse/near?s=t (last visited Jan. 5, 2018).   Therefore, the panel erred in concluding that the issue of whether the City reasonably interpreted Dr. Harris's letter is a question for the jury.

**Second error:**   The majority erred in finding that the amount of leave provided to Heard and McClure was pursuant to the same policy applied to Plaintiff.   (Op. p. 32 & n.10.)   The majority failed to credit undisputed testimony from Chief Odom and Sergeant McClure that the 90-day leave period applied to Heard and McClure was pursuant to a specific departmental *fitness* policy.[8]

---

[7]   The majority notes that "Defendants assert that the language in Dr. Harris's letter that states Ms. Lewis 'should not have a Taser used on her secondary to previous cardiac history,' supported a conclusion that Ms. Lewis was at risk from accidental exposure."   (Op., p. 30, n.8.)   The majority omits Dr. Harris's language relevant to Defendants' position, which is that a Taser and OC spray not be used "near" Plaintiff, which does in fact support the magistrate's conclusion.   (Op., p. 30, n.8.)   Furthermore, while Dr. Harris's letter does not explicitly use the words "accidental exposure," the letter certainly suggests that Plaintiff is at risk if exposed, whether intentionally or inadvertently.

[8]   The majority found a triable issue in part because Defendants attached the Taser policy and not the fitness policy to Chief Odom's supplemental declaration so the majority could not determine whether the fitness policy actually exists or formed the basis for Heard and McClure's leave.   (Op., p. 32, n. 10.) Counsel for Defendants now realizes that they inadvertently attached the wrong policy to Chief Odom's supplemental declaration.   However, Odom and McClure's

-13-

Case No. 15-11362-GG
*Lewis v. City of Union City*

(Docs. 65 at 33-34; 82-1, ¶¶ 2, 5.)  McClure also testified that his leave was not pursuant to the same policy that the majority applied to Plaintiff.  (Docs. 65 at 34-35, 33:20-34:7; 65-1 at 4-5.)    The majority further observed that Heard's declaration "makes no mention of the physical fitness policy," (Op., p. 32, n. 10), but the fact that Heard did not testify that his initial leave was pursuant to the fitness policy does not raise an issue of fact because he did not testify that his leave was *not* pursuant to that policy.  Odom's testimony that Heard's initial 90-day leave was pursuant to the fitness policy – not the leave of absence policy – is undisputed.[9]

**Third error:**  The majority failed to consider the City's *undisputed* legitimate, non-discriminatory reasons for extending Heard's leave beyond the 90-days, which resulted in the majority making an improper "apples to oranges"

_____

undisputed testimony establishes the existence of the fitness policy and that the 90-day leave period applied to Heard and McClure was pursuant to that policy, and not the policy that the majority found applied to Plaintiff.  Therefore, the majority erred in finding a triable issue as it relates to the existence of the fitness policy and the amount of leave provided under that policy.

[9]   The majority also misstated the evidence in finding that "Tracie McCord testified that she was not sure what leave policy applied to McClure, but when asked whether it was the same as that applied to Ms. Lewis, answered 'I would assume so.'"  (Op., p. 32, n.10.)  But McCord's testimony related to Heard, not McClure, and it was error for the majority to credit this testimony in any event because McCord's testimony indicates she lacked personal knowledge of the basis for Heard's leave; as her testimony makes clear, McCord merely "assumed" it was pursuant to the same policy applied to Plaintiff.  (Doc. 75 at 169-170.)

-14-

Case No. 15-11362-GG
*Lewis v. City of Union City*

comparison between Plaintiff's and Heard's situations.  This error is particularly harmful to the finding of a "convincing mosaic" of intentional discrimination wherein the majority highlighted the differential treatment to support its conclusion that "a jury could reasonably interpret the evidence of [Heard and McClure's] significantly more lenient treatment – particularly the 449 days accorded to Heard – as circumstantial evidence that the UCPD treats white men more favorably than black woman."[10]  (Op., p. 38.)

When reviewing this evidence properly, no reasonable jury could conclude that the City extended different amounts of leave to Plaintiff and her comparators because of her race or gender.  Plaintiff's proposed comparators were not similarly situated to Plaintiff in all relevant respects, and the only "tile" supporting a mosaic of circumstantial evidence that even touches upon Plaintiff's race and sex is the difference in their race and gender.  This evidence falls far short of creating a "convincing mosaic" of discriminatory treatment, and review of the majority's decision is necessary to correct these errors.  Cf. Smith, 644 F.3d at 1346 (noting that "Lockheed's injection of race into its decision-making process yields an unavoidable inference that the employee's race impacted the discipline

---

[10]  This is the only evidence relied on by the majority in finding a "mosaic of circumstantial evidence" that even touches on race or gender.

Case No. 15-11362-GG
*Lewis v. City of Union City*

determination, and it is a jury's province to decide whether race actually bore on the decision to terminate Mitten.").

## V.    **CONCLUSION**

For the reasons stated herein, the City respectfully requests that the Eleventh Circuit, or the panel, grant its Petition for Rehearing, and vacate the panel's December 15, 2017 Opinion.

Respectfully submitted, this the 5th day of January, 2018.

s/ Sharon P. Morgan
Sharon P. Morgan
Georgia Bar No. 522955
morgan@elarbeethompson.com
Tracy L. Glanton
Georgia Bar No. 415008
glanton@elarbeethompson.com

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718

Attorneys for Defendants-Appellees

Case No. 15-11362-GG
*Lewis v. City of Union City*

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Fed. R. App. P. 32(g), I hereby certify that this petition complies with the type-volume limitations set forth in Fed. R. App. P. 35(b)(2)(A) and Fed. R. App. P. 40(b)(1), and contains 3800 words.

This petition also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using MS Word in Times New Roman 14 point font.

Submitted this, the 5th day of January, 2018.

s/ Sharon P. Morgan
Sharon P. Morgan
Georgia Bar No. 522955
morgan@elarbeethompson.com

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718

Attorney for Defendants-Appellees

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| **JACQUELINE LEWIS,** ) | |
| ) | |
| **Plaintiff-Appellant,** ) | |
| ) | |
| **v.** ) | **CASE NO. 15-11362-GG** |
| ) | |
| **CITY OF UNION CITY, GA, et al.,** ) | |
| ) | |
| **Defendants-Appellees.** ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2018, pursuant to 11th Circuit Rule 25-3, I electronically filed **APPELLEES' PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC** with the Clerk of Court using the CM/ECF system which will automatically send email or other notification of such filing to the following attorneys of record:

Cheryl Legare
Brian J. Sutherland

Submitted this, the 5th day of January, 2018.

s/ Sharon P. Morgan
Sharon P. Morgan
Georgia Bar No. 522955
morgan@elarbeethompson.com

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718

Attorney for Defendants-Appellees

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11362

_____

D.C. Docket No. 1:12-cv-04038-RWS

JACQUELINE LEWIS,

Plaintiff - Appellant,

versus

CITY OF UNION CITY, GEORGIA,
CHIEF OF POLICE CHARLES ODOM,
in his official and individual capacities,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 15, 2017)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and Kaplan,[*] District Judge.

---

[*] The Honorable Lewis A. Kaplan, of the United States District Court for the Southern District of New York, sitting by designation.

KAPLAN, District Judge:

Jacqueline Lewis, an African-American police detective in Union City, Georgia, was terminated abruptly from her position after about ten years of service. The ostensible reason was that Ms. Lewis was absent without leave—this notwithstanding that the Union City Police Department ("UCPD") only days earlier had placed her on indefinite administrative leave pending resolution of the question whether she safely could be subjected to a Taser shock as part of a new UCPD training policy.

Ms. Lewis here contends that her discharge reflected unlawful disability and/or racial or gender discrimination. She seeks back pay, damages, and reinstatement. The matter is before this Court on appeal from the district court's grant of defendants' motion for summary judgment dismissing the complaint. We hold that the evidence raised genuine issues of material fact and therefore reverse.

## I. FACTS

### A. Ms. Lewis's Medical Condition

Jacqueline Lewis joined the UCPD in 2000 as a patrol officer. She was promoted to detective in 2008.

In January 2009, Ms. Lewis suffered a small heart attack. The episode was unusual in that a cardiac catheterization showed "no clot and no disease" in Ms.

Lewis's heart, although heart attacks generally are caused by a "clot inside the coronary arteries." And while Dr. Arshed Quyyami, a Harvard-trained cardiologist who treated Ms. Lewis at Emory University's cardiology clinic, described the damage to Ms. Lewis's heart as being "miniscule to small," enzyme levels confirmed the diagnosis of a heart attack. Dr. Quyyami found also that the "global function of the heart was unaffected," though he noted that people who have had heart attacks tend to be at greater risk for subsequent heart attacks.

Ms. Lewis's primary care doctor, Dr. Erinn Harris, noted that Ms. Lewis had some residual "mild tricuspid regurgitation" but concluded that this did not have much effect on her bodily function. Ms. Lewis occasionally did complain of paroxysmal nocturnal dyspnea—in other words, shortness of breath while lying down—which, according to Harris "can affect [Lewis's] ability to sleep." Dr. Harris testified, however, that Lewis does not have heart disease that "chronically affects her life." Accordingly, Dr. Harris, following Ms. Lewis's heart incident, cleared her to return to work without any "cardiac restrictions" because there "weren't any blockages to her heart."

**B. UCPD's New Taser Policy**

Prior to 2010, the UCPD allowed officers to choose which non-lethal weapons they carried.  The options included oleoresin capsicum ("OC") spray,[1] ASP batons,[2] and Tasers.[3]  In early 2010, however, then-Police Chief Charles Odom purchased Tasers for all UCPD officers and required each to carry one.

Chief Odom testified that he thought Tasers were superior to the ASP baton and OC spray because Tasers would "reduc[e] the risk of injury to officers, suspects, and the public because [a Taser] allows officers to maintain distance from an uncooperative subject when attempting to obtain compliance and effect an arrest."  Although the manufacturer, Taser International, does not require trainees to receive a Taser shock to be certified in Taser use, Odom required his officers to receive a five-second shock as part of the Taser training.  In moving for summary judgment, he offered five justifications for this requirement:

> "assisting [officers] in (1) evaluating the appropriate circumstances under which to deploy the Taser, (2) testifying in Court about the effects of the Taser, (3) knowing that they can go 'hands-on' with an uncooperative subject without being shocked, (4) considering how to defend themselves if threatened with a Taser or similar device, and (5) understanding what it feels like to be shocked by the Taser in the event of an accidental exposure so that they will have confidence in their ability to survive the experience."

### C. Ms. Lewis Is Scheduled for Taser Training

---

[1] OC spray, commonly known as pepper spray, is a nonlethal aerosol used to blind and incapacitate temporarily in order to subdue a subject for arrest.

[2] An ASP is an expandable baton carried on an officer's duty belt.

[3] A Taser is a brand of electronic control device, a nonlethal weapon that deploys an electric shock that temporarily disables a subject through neuromuscular incapacitation.

On June 14, 2010, Ms. Lewis was told to report for Taser training on June 17, 2010.  Ms. Lewis was concerned that her prior heart attack might increase her risk of injury from a Taser shock as compared with the average officer.  So she saw Dr. Harris, her primary care doctor, on June 15, 2010 to discuss the issue.

Dr. Harris shared Ms. Lewis's concerns, worrying that the "electrical current . . . could cause undue stress to [Lewis's] . . . heart."  Dr. Harris therefore wrote to Chief Odom.  Her letter explained that she had been treating Ms. Lewis for "several chronic conditions including a heart condition" and that she "would not recommend that a Taser gun or OC spray be used on or near [Lewis] secondary to her chronic conditions."  Dr. Harris urged the department to take this recommendation "into consideration when making any decisions about occupational training."

### D. Union City's Leave Policies

At this point we turn briefly to Union City's policies with respect to employee leave, as they are essential to understanding events subsequent to Dr. Harris's June 15, 2010 letter.

The City of Union City's Employee Handbook (the "Handbook"), as revised in March of 2010 and in force at the time of the events of this lawsuit, provided for various types of leaves of absence.  Chapter 6, section 1.A, permitted an employee

to request an unpaid leave of absence of up to 180 days. Notably, this provision stated also, however, that "[a]n employee may also be placed on leave of absence status without application."

In addition, Union City had a medical leave policy under the Family and Medical Leave Act ("FMLA"). It provided employees with up to 12 weeks of unpaid leave for, *inter alia*, a "serious health condition that makes the employee unable to perform the functions of that employee's job." Under the procedures set forth in the Handbook, when the need for medical leave could be anticipated, the employee was required to submit the paperwork thirty days prior to the effective date of the leave. Where such need was unanticipated, however, the Handbook provided no time period within which the paperwork had to be submitted.

### E. Ms. Lewis Placed on Administrative Leave

On June 17, following Chief Odom's receipt of Dr. Harris's June 15 letter, Assistant Chief Lee Brown notified Ms. Lewis by letter on June 17 that she was being placed on "*administrative leave* without compensation *until such time as your physician releases you to return to full and active duty*." He wrote that he took this action due to what he described as Dr. Harris's "instructions [that Lewis] . . . not come into contact with either" a Taser or OC spray, which, Brown wrote, could happen in "a variety of [field] and office settings." The letter told Ms. Lewis

to contact Tracie McCord in human resources to complete "the necessary FMLA paperwork concerning your absence." But the letter fixed no time period during which Ms. Lewis was required to be medically cleared to return to full and active duty. Lastly, although the letter said Ms. Lewis was being placed on leave without pay, it gave her the option to use her accrued leave "until the time such leave is expended," an option that would have permitted her to continue being paid until she exhausted her accrued vacation and sick time. The implication of the letter, a jury might find, was that Ms. Lewis would be on unpaid administrative leave indefinitely, save to the extent she first used her accrued paid leave to continue to receive her salary.

Ms. Lewis wrote Chief Odom on July 1, 2010, asking permission to resume her duties as a detective, explaining that she was "only asking for an accommodation on the taser [sic] and OC training." She sent Chief Odom a second letter, dated July 1, requesting permission to "seek temporary employment elsewhere while the Union City Police department and my doctor (Dr. Harris) are trying to come to some conclusion on this medical matter." She expressed concern in this second letter that her sick and vacation leave had nearly run out and that she "need[ed] to be able to provide for [her] family."

Chief Odom directed Assistant Chief Brown to reply to Ms. Lewis, which he did by letter dated July 1, denying her request to return to work. Brown noted first

Case: 15-11362    Date Filed: 12/15/2017    Page: 8 of 48

that Lewis was "out of work early in 2009 with what was suspected of being a heart attack," but that she subsequently received medical clearance to return to work without limitation. Brown then stated that "this changed"—presumably referring to Ms. Lewis's ability to work without limitation—when the department received Dr. Harris's June 15 letter. Brown's letter concluded that, "[b]ased on your current job description, your doctor's letter essentially makes it impossible for you to work or be at work." It denied Ms. Lewis's request to resume her duties "until your doctor releases you for duty." Again, no time frame was fixed for obtaining such a medical release.

Dr. Harris was on vacation for the first week of July and was unreachable until July 7. Ms. Lewis so informed Assistant Chief Brown on July 2, adding that she had scheduled an appointment for the day of Dr. Harris's return. She asked also for Assistant Chief Brown's cell phone number so Dr. Harris could call him directly.

Ms. Lewis emailed again on July 6 to remind Assistant Chief Brown that Dr. Harris still was on vacation. He replied that day, providing his office telephone number and instructing Ms. Lewis that Dr. Harris should call him or his assistant to schedule a conversation. He stated also that "[a]s far as your seeking employment outside of the agency after filing for Family and Medical Leave[, which never occurred], it would be, as I understand, illegal for you to be employed elsewhere

while you are currently on FMLA Leave with our department."  At that time, however, Ms. Lewis was on administrative leave pursuant to Chief Brown's June 17 letter, not FMLA leave.  In fact, she had not applied for FMLA leave.

### F. Ms. Lewis Is Terminated

Chief Odom testified that "I don't want to use the word with 'bated breath,' but we were waiting for either her doctor's appointment on the Wednesday [July 7] or [to] hear from the doctor on Wednesday or for her to bring us something on Wednesday to say here is where we are at or here is where we need to go or . . . there is some kind of a plan of action here."  Dr. Harris in fact attempted to call on July 7, but she did not have the correct phone number.  In addition, although Dr. Harris largely filled out the FMLA paperwork on July 7, she did not complete, sign, and send it to the police department until July 12.

On July 8 at 10 a.m., Assistant Chief Brown terminated Ms. Lewis.  He did so without speaking to human resources manager Tracie McCord.  Nor did he make any attempt to contact Dr. Harris or to have anyone else from the department contact her.  His termination letter stated that Ms. Lewis had been placed on administrative leave without pay on June 17 but had had the option to use her accrued leave until it was exhausted.  Brown then stated that her accrued leave was exhausted on July 5, but that he "granted her request" because Ms. Lewis had

Case: 15-11362    Document: 43    Date Filed: 12/18/2017    Page: 10 of 48

advised him that Dr. Harris was on vacation until July 7, though it is not clear to what request, if any, this referred.  Restating but otherwise ignoring the fact that his June 17 letter had placed Ms. Lewis on administrative leave without pay and imposed no time limits at all, he concluded that "[b]ecause you have exhausted all of your accrued [paid] leave and have failed to complete and turn in the necessary paperwork to be placed on Family and Medical Leave, your absence is unapproved and you are terminated effective immediately."  Although Assistant Chief Brown had told Ms. Lewis one week earlier that she was not *permitted* to return to work, Chief Odom characterized this as "a situation where an employee has just failed to come to work."  Chief Odom acknowledged that he never advised Ms. Lewis that she had to apply for 180 days of unpaid leave under the city's administrative leave policy, although she already had been placed on administrative leave, or warned her that she had to file FMLA paperwork within a certain time frame to avoid being terminated.

During the afternoon of July 8, after the termination letter already had been sent, Dr. Harris spoke with Assistant Chief Brown.  To Dr. Harris's recollection, this conversation was unpleasant and left her "quite offended" because she felt that Assistant Chief Brown "questioned my professionalism and my professional opinion."  Brown gave Dr. Harris the impression that he thought "Ms. Lewis was influencing [Harris's] decision to say that [Lewis] should not use the Taser or the

pepper spray." Dr. Harris made clear that her opinion was based solely on her professional medical judgment and that she does not "do things because patients tell me to do them." In his deposition, Brown stated that he "would have had a conversation with [Dr. Harris] about reasonable accommodations" if she had called before July 8. But when the questioner pointed out to him that Dr. Harris had been on vacation, Brown responded simply: "According to Jackie [Lewis]."

By way of summary, it bears pointing out some conclusions a jury reasonably might draw from the preceding evidence. Given the nature of Ms. Lewis's interactions with the UCPD up through July 7, her termination on July 8 is mysterious in an important respect. She had been placed on unpaid, indefinite administrative leave on June 17, at which time she was given the option first to use her accrued vacation and sick time so that she could continue receiving a salary until that leave was exhausted. She never was given any deadlines, nor did any appear in the written city policies, by which she had to obtain medical clearance, file FMLA paperwork, or otherwise resolve the questions about whether she could perform her job duties. She never was transferred from administrative leave to another type of leave. Indeed, at oral argument, defendants conceded that Ms. Lewis was on administrative leave *at the moment she was fired*—an involuntary, unpaid leave initiated by a supervising officer. They conceded further that inherent (though unarticulated) in the act of firing Ms. Lewis was the act of

Case: 15-11362    Document: 42    Date Filed: 12/13/2017    Page: 12 of 48

terminating her administrative leave. Otherwise, there is no plausible way to justify the stated reason for her termination, which was that she was absent without leave. Moreover, Assistant Chief Brown's deposition response to the examiner's suggestion that Dr. Harris had been on vacation—"[a]ccording to Jackie"—might be regarded by a jury as indicating a belief by Brown that Ms. Lewis had lied about Dr. Harris's being away in early July.

We make no findings of fact here, of course. We are obliged, however, to view the evidence in the light most favorable to the non-moving party, Ms. Lewis, and to draw all reasonable inferences in her favor. We therefore point out that a jury in these circumstances reasonably could find that the stated reason for terminating Ms. Lewis—that she was absent without leave—was a pretext for one or more other motives. And there are several possible alternative motives for which there is some evidentiary support. They include a belief that Ms. Lewis (1) could not properly do her job in consequence of her heart condition, (2) had procured unwarranted support from Dr. Harris in an effort to avoid the Taser test while retaining her job, and (3) had lied about Dr. Harris's unavailability until July 7. We discuss additional possibilities below.

### G.  Administrative Appeal

Lewis appealed her termination to the Union City manager, Steve Rapson. At that hearing, Ms. Lewis was represented by an attorney and given the opportunity to present evidence. However, she did not present evidence regarding whether she may have been entitled to 180 days of unpaid administrative leave or to question whether she had fully exhausted her paid leave. Nor did Mr. Rapson or anyone from the city undertake an independent investigation of that issue. Mr. Rapson ultimately upheld Chief Odom's decision to terminate Ms. Lewis.

## II. PROCEEDINGS BELOW

Ms. Lewis filed suit in the Northern District of Georgia on November 19, 2012, alleging disability discrimination under the Americans with Disabilities Act and race and gender discrimination under 42 U.S.C. § 1981 and Title VII.

Defendants moved for summary judgment dismissing all of Ms. Lewis's claims. In opposing the motion, Ms. Lewis pointed to two other Union City police officers as comparators for how she was treated.

The first was Sergeant Cliff McClure, a white man, who was placed on administrative leave after failing the balance portion of a physical fitness test on April 22, 2014. He was given 90 days of leave to remedy the conditions that caused him to fail the test and to retake it.

13

Case: 15-11362   Document: 42   Date Filed: 12/18/2017   Page: 14 of 48

The second comparator was Patrol Officer Walker Heard, a white man who failed a physical fitness test. Heard was placed on leave without pay for 90 days, offered a position as a dispatcher, and ultimately terminated by the department after 449 days on administrative leave. The city notes that Heard filed an EEOC charge against the city during the 90-day leave period and requested that he be exempted from the physical fitness requirements.

On November 26, 2014, a magistrate judge issued a report and recommendation that recommended granting the defendants' motion for summary judgment in its entirety on the bases that: (1) on her ADA claim, Ms. Lewis had failed to demonstrate a genuine issue of fact that she was a "qualified individual," thus failing to make out one of the three elements of her *prima facie* case, and (2) on her race and gender claims, Ms. Lewis's purported white male comparators were not "similarly situated" because they had failed physical fitness tests, not weapons certification tests, and because Ms. Lewis's lead physician had expressed concern about her proximity to Tasers and OC spray. The district court adopted the R&R on March 17, 2015, accepting in all relevant respects the magistrate's reasoning and conclusions. Ms. Lewis appeals from that order and from the judgment entered upon it.

Case: 15-11362 Document: 42 Date Filed: 12/18/2017 Page: 15 of 48

## III. DISCUSSION

### A.  Standard of Review

"We review the district court's grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party."  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).  Summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Strickland*, 692 F.3d at 1154.  The court must draw all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which "'are jury functions, not those of a judge.'"  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### B.  The Disability Discrimination Claim

Under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12112(a), it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment."  To establish a *prima facie* case for disability discrimination, a plaintiff must produce sufficient evidence to permit a jury to find that she: (1) is disabled, (2) is a qualified individual, and (3)

was discriminated against because of her disability. *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007)). "The ADA defines the term 'disability' as (1) a physical or mental impairment that 'substantially limits one or more' of an individual's 'major life activities,' (2) a 'record of such an impairment,' or (3) 'being regarded as having such an impairment' as described in subsection (1)." *Mazzeo*, 746 F.3d at 1268 (quoting 42 U.S.C. § 12102(1)).

    1. <u>Ms. Lewis's Evidence Is Insufficient to Meet Her Prima Facie Burden that She Was Actually Disabled, But Is Sufficient on Whether She Was Regarded as Disabled.</u>

Ms. Lewis argues that she meets the definition of "disabled" under both the "actually disabled" and the "regarded as disabled" prongs. The district court, adopting the R&R, held that Ms. Lewis's evidence had sufficiently demonstrated, for the purpose of her *prima facie* case, that she had a physical impairment, but that she had not produced evidence sufficient to demonstrate that the impairment substantially limited any major life activity. It therefore held that there was no basis for a disability discrimination claim based on a theory that she was actually disabled. But the district court agreed also with the magistrate judge's report and recommendation that there was sufficient evidence to raise a genuine issue of fact on the question of whether Ms. Lewis was "regarded as" disabled.

Case: 15-11362 Document: 42 Date Filed: 12/13/2017 Page: 17 of 48

> a. *The court below correctly concluded that Ms. Lewis did not produce sufficient evidence to permit a conclusion that she is actually disabled.*

Ms. Lewis contends that she is disabled because her heart attack left her with a "permanent injury to her heart and [she] continues to suffer regurgitation of the mitral tricuspid, and aortic heart valves."  The district court rejected this argument, holding that she may have produced sufficient evidence of a physical impairment but she failed to adduce sufficient evidence that that impairment substantially limited any major life activity.  Ms. Lewis here challenges this conclusion, contending that her heart condition substantially limits her ability to sleep and breathe.

An individual who is "actually disabled" is one with "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id*. § 12102(2)(A).

Congress amended the ADA by enacting the ADA Amendments Act of 2008 (the "ADAAA") with the goal of broadening the interpretation of a disability under the ADA.  It sought to "convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."

17

*Mazzeo*, 746 F.3d at 1268 (quoting 42 U.S.C. § 12101 Note). It was concerned also that "the Supreme Court's interpretation of the phrase 'substantially limits' . . . had 'created an inappropriately high level of limitation necessary to obtain coverage under the ADA.'" *Mazzeo*, 746 F.3d at 1269 (quoting 42 U.S.C. § 12101 Note). In consequence, Congress added a rule of construction to the definition of disability, instructing that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

We accept *arguendo* that Ms. Lewis's evidence is sufficient to permit a fact finder to conclude that her heart is physically impaired. *See, e.g.*, *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015). Nevertheless, there remains the question whether the evidence is sufficient to permit a conclusion that the impairment substantially limits a major life activity.

Ms. Lewis argues that her paroxysmal nocturnal dyspnea substantially limits the major life activities of breathing and sleeping. The only such evidence in the record, however, is plaintiff's own testimony that she has "periodic . . . shortness of breath," and Dr. Harris's testimony that this could—but, notably, not that it did—affect Ms. Lewis's ability to sleep. Without minimizing any discomfort these episodes may cause Ms. Lewis, the record here is devoid of evidence of the severity, frequency, and duration of these episodes. Nor is there any evidence of

the extent to which they limit Ms. Lewis's ability to sleep or that could lead a reasonable jury to conclude that Lewis is substantially limited in a major life activity.  *Compare Mazzeo*, 746 F.3d at 1269 (finding sufficient evidence of an actual disability where record included affidavit from plaintiff's doctor detailing both the "specific pain the condition caused, and the limitations on major life activities" (quotations omitted)), *with Holton v. First Coast Serv. Options, Inc.*, No. 16-15289, 2017 WL 3446880, at *3 (11th Cir. Aug. 11, 2017) (distinguishing *Mazzeo* where plaintiff's chiropractor "included nothing to link her back impairment to the limitations on her major life activities that she alleged"), *and Vaughan v. World Changers Church Int'l, Inc.*, No. 1:13-CV-0746-AT, 2014 WL 4978439, at *9 (N.D. Ga. Sept. 16, 2014) (distinguishing *Mazzeo* where plaintiff's "treating physician did not, even in a conclusory fashion, state that the effects of this pain on her major life activities . . . were at all substantial, or at least substantial as compared to most people in the population" and "was unable to assess how episodic Vaughan's pain would be").  Accordingly, we agree with the district court that Ms. Lewis did not produce evidence sufficient to raise a genuine issue of fact that she is actually disabled.

> b. *Ms. Lewis has produced evidence sufficient to raise a genuine issue of fact on whether she was "regarded as" disabled.*

Case: 15-11362  Document: 42  Date Filed: 12/13/2017  Page: 20 of 48

Ms. Lewis contends also that she is "disabled" under the "regarded as" definition regardless of whether she is actually disabled.  The district court agreed, holding that she had produced evidence sufficient to permit findings that the UCPD regarded her heart condition as a physical impairment and took adverse action—placing her on leave—because of the impairment.

The ADA provides that an individual is "regarded as" disabled if she "establishes that . . . she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).

As the district court held, there was ample evidence here to raise a genuine issue of fact as to whether the UCPD regarded Ms. Lewis as disabled.  Chief Odom himself was a witness to Ms. Lewis's heart attack.  In his June 17 letter putting Ms. Lewis on leave, Assistant Chief Brown referred to her chronic conditions and instructed her to complete FMLA paperwork, suggesting that he believed Ms. Lewis had a medical condition warranting medical leave.  Next, Assistant Chief Brown's July 1 letter forbade Ms. Lewis from returning to work until "everything is cleared up with your doctor," said that "your doctor's letter essentially makes it impossible for you to work or be at work," and concluded that Ms. Lewis could not return "until your doctor releases you for duty."  Assistant Chief Brown's July 6

Case: 15-11362 Document: 43 Date Filed: 12/13/2017 Page: 21 of 48

email again referred to the possibility of Ms. Lewis taking leave under FMLA. Indeed, the department's own stated reason for putting Lewis on leave—that it feared for her safety in view of her heart condition—demonstrates the department's belief that Ms. Lewis's medical condition set her apart from other police officers.

Defendants nevertheless argue that they did not regard Ms. Lewis as disabled and that they did not put her on administrative leave because of her actual or perceived heart condition. Rather, they assert, they construed Dr. Harris's letter recommending that Ms. Lewis not be exposed to OC spray or a Taser shock as meaning that Ms. Lewis would be in danger by virtue of her "mere presence at work." But that argument does not carry the day for at least two reasons.

First, even if we were to assume that the UCPD's argument, if accepted, somehow could divorce its placement of Ms. Lewis on administrative leave and her subsequent termination from any perception or belief that Ms. Lewis suffered from a physical impairment—and it is difficult to credit any such assumption—it could do no more than raise an issue of fact. A jury would be entitled to accept Ms. Lewis's evidence, already detailed, and to conclude that the UCPD put her on leave and fired her because it regarded her as disabled.

Second, the defendants' argument is nearly identical to one rejected by the interpretive guidance that accompanies the regulations under the ADA. That guidance gives the following example: "an employer who terminates an employee

with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled." 29 C.F.R. § Pt. 1630, App.  The guidance explains further that "[w]hether the employer has a defense (e.g., that the employee posed a direct threat to himself or coworkers) is a separate inquiry."  *Id*.  While not binding, the guidance illustrates the common sense principle that an employer that takes an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled.

In the last analysis, then, a jury would be entitled to find that the department placed Ms. Lewis on administrative leave and fired her because it regarded her as disabled.   We therefore agree with the district court that Ms. Lewis has produced evidence sufficient to meet her *prima facie* burden on this element.

2. <u>The District Court Erred in Holding that Ms. Lewis Failed to Produce Sufficient Evidence that She was a Qualified Individual.</u>

Having concluded that Ms. Lewis met the first element of her *prima facie* case of disability discrimination on the "regarded as" theory, we turn to the second element, viz., whether there was evidence sufficient to conclude that she was a "qualified individual."

The ADA defines a qualified individual as one who, "with or without reasonable accommodation, can perform the essential functions of the employment

Case: 15-11362 Date Filed: 12/13/2017 Page: 23 of 48

position that such individual holds or desires." 42 U.S.C. § 12111(8). The district court held that Ms. Lewis was not a qualified individual. It did so by adopting the UCPD's position that she could not perform the essential functions of a Union City detective, which, it held, included being exposed to OC spray and a Taser shock. In adopting the UCPD's contention, however, the district court made a factual determination that was inappropriate on summary judgment.

"'Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors.'" *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (quoting *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000)). Courts consider the employer's judgment of whether a particular function is essential, *id.*, and may choose to accord additional weight to such a judgment when the employer is a police department, *cf. Ethridge v. State of Alabama*, 860 F. Supp. 808, 816 (M.D. Ala. 1994). But courts must consider also:

> "any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience of employees in similar jobs."

*Samson v. Fed. Ex. Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(3)(ii)-(vii)). Accordingly, "[a]lthough the employer's judgment is 'entitled to substantial weight in the calculus,' this factor alone is not conclusive."

*Id.* (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1285 (11th Cir. 2007)).

In this case, there is significant evidence that cuts against Union City's contention that exposure to OC spray and Taser shocks are essential functions of the job of police detective. The city's written job description for the position of detective nowhere mentions that it is necessary for a detective either to carry or to be exposed to OC spray or a Taser shock. Indeed, there is no such mention in an entire paragraph listing various "physical demands" of the job. The "work environment" section states that a detective "[m]ust be willing to carry a firearm on and off the job [and be] mentally and physically capable of using deadly force, if justified," but contains no reference to OC spray or Tasers. Further, Ms. Lewis offered evidence that detectives previously were permitted a choice of what nonlethal weapon or weapons to carry. Moreover, neither party disputes the fact that Taser International does not require trainees to receive a shock in order to become certified in Taser use.

In these circumstances, a jury would be justified in concluding that receiving a Taser shock was not an essential function of Ms. Lewis's job, in which case it would follow that she was a "qualified individual."

### 3. Ms. Lewis Met her Prima Facie Burden of Demonstrating that the City Discriminated Against Her Because of Her Perceived Disability.

We turn next to the third element of the *prima facie* case, which requires evidence sufficient to permit the fact finder to conclude that the employee was discriminated against "because of" her disability.[4]

As was demonstrated in the analysis of the first *prima facie* element, built in to the "regarded as" definition of disabled is an analysis of whether the employer subjected the employee "to an action prohibited under this chapter because of an actual or perceived physical or mental impairment." 42 U.S.C. § 12102(3)(A). The evidence tending to prove the "regarded as" definition of disabled therefore

---

[4] In cases where the employee meets either the first or second definitions of "disabled" (that is, that employee shows that he or she is actually disabled or has a history of being actually disabled) on the first *prima facie* element, that employee may meet his or her *prima facie* burden on this third element by showing that the employer does not make reasonable accommodations for the disability. *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) ("An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer."); *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (framing issue on appeal as "whether Defendant discriminated against Plaintiff by failing to provide a reasonable accommodation that would have enabled her to perform either her CSO duties or the essential duties"); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) ("[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."); *see also* 42 U.S.C. § 12112(b)(5)(A). In other words, an employer's failure to provide a reasonable accommodation may be evidence that that employer has discriminated against her "because of" her disability.

Ms. Lewis contended that the UCPD's failure to put her in an administrative role constituted a failure to provide a reasonable accommodation and thus was evidence of discrimination. Given our conclusion that Ms. Lewis has not put forth evidence sufficient to warrant a finding that she is actually disabled, however, we need not address this argument because an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.9(e).

often is duplicative of the evidence relevant to the third *prima facie* element. *See* 29 C.F.R. § Pt. 1630, App. ("While a person must show, for both coverage under the 'regarded as' prong and for ultimate liability, that he or she was subjected to a prohibited action because of an actual or perceived impairment, this showing need only be made once.").[5] Because we hold Ms. Lewis's evidence sufficient to meet her *prima facie* burden on the first element, we therefore hold also that her evidence is sufficient on this element of her *prima facie* case for the same reasons detailed *supra* section II.A.2.

### 4. Plaintiff Has Produced Sufficient Evidence that She is Not a Direct Threat.

The magistrate judge held in a footnote that the city would be entitled to summary judgment under the "direct threat" defense even if Ms. Lewis established her *prima facie* case. *See* 42 U.S.C. § 12113. Specifically, he reasoned that Dr. Harris's letter recommending that Ms. Lewis not be exposed to OC spray or a Taser shock meant that Ms. Lewis's "presence near the use of OC spray and Tasers while in the workplace posed a significant risk of harm to her health." Ms. Lewis

---

[5] Defendants state that the district court did not reach the third element of the *prima facie* case— whether Ms. Lewis was discriminated against because of a disability. The district court, however, did find that there was sufficient evidence that Ms. Lewis was regarded as disabled. Because, as discussed above, the evidence of the third *prima facie* element is duplicative of the evidence needed to show that Lewis was regarded as disabled, the district court did, in fact, resolve this question in Ms. Lewis's favor.

Case: 15-11362   Document: 42   Date Filed: 12/13/2017   Page: 27 of 48

argues on appeal that she poses no direct threat to herself or others and that the court below failed to conduct the requisite individualized assessment.

"Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). Moreover, the "direct threat" defense:

> "must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended."

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)).

Here, we disagree with the district court for one simple reason. The definition of the direct threat defense requires an analysis of the individual's ability to perform safely the "essential functions of the job." 29 C.F.R. § 1630.2(r). As we have held that there is a genuine dispute of material fact on what the essential functions of a UCPD detective are, we certainly cannot resolve the question of whether she can perform those as-yet-undefined essential functions safely.

Case: 15-11362 Document: 42 Date Filed: 12/13/2017 Page: 28 of 48

## C.     Race and Gender Discrimination Claims

Ms. Lewis alleges also sex and race discrimination under Title VII, the Equal Protection Clause, and 42 U.S.C. § 1981.[6]  The legal elements under any of these frameworks are identical. "To make out a *prima facie* case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see also Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical.").

### 1.  Similarly Situated Comparators

Defendants concede for purposes of this appeal that Ms. Lewis made out the first three elements of a *prima facie* case.  They dispute only the fourth element of the *prima facie* case, viz., whether other similarly situated employees were treated more favorably.[7]

---

[6] The Equal Protection and § 1981 claims are brought pursuant to 42 U.S.C. § 1983.

[7] In proceedings before the district court, Union City disputed the second element also. However, the district court noted correctly that the city had overlooked the distinction between

"To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff in all relevant respects." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

Ms. Lewis's two proposed comparators are Sergeant McClure and Officer Heard, both white men. They, like Ms. Lewis, were unable to meet UCPD-imposed physical requirements—Sergeant McClure failed a balance test and Officer Heard failed an agility test. Both, like Ms. Lewis, were placed on administrative leave to give them time to resolve these physical limitations and meet the department's requirements. Yet McClure was allowed 90 days of administrative leave and Heard 449—both significantly longer than Ms. Lewis's 22 days.

The magistrate judge held that McClure and Heard were not appropriate comparators for two principal reasons. He held that one key dissimilarity was that Ms. Lewis, "pursuant to her physician's recommendations, could not work with other officers who carried OC spray and Tasers without serious risk of harm." This distinction is not so indisputably well founded, however, as to warrant the

---

"qualified individual" in the disability discrimination versus race/gender discrimination contexts. In the race/gender discrimination, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987). Appellants appear to have conceded this point on appeal.

rejection of the comparators as a matter of law on a summary judgment motion, even if it might prove persuasive at trial. Dr. Harris's letter to the UCPD made no mention of Ms. Lewis being at risk from her mere presence around other officers carrying those weapons.[8] And her deposition testimony, even if it properly were read as supporting a view that Ms. Lewis would be at risk from accidental exposure,[9] is entirely irrelevant here for the simple reason that the deposition took place long after Ms. Lewis was terminated. It thus could have played no role in defendants' decision to put her on leave and terminate her.

The magistrate judge held also—and defendants rely heavily on this distinction in this Court—that Heard and McClure were not appropriate comparators because they failed physical fitness tests, not weapons certification tests. The magistrate reasoned that "[a]n officer's exposure to a Taser shock and OC spray was required by Union City to obtain the necessary certifications, and

---

[8] Defendants assert that the language in Dr. Harris's letter that states Ms. Lewis "should not have a Taser used on her secondary to previous cardiac history" supported a conclusion that Ms. Lewis was at risk from accidental exposure. The letter, however, is entirely silent with respect to accidental exposure. It was directed solely at the issue of whether Ms. Lewis should participate in Taser and OC spray *training*, urging the department to take Dr. Harris's recommendation "into consideration when making any decisions about occupational training." A jury might find at trial that the UCPD reasonably interpreted Dr. Harris's letter to imply that Ms. Lewis would be in danger from accidental exposure, but such a factual conclusion is not permissible on summary judgment.

[9] Specifically, Dr. Harris was asked whether there would be any risk to Ms. Lewis if a Taser was used near, but not on, her. Dr. Harris answered, "I don't think so." Dr. Harris did answer "yes" when asked further whether "if there was some electrical current residual even, would your recommendation also be that she not use it as well?" This bare testimony, however, cannot support a conclusion on summary judgment that Ms. Lewis was in danger from an accidental discharge.

Case: 15-11362  Document: 42  Date Filed: 12/13/2017  Page: 31 of 48

Plaintiff did not become certified to carry these weapons. In contrast, there is no evidence . . . that McClure and Heard were not certified to carry a Taser, OC spray, or any other weapon." Defendants argue also that the fitness policy was instituted after Ms. Lewis's termination and thus cannot properly be compared to the policy under which Ms. Lewis was put on leave.

This reasoning misses the mark. The test for whether comparators are appropriately considered is whether they are similarly situated in all *relevant* respects. The focus on the receipt or non-receipt of the Taser and OC certifications *per se* was inappropriate. It fails to recognize that a jury would have been entitled to conclude that the certifications are not what was important. The certifications simply would have been evidence that Ms. Lewis was physically able safely to carry and use a Taser or pepper spray. Carrying and using those implements were physical requirements that the UCPD claims were essential functions of her job— just as proper balance and sufficient agility were physical requirements that the UCPD regarded as essential functions of the jobs of McClure and Heard. In other words, the evidence was sufficient to permit the conclusions that (1) three officers—two white men and one African-American woman—each were required to possess a physical ability said to be essential to the performance of his or her job, (2) each either failed a test as to whether the officer possessed the respective physical ability or failed to provide a certificate evidencing the possession of the

Case: 15-11362 Document: 42 Date Filed: 12/13/2017 Page: 92 of 48

relevant physical ability, and (3) the two white men then were treated far more favorably than this African-American woman in that both white men were given extended periods of time to attempt to demonstrate the physical ability but the African-American woman was fired without warning. Even assuming that the physical fitness requirements that the two white men failed were in a fitness policy, as to which the evidence below at best raised an issue of fact,[10] and the Taser-OC requirement was in another piece of paper or departmental policy, that would be entirely immaterial.

In this Court, defendants argue also that Officer Heard is not an appropriate comparator because, unlike Ms. Lewis, he filed an EEOC charge during his 90-day administrative leave period. But this is unpersuasive. Officer Heard failed his physical fitness test on or around February 14, 2013. But he did not file his EEOC charge until the very end of the 90-day leave period. The UCPD was not advised until May 24, 2013, that he had filed an EEOC charge. Thus, Officer Heard had

---

[10] Defendants rely solely on the supplemental declaration of Chief Odom, which purports to attach a copy of the physical fitness policy. In fact, however, the only exhibit attached to that declaration is the department's 2010 Taser standard operating procedure. Thus, defendants' attempt to differentiate this alleged fitness policy—and indeed, defendants' attempt to prove its existence at all—from the policy that applied to Ms. Lewis is based solely on Chief Odom's assertion. But Officer Heard's declaration makes no mention of a physical fitness policy. Sergeant McClure testified that his leave was pursuant to an "administrative action," not a "leave of absence," based on some unspecified "police SOP," but offered no more than that. And Tracie McCord testified that she was not sure what leave policy applied to McClure, but when asked whether it was the same as that applied to Ms. Lewis, answered "I would assume so." The Court therefore cannot conclude from this record as a matter of law even that the alleged fitness policy existed, much less that it was the basis of the action with respect to McClure and Heard.

been accorded over two months more leave than Ms. Lewis was even before he took legal action.

We acknowledge that the question whether Ms. Lewis has adduced sufficient evidence to demonstrate that Officer Heard and Sergeant McClure are similarly situated comparators is a close call. Much depends, of course, on the definition of what characteristics are "relevant." *Compare Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997) (proposed comparator who had similar complaints against him but who, unlike plaintiff, had maintained full workload not similarly situated), *with Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) (jury question whether violation of company policy for alcohol was similar to violation for absenteeism), *and Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 262 (5th Cir. 2009) (railroad employees similarly situated who had "compiled a similar number of serious moving violations over a similar period of time," and noting that distinctions put forward by railroad "might very well prove to be relevant" to whether railroad had legitimate, nondiscriminatory reason for differing treatment, but did not defeat *prima facie* case). We conclude, however, that there was a genuine issue of material fact as to whether Heard and/or McClure are appropriate comparators.[11] But we do not rely on this alone, as pointing to similarly situated

---

[11] This Circuit often has applied or referred to a "nearly identical" standard to determine whether proposed comparators are similarly situated. *See, e.g.*, *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1340 (11th Cir. 2015). In the majority of those cases, however, this standard was

comparators is but one way of raising an inference of discrimination.  Regardless

of whether McClure and Heard correctly were ruled out as appropriate comparators

---

applied to answer the narrow question of whether workplace *misconduct* by proposed
comparators of different races or genders, but for which they were treated more leniently than a
plaintiff, was sufficiently similar to the plaintiff's misconduct to give rise to an inference of
discrimination.  *E.g.*, *id.*  ("In order to use comparators to support an inference of race
discrimination in the context of workplace discipline, a plaintiff must show that the comparators'
alleged misconduct is nearly identical to the plaintiff's in order to prevent courts from second-
guessing employers' reasonable decisions and confusing apples with oranges." (quotations
omitted)); *see also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1341 n.73 (11th Cir. 2011);
*McCann v. Tillman*, 526 F.3d 1370, 1374 (11th Cir. 2008); *Rioux v. City of Atlanta, Ga.*, 520
F.3d 1269, 1280 (11th Cir. 2008); *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th
Cir. 2006); *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001); *Maniccia v.
Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Jones v. Gerwens*, 874 F.2d 1534, 1537 (11th Cir.
1989); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984).  One case
cited the language, but did not employ it because the plaintiff offered no evidence of comparators
whatsoever.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091-92 (11th Cir. 2004).  Other
cases questioned whether "nearly identical" was too rigid a test for whether proposed
comparators' misconduct was sufficiently similar to the plaintiffs'.  *Knight v. Baptist Hosp. of
Miami, Inc.*, 330 F.3d 1313, 1316 n.2 (11th Cir. 2003); *Maynard v. Bd. of Regents of Div. of
Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1290 (11th Cir. 2003);
*Anderson v. WBMG-42*, 253 F.3d 561, 565 (11th Cir. 2001); *Alexander v. Fulton Cty., Ga.*, 207
F.3d 1303, 1334 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304
(11th Cir. 2003).

Two recent cases that did not involve disparate treatment of workplace misconduct have used the
"nearly identical" standard.  *See Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1192
(11th Cir. 2016); *Slater v. U.S. Steel Corp.*, 820 F.3d 1193, 1196 n.3 (11th Cir. 2016), *vacated on
other grounds to be reheard en banc*.  But a review of those decisions and the parties' briefs
reveals that the issue whether the "nearly identical" standard should apply beyond the realm of
workplace misconduct was not litigated.  Accordingly, the references in those cases to the
"nearly identical" standard, to any extent the cases went beyond disparate treatment for
workplace misconduct, "were mere dicta."  *See In re MDL–1824 Tri–State Water Rights Litig.*,
644 F.3d 1160, 1189 n. 21 (11th Cir. 2011).  Thus, the "nearly identical" test was tailored
specifically to determine whether the misconduct committed by proposed comparators were
sufficiently comparable to those committed by plaintiffs in discrimination cases.  *E.g.*, *Maniccia*,
171 F.3d at 1368 ("We require that the quantity and quality of the comparator's misconduct be
nearly identical . . . .").  Accordingly, the "nearly identical" test does not apply in this case.  As
noted, however, the result here does not depend on this conclusion.

as a matter of law, we hold that Ms. Lewis has adduced evidence sufficient to survive summary judgment on an additional basis.

### 2. Mosaic of Circumstantial Evidence

"[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Even without similarly situated comparators, "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*.

This, of course, is perfectly logical. Not every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator. Among other things, a proper comparator simply may not exist in every work place. Accordingly, a "plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011), *overruled by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) (footnote omitted)). A "convincing

Case: 15-11362    Document: 42    Date Filed: 12/13/2017    Page: 36 of 48

mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. *Silverman*, 637 F.3d at 733-34 (quotations omitted).

Here, Ms. Lewis has presented a mosaic of circumstantial evidence that raises a genuine issue of material fact.

As an initial matter, Ms. Lewis has presented evidence from which a jury would be entitled to conclude that the city's actions in regards to Ms. Lewis were extraordinarily arbitrary in at least three ways. *First*, the UCPD initiated Ms. Lewis's indefinite administrative leave on June 17 and informed her on July 1 that she would not be permitted to return to work until she was medically cleared. Yet a week later, and despite Ms. Lewis's request to return to work and Chief Brown's explicit denial of that request, the UCPD terminated her for being absent without leave. *Second*, the UCPD gave no warning that if Ms. Lewis exercised the option to use her accrued leave in lieu of being on unpaid status, she would be terminated upon exhausting her accrued leave instead of simply reverting to unpaid administrative leave status. *Third*, the UCPD gave Ms. Lewis no notice that she had to file FMLA paperwork by any specific date, nor did the department's written FMLA policy provide any such deadline. She informed the department on two

occasions that her doctor was on vacation until July 7, but that she had an appointment scheduled for that day. At no time was she told that she would be terminated if her doctor failed to contact the department on the very first day she returned from vacation. From all this evidence, a jury could conclude that the UCPD was searching for a policy to fit its desire to terminate Ms. Lewis rather than neutrally enforcing an existing policy.

There is evidence also that suggests that the department believed either that Lewis was faking her medical condition or that her condition was not sufficiently serious to prevent her from working as a detective. The initial letter placing Ms. Lewis on leave went to great lengths to stress that she had been cleared for full duty without restrictions after her heart attack and to emphasize that the letter disclosing her chronic conditions came as a surprise. Chief Odom testified that he was caught off guard by Dr. Harris's June 17 letter. And Dr. Harris testified also that Assistant Chief Brown made clear to her in the July 8 telephone conversation that he thought Dr. Harris's letter was more a product of Ms. Lewis's influence than Dr. Harris's unbiased medical judgment. In fact, in his deposition, Assistant Chief Brown evidenced his disbelief of Ms. Lewis's assertion that Dr. Harris was on vacation for the week leading up to her termination suggesting that he doubted her truthfulness more generally. At the same time, however, at least two of Chief Brown's letters indicated a belief that Ms. Lewis's doctor ultimately would clear

Case: 15-11362    Document: 42    Date Filed: 12/13/2017    Page: 38 of 48

her for duty and that the medical condition would not, in the department's view, permanently prevent Ms. Lewis from doing her job as a detective. This inconsistency in the department's view of the nature and severity of Ms. Lewis's condition could be interpreted as evidence that the medical condition was a pretext for Ms. Lewis's termination.

Lastly, even if Officer Heard and Sergeant McClure do not meet the strict definition of similarly situated comparators, the evidence of their treatment in the face of physical limitations on their ability to perform as police officers is not irrelevant. To the contrary, a jury reasonably could interpret the evidence of their significantly more lenient treatment—particularly the 449 days accorded to Heard—as circumstantial evidence that the UCPD treats white men more favorably than black women.

Of course, there are many conclusions a jury could reach based on the evidence presented, not all of which would support a finding of discrimination. We conclude, however, that the differing treatment of Ms. Lewis's white colleagues, in combination with the rest of the evidence, is part of a mosaic of circumstantial evidence sufficient to create a triable issue of material fact on whether the UCPD's actions were discriminatory on the basis of race and/or gender.

### D. Municipal Liability Under Section 1983

Ms. Lewis argues that Union City is liable under section 1981 for Odom's discriminatory actions because Odom was the final decision-maker.[12]

A municipality may not be held liable for the torts of its employees on a *respondeat superior* theory. *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)). "Instead, municipalities may only be held liable for the execution of a governmental policy or custom." *Id.* The Supreme Court has clarified that "'municipal liability may be imposed for a single decision by municipal *policymakers* under appropriate circumstances.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). However, we have repeatedly recognized that "a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Id.*

Where review of a municipal official's employment decision does exist, a plaintiff can attempt to show that the review was not meaningful, but rather "'serve[s] as the conduit of the subordinate's improper motive'" by "'rubber-stamp[ing] the recommendation of a subordinate.'" *Quinn v. Monroe Cty.*, 330

---

[12] This theory of municipal liability applies only to the claims under § 1983, not those under Title VII. As this court has recognized, "the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly," *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991), as Ms. Lewis has done here.

Case: 15-11362  Document: 42  Date Filed: 12/18/2017  Page: 40 of 48

F.3d 1320, 1326 (11th Cir. 2003) (quoting *Hitt v. Connell*, 301 F.3d 240, 248 (5th Cir. 2002)); *see also Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997)). However, where there is an opportunity for the plaintiff to appeal an official's decision to a reviewing board, such review is generally sufficient to find that the official was not the final policymaker. *See Scala*, 116 F.3d at 1403 (finding meaningful review where "there is no evidence . . . that the Board's decision approved any improper motive that Barrett or Younger may have had"); *Quinn*, 330 F.3d at 1326 (finding meaningful review where "the Council afforded her a full adversarial and evidentiary hearing" and both parties were represented by counsel); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1293 (11th Cir. 2004) (finding no meaningful review despite "appellate process that was theoretically available on paper" because plaintiff "as a practical matter [could not] take advantage of it").

Ms. Lewis argues that Chief Odom should be considered the final policymaker because the review of the termination decision by Steve Rapson, city manager, was not meaningful. She argues that Mr. Rapson failed to investigate properly whether Lewis still had any unused sick or vacation leave at the time she was terminated and that no evidence was presented to Mr. Rapson about Ms. Lewis's ability to be exposed to OC spray. Whether a fuller investigation by Mr. Rapson would have been proper or desirable is immaterial, however. There is no

requirement that the administrative review be ideal, simply that it be a meaningful layer of review of an official's decision. Mr. Rapson conducted a hearing and heard from Ms. Lewis, who was represented by counsel in the proceeding. Ms. Lewis has not offered any facts to suggest that Mr. Rapson was a mere rubber stamp or that he approved any improper motive.

## IV. CONCLUSION

In the last analysis, the evidence before the district court properly might have yielded any of a number of conclusions. Perhaps Ms. Lewis was terminated simply because the UCPD regarded her as disabled, thus violating the ADA. Perhaps she was terminated because it concluded, rightly or wrongly, that Ms. Lewis was shirking to avoid the Taser shock and had enlisted her doctor to provide unwarranted support in attaining that goal. Perhaps her fate—which a jury might find was the result of disparate application of Union City's leave policies as between Ms. Lewis and white male officers who were sufficiently comparable to Ms. Lewis in all material respects save race and gender—was a product of, or influenced by, race and/or gender. Perhaps her termination was the product of an amalgam of such considerations. At bottom, however, the ultimate decision in this case is for a properly instructed jury that has seen the witnesses and heard all of the evidence.

Case: 15-11362 Document: 42 Date Filed: 12/13/2017 Page: 42 of 48

The judgment appealed from is AFFIRMED to the extent it dismissed the Section 1981 and Equal Protection claims against the City of Union City and against Chief Odom,[13] REVERSED in all other respects, and REMANDED for further proceedings consistent with this opinion.

---

[13] Although Ms. Lewis's Notice of Appeal stated that she appealed from the judgment dismissing her claims in their entirety, in this Court she failed to address the district court's grant of qualified immunity to Chief Odom in her opening brief.  She therefore has waived this claim. *E.g.*, *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1307 (11th Cir. 2012); *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004); *see also* FED. R. APP. P. 28(a)(5).

TJOFLAT, Circuit Judge, dissenting:

I agree with the majority that the dismissal of Lewis's § 1983 and equal protection claims against Union City and against Chief Odom should be affirmed. We part ways after that.

## I.

Lewis fails to show a genuine dispute of material fact as to whether she was "regarded as" disabled under the ADA. To be "regarded as" disabled, Lewis must show that "she has been subjected to a[] [prohibited] action . . . *because of* an actual or perceived physical or mental impairment." 42 U.S.C. § 12102(3)(A) (emphasis added). Lewis was placed on administrative leave because Dr. Harris recommended that Tasers and OC spray not be used on "or near" Lewis. The Union City Police Department required all officers to carry Tasers, and officers routinely carried OC spray into the office. Lewis's mere presence at work put her at risk. Whether that fact derived from her heart condition is irrelevant: she could not be at work, so she was placed on leave. She was then terminated because she was out of leave, had not submitted FMLA paper work requesting additional leave, and had not provided any information from her doctor indicating she could return to work. Although the trier of fact is not required to accept the Defendants' proffered reasons, the Plaintiff *is* required to put forth evidence countering them and allowing a jury to reasonably conclude she was fired *because* she was regarded

as disabled.  *See Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191

(11th Cir. 2016).  Lewis has not done so.

Lewis must also show she is a "qualified individual" who can perform the

"essential functions" of her job to succeed on her ADA claim.  42 U.S.C.

§ 12111(8).  I agree with the majority that whether receiving a Taser shock is an

essential function of being a detective is a question for the jury.  But surely Lewis

would at least have to be medically able to be *around* Tasers and OC spray.  The

position of Police Department Detective requires working with other officers who

carry and use such weapons.  OC spray is an aerosol that can affect anyone in its

vicinity; an inadvertent discharge in the Police Department building might affect

everyone present.  Taser shocks can endanger many others beside the intended

recipient.  No reasonable jury could find that a detective who cannot risk exposure

to OC spray and Tasers could satisfy the essential functions of her job.[1]

Thus, whether stated as failing to prove she was fired *because* she was

regarded as disabled, or as failing to prove she could perform the essential

functions of her job, Lewis failed to meet her burden.  Lewis has not shown that

the Police Department fired her because it regarded her as disabled.

---

[1] At least not without a reasonable accommodation of transfer to another position, which Lewis has failed to put forth.

44

II.

Likewise, under Title VII, Lewis has not put forth sufficient evidence for a
jury to reasonably conclude the Union County Police Department discriminated
against her because of her race or gender.  First, she has failed to offer comparators
who are similarly situated such that their disparate treatment could support an
inference of discrimination.  Lewis must show that she and her comparators "are
similarly situated in all relevant aspects."  *Holifield v. Reno*, 115 F.3d 1555, 1562
(11th Cir. 1997).  She must show that the activity in which her comparators were
involved and the consequences that resulted are "nearly identical to the plaintiff's
in order to prevent courts from second-guessing employers' reasonable decisions
and confusing apples with oranges."  *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803
F.3d 1327, 1341 (11th Cir. 2015) (quoting *Silvera v. Orange Cty. Sch. Bd.*, 244
F.3d 1253, 1259 (11th Cir. 2001) (quotation marks omitted)).  "Though the
comparators need not be the plaintiff's dopplegangers, the 'nearly identical'
standard requires much more than a showing of surface-level resemblance."[2]  *Id.*

---

[2] The Court here argues that the nearly identical test does not apply because in "the majority" of
cases where this Court uses the standard, it has been applied to answer the supposedly "narrow
question" of whether "workplace *misconduct*" by proposed comparators of different races or
genders, for which they were treated more leniently than the plaintiff, was sufficiently similar to
the plaintiff's misconduct to support an inference of discrimination.  *Ante*, at 34, n.11.  Two
points, at least.  First, continuing to stay out on leave one knows one is no longer entitled to,
without properly notifying one's employer, sure seems like "misconduct."  Second, the majority
admits "[t]wo recent cases that did not involve disparate treatment of workplace misconduct
have used" the nearly identical standard, while failing to cite any precedent indicating that
standard is confined to that circumstance.  *See Id.*  The majority nevertheless concludes that the

Lewis's proposed comparators, Sergeant McClure and Officer Heard, fall far short of this standard. Indeed, the *only* ways in which they are similar to Lewis are that all three failed to meet some sort of requirement, and all three were placed on administrative leave.

The similarities stop there. McClure and Heard failed to meet *physical fitness* requirements, while Lewis failed to meet a *training* requirement. These two sets of requirements have different purposes, and thus are governed by different sets of policies.[3] It is the Police Department's prerogative to decide how best to remedy deficiencies in each set.[4] Holding that McClure and Heard are sufficiently comparable to Lewis such that she can escape summary judgment would do away with our "nearly identical" standard.

---

nearly identical test "was tailored specifically to determine whether" misconduct by proposed comparators was sufficiently comparable to that of plaintiffs. *Id.* I fail to see a foundation on which this conclusion rests.

[3] McClure and Heard were placed on administrative leave under a physical fitness policy that expressly provided for 90 days of unpaid leave for failing a fitness test. In contrast, Lewis was placed on administrative leave because her doctor recommended that weapons she was to be certified to carry as part of her training could not be used "on or near her." Under this separate policy, she was expressly instructed to apply for FMLA leave and that she could use her other leave "until . . . expended." Lewis was then terminated after exhausting her other leave and failing to apply for FMLA leave.

[4] Note here, in addition to our reticence to substitute the Court's judgment for that of employers, the "special need for deference to the employment decisions of those responsible for ensuring public safety," across many contexts. *See, e.g., Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999); *Juchenreuther v. City of Milwaukee*, 221 F. 3d 967, 974 (7th Cir. 2000); *Etheridge v. Alabama*, 860 F. Supp. 808, 816 (M.D. Ala. 1994); *Robert v. Carter*, 819 F. Supp. 2d 832, 844–45 (S.D. Ind. 2011).

Lewis has also failed to show a "convincing mosaic of circumstantial evidence that would allow a jury to infer *intentional discrimination*." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (emphasis added) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). The majority finds evidence from which the jury could infer the Police Department was "arbitrary" and "inconsisten[t]" in its actions toward Lewis, that its averred reasons for terminating her were false, and that it treated other employees differently. *Ante*, at 38–41. I agree. Lewis may have put forth a mosaic of circumstantial evidence that would allow a jury to infer *something*. But there is no evidence that something would be *intentional discrimination*.

There could be any number of reasons[5] that the Police Department treated Lewis the way it did—she could have been personally disliked, the Police Department may have believed that she was malingering, or perhaps she and Chief Odom were fans of rival basketball teams. "Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges." *Flowers*, 803 F.3d at 1338. The only evidence Lewis offers "that even touches on" her race or gender is the fact that her proposed comparators—whose situations are dissimilar in degree and kind—are of a different race and gender. *See id.* Lewis

---

[5] As the majority puts it: "there are many conclusions a jury could reach based on the evidence presented . . . which would [not] support a finding of discrimination." *Ante*, at 41.

Case: 15-11362   Document: 42   Date Filed: 12/13/2017   Page: 48 of 48

has the burden of persuasion, yet the evidence she puts forward, without more, simply does not "suggest a causal connection between" her race or gender and her treatment by the Police Department.  *See id.*  Lewis has not put forth a convincing mosaic of circumstantial evidence that would tend to show that the Police Department intentionally discriminated against her based on her race or gender. Her claim thus cannot survive summary judgment.

      For these reasons, I respectfully dissent.