_____

## CASE NO. No. 15-11362
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

## JACQUELINE LEWIS,

Plaintiff-Appellant

## v.

## CITY OF UNION CITY, GEORGIA, CHIEF OF POLICE CHARLES ODOM, in his official and individual capacities,

Defendants-Appellees.
_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION
## CASE NO. 1:12-cv-04038-RWS
_____

## DEFENDANTS-APPELLEES' PETITION FOR
## REHEARING *EN BANC*
_____

*Respectfully Submitted by Attorneys for Appellees:*

Sharon P. Morgan, Georgia Bar No. 522955
Tracy L. Glanton, Georgia Bar No. 415008
ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
(404) 659-6700 (Telephone)
(404) 222-9718 (Facsimile)

Case No. 15-11362

*Lewis v. City of Union City*

## <u>APPELLEES' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the <u>Federal Rules of Appellate Procedure</u> and 11th Cir R. 26.1-2(c), the undersigned counsel of record for Defendants-Appellees hereby certifies that the following persons or entities may have an interest in the outcome of this case:

1. Buckley Beal, LLP, Attorneys for Plaintiff-Appellant;

2. Chichester, Paulding IV, Attorney for Plaintiff-Appellant;

3. City of Union City, Georgia, Defendant-Appellee;

4. Elarbee Thompson, Sapp & Wilson, LLP, Attorneys for Defendants-Appellees;

5. Glanton, Tracy L., Attorney for Defendants-Appellees;

6. King, Hon. Janet F., United States Magistrate Judge;

7. Legare, Attwood & Wolfe, LLC, Attorneys for Plaintiff-Appellant;

8. Legare, Cheryl, Attorney for Plaintiff-Appellant;

9. Lewis, Jacqueline, Plaintiff-Appellant;

10. Morgan, Sharon P., Attorney for Defendants-Appellees;

11. Odom, Charles, Defendant-Appellee;

12. Story, Hon. Richard W., United States District Judge;

13. Sutherland, Brian J., Attorney for Plaintiff-Appellant;

Case No. 15-11362
*Lewis v. City of Union City*

14.    The Buckley Law Firm, LLC, Attorneys for Plaintiff-Appellant;

15.    The Georgia Interlocal Risk Management Agency ("GIRMA"), an identifiable legal entity with a potential interest in the outcome of this appeal.  GIRMA is a statutory association of municipalities and other local government organizations, including City of Union City, formed to establish a group self-insurance fund to pool the risks of general liability.  <u>See</u> O.C.G.A. § 36-85-1, <u>et seq.</u>

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned certifies that there are no corporate entities that require disclosure pursuant to Federal Rule of Appellate Procedure 26.1 or 11th Cir. R. 26.1.

Respectfully submitted, this 5th day of September, 2019.

s/ Sharon P. Morgan
Sharon P. Morgan
Georgia Bar No. 522955
morgan@elarbeethompson.com
Tracy L. Glanton
Georgia Bar No. 415008
glanton@elarbeethompson.com

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718
Attorneys for Defendants-Appellees

## STATEMENT OF COUNSEL REGARDING EN BANC CONSIDERATION

**1.      I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324 (1977); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *Young v. UPS*, 135 S. Ct. 1338 (2015); *Lewis v. City of Union City*, *Ga.*, 918 F.3d 1213 (11th Cir. 2019) (en banc); *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327 (11th Cir. 2015); and *Smith v. Lockheed- Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).

**2.      I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance:**  Whether Plaintiff's appeal of her termination to the City Manager broke the link of causation to the police department's alleged discriminatory decision to terminate Plaintiff under the Americans with Disabilities Act's ("ADA") "but for" causation standard.  In the context of analyzing Plaintiff's Title VII claim, the majority found that "the [police] department made the decision to terminate [Plaintiff]" and Plaintiff's "pursuit of an administrative appeal of the

department's decision did not break the link of causation to the department's decision to terminate her." (Panel Opinion ("Op.") 40-41.) The causation standard under Title VII, which requires a showing that discriminatory animus was a "motivating factor" in the employment decision, is different from the causation standard under the ADA, which requires a showing that discriminatory animus was the "but for" cause of the employment decision. *See Sims v. MVM*, *Inc.*, 704 F.3d 1327 (11th Cir. 2013) (holding that under the Age Discrimination in Employment Act's "but for" causation standard, the alleged discriminatory animus of someone other than the ultimate decisionmaker must be the "but for" cause of, or a determinative influence on the "ultimate decision"); *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996) (applying "but for" standard to ADA claims); *Duckworth v. Pilgrim's Pride Corp.*, 764 F. App'x 850, 853 (11th Cir. 2019) ("An employer who fires a qualified employee with a disability violates the ADA if the employer would not have fired the employee but for his disability."). In light of this distinction, review of the panel decision is necessary to clarify the relevant decisionmaker for purposes of Plaintiff's ADA claim.

**3.     I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance:** Under this Circuit's precedent, a plaintiff maintains the burden of establishing that he or she is a "qualified individual" under the ADA, which

requires a showing that the plaintiff can perform the essential functions of his or her job without risk of serious physical harm to oneself or others. *See LaChance v. Duffy's Draft House*, 146 F.3d 832 (11th Cir. 1998) (ADA); *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275 (11th Cir. 2001) (ADA); *see Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) (Rehabilitation Act); *Dickerson v. Sec'y, Dep't of Veterans Affairs Agency*, 489 F. App'x 358 (11th Cir. 2012) (Rehabilitation Act); *Cash v. Smith*, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000) ("[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa."). Here, the panel failed to consider *all* of the essential functions of a police detective in its analysis of whether Plaintiff is a "qualified individual" under the ADA in contradiction of Eleventh Circuit precedent, which has resulted in an incomplete analysis and potentially improper remand for trial.

[Signature Follows]

Respectfully submitted, this 5th day of September, 2019.

s/ Sharon P. Morgan
Sharon P. Morgan
Georgia Bar No. 522955
Tracy L. Glanton
Georgia Bar No. 415008

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718
morgan@elarbeethompson.com
glanton@elarbeethompson.com

Attorneys for Defendants-Appellees

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

**APPELLEES' CERTIFICATE OF INTERESTED PERSONS AND**

 **CORPORATE DISCLOSURE STATEMENT ............................ C-1, C-2**

**STATEMENT OF COUNSEL REGARDING**

 **EN BANC CONSIDERATION ....................................................................i**

**TABLE OF CONTENTS ....................................................................v**

**TABLE OF AUTHORITIES ............................................................. viii**

**I. STATEMENT OF THE ISSUES ASSERTED TO MERIT EN BANC**

 **CONSIDERATION ........................................................................1**

**II. STATEMENT OF THE COURSE OF PROCEEDINGS AND**

 **DISPOSITION OF THE CASE ....................................................2**

**III. STATEMENT OF FACTS NECESSARY TO ARGUMENT**

 **OF THE ISSUES........................................................................3**

**IV. ARGUMENT AND AUTHORITIES .........................................5**

 **A. The panel's application of the "convincing mosaic" theory of**

  **liability under Title VII is contrary to established precedent.........5**

      1.    *Supreme Court precedent requires a Title VII plaintiff to carry the initial burden of creating an inference of unlawful discrimination.* ....................................................... **5**

      2.    *The panel's finding that Plaintiff established a "convincing mosaic" of circumstantial evidence under Title VII using the same comparator evidence that this Court held was legally insufficient to create an inference of unlawful discrimination under the "similarly situated" theory of liability is contrary to binding precedent* ................................................................ **8**

  B.    **Review of the panel opinion is necessary to clarify the relevant decisionmaker under the ADA's "but for" causation standard based on Plaintiff's appeal of her termination to the City Manager.** .................................................................**11**

  C.    **The panel's failure to consider all of the essential functions of Plaintiff's position in analyzing whether Plaintiff is a "qualified individual" under the ADA contradicts established precedent** ..........................................................................**14**

**V.**    **CONCLUSION** ..........................................................................**16**

**COPY OF OPINION SOUGHT TO BE REHEARD**

# TABLE OF AUTHORITIES

## Cases

Brooks v. Cty. Comm'n of Jefferson Cnty., Ala.,
446 F.3d 1160 (11th Cir. 2006) ....................................................................9

Cash v. Smith, 231 F.3d 1301 (11th Cir. 2000)..................................................iii, 15

Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249 (2012)............................11

Dickerson v. Sec'y, Dep't of Veterans Affairs Agency,

489 F. App'x 358 (11th Cir. 2012)...........................................................iii, 15

Duckworth v. Pilgrim's Pride Corp., 764 F. App'x 850 (11th Cir. 2019)...........ii, 12

Fitzpatrick v. City of Atlanta, 2 F.3d 1112 (11th Cir. 1993)...............................iii, 15

Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327 (11th Cir. 2015) ...............i, 9

Furnco Constr. Corp. v. Waters, 438 U.S. 567 (1978) ...........................................i, 6

Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316 (11th Cir. 2012).........10

Int'l Broth. of Teamsters v. U.S., 431 U.S. 324 (1977).........................................i, 6

King v. Ferguson Enters., 568 F. App'x 686 (11th Cir. 2014)..................................9

LaChance v. Duffy's Draft House, 146 F.3d 832 (11th Cir. 1998) ....................iii, 14

Lewis v. City of Union City, Ga., 918 F.3d 1213 (11th Cir. 2019)............i, 1, 6, 7, 8

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ....................i, 1, 3, 5, 6, 9

McNely v. Ocala Star-Banner Corp., 99 F.3d 1068 (11th Cir. 1996) ................ii, 12

Price Waterhouse v. Hopkins, 490 U.S. 229 (1989)...............................................10

Reeves v. Sanderson Plumbing Prods., 530 U.S. 133 (2000)....................................7

Silverman v. Bd. of Educ., 637 F.3d 729 (7th Cir. 2011)...........................................6

Sims v. MVM, Inc., 704 F.3d 1327 (11th Cir. 2013) ...........................................ii, 12

Smith v. Lockheed-Martin Corp., 644 F.3d 1321 (11th Cir. 2011)............i, 6, 10, 11

Steger v. General Elec. Co., 318 F.3d 1066 (11th Cir. 2003)..................................10

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)........................i, 6, 7

Waddell v. Valley Forge Dental Assocs., 276 F.3d 1275 (11th Cir. 2001) .......iii, 15

Young v. UPS, 135 S. Ct. 1338 (2015)................................................................i, 5

## Statutes

29 U.S.C. 621 ("ADEA") ........................................................................................12

29 U.S.C. § 794(a) ("Rehabilitation Act")..........................................................iii, 15

42 U.S.C. § 1981 ....................................................................................................2, 3

42 U.S.C. § 1983 ......................................................................................................13

42 U.S.C. § 2000e ("Title VII").............................................. i, ii, 1-3, 5-6, 8, 11-12

42 U.S.C. § 12101 ("ADA") ......................................................... i, ii, iii, 1-3, 11-15

42 U.S.C. § 12111(8) ("ADA") ...............................................................................14

## I.    STATEMENT OF THE ISSUES ASSERTED TO MERIT EN BANC CONSIDERATION

1.    Whether the *same* comparator evidence that the *en banc* Court held was legally insufficient to establish an inference of discriminatory treatment under Title VII's "similarly situated" theory of liability in *Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019), is nevertheless admissible and sufficient to create an inference of discriminatory treatment under the "convincing mosaic" theory of liability, in the absence of any other evidence of discriminatory animus by the relevant decisionmaker(s).

2.    In analyzing whether Plaintiff has established a "convincing mosaic" of unlawful discrimination, whether the panel's consideration of the City's asserted reasons for Plaintiff's termination – which do not touch upon Plaintiff's race or gender – is contrary to Supreme Court and Eleventh Circuit precedent.

3.    Whether the "convincing mosaic" test is an alternative method for establishing a prima facie case of discriminatory treatment under the *McDonnell Douglas* burden-shifting analysis, or whether it is a separate test entirely.

4.    Whether, under the ADA's "but for" causation standard, Plaintiff's appeal of her termination to the City Manager broke the causal link between the department's alleged discriminatory termination decision and the City Manager's ultimate decision to terminate Plaintiff's employment.

-1-

5.    Whether the panel's failure to consider all of the essential functions of Plaintiff's position in its analysis of whether Plaintiff is a "qualified individual" under the ADA is in contradiction of Eleventh Circuit precedent.

## II.    STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

Plaintiff Jacqueline Lewis, a former Union City police detective, commenced this action on November 19, 2012 against the City and former Chief of Police, Charles Odom, in his official and individual capacities, alleging claims for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and race and gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the Equal Protection Clause of the Fourteenth Amendment.  (Doc. 1.) Defendants filed a Motion for Summary Judgment on May 19, 2014.  (Doc. 59.) On November 26, 2014, Magistrate Judge Janet F. King issued a Final Report and Recommendation (R&R), recommending that summary judgment be granted to Defendants on each of Plaintiff's claims.  (Doc. 84.)  On March 17, 2015, District Judge Richard W. Story issued an Order adopting the R&R, and judgment was entered against Plaintiff on March 18, 2015.  (Docs. 90, 91.)

Plaintiff filed her Notice of Appeal on March 31, 2015.  (Doc. 92.)  The Eleventh Circuit heard oral argument on March 15, 2016.  On December 22, 2017, the Eleventh Circuit panel, in a 2-1 decision, affirmed the District Court's

dismissal of Plaintiff's Section 1981 and Equal Protection claims against the City and Chief Odom, and reversed the District Court's Order "in all other respects."

The Eleventh Circuit granted Defendants-Appellees' Petition for Rehearing *En Banc* on June 28, 2018, and vacated the panel opinion. After hearing oral argument, the *en banc* Court issued a decision on March 21, 2019, wherein the Court held that under the *McDonnell Douglas* burden-shifting framework, Plaintiff had the prima facie burden of showing that her proposed comparators were similarly situated in all material respects. The *en banc* Court further held that Plaintiff had not satisfied this burden. The *en banc* Court then remanded the remaining issues back to the Eleventh Circuit panel for resolution in the first instance.

On August 15, 2019, the panel, in a 2-1 decision, affirmed the District Court's dismissal of Plaintiff's Section 1981 and Equal Protection claims against the City and Chief Odom, but reversed the District Court's Order "in all other respects" (i.e., Plaintiff's Title VII and ADA claims). The City seeks review of this Opinion for the reasons set forth herein.

### III.    STATEMENT OF FACTS NECESSARY TO ARGUMENT OF THE ISSUES

On June 1, 2010, Chief Odom implemented a policy requiring any officer who is in a position to make an arrest or supervise an arrestee, which includes detectives, to carry a Taser in an effort to reduce the risk of injury to officers in the

field.  (Docs. 59-1 at ¶ 13; 59-16, ¶ 5, Ex. C; 59-12 at 2.)  As part of the City's training to become Taser certified, officers must receive a five-second Taser shock. (Doc. 59-16, ¶ 7.)  Chief Odom articulated at least five reasons for requiring the Taser shock, which are supported by the Taser manufacturer.  (Doc. 59-16, ¶ 7 & Ex. D.)  The City also requires all sworn officers to be certified to carry Oleoresin Capsicum ("OC") spray, and requires exposure to the spray as part of the training and certification process.  (Doc. 59-16, ¶ 5; Doc. 59-7 at 33.)  The City has never waived any of these requirements.  (Doc. 59-16, ¶¶ 5, 7.)

When auditing officers' training files in June 2010, the City discovered that Plaintiff was the only officer who was not certified to carry OC spray.  (Doc. 59-16, ¶ 8.)  Plaintiff was scheduled for OC training on June 17, 2010, but had not yet been scheduled for Taser training, when she brought in a doctor's note on June 16, 2010 which recommended that a Taser gun and OC spray not be used "on ***or near***" her "secondary to her chronic conditions."  (Docs. 59-3 at 65-66; 59-4 at 100-101; 59-16, ¶ 9; emphasis added.)  Since Plaintiff's co-workers carried OC spray and would soon be carrying the Taser, her doctor's proximity restrictions prevented her from performing all field assignments where she would be around other officers carrying and potentially using these weapons; her mere presence at work also placed her at risk of having the weapons used on or near her.  Plaintiff was therefore placed on unpaid administrative leave until her doctor cleared her to

return to work.  (Doc. 59-16, ¶ 10.)  She was told she could use her accrued leave and was advised to contact Human Resources to complete necessary FMLA paperwork for purposes of protecting her job once she exhausted her leave.  (Docs. 59-3 at 67; 59-4 at 102; 59-7 at 2-3, 21.)

By July 8, 2010, when Plaintiff had exhausted all of her accrued leave, and had not submitted her FMLA paperwork requesting additional leave or presented any information from her doctor indicating she could return to work, the City terminated her employment for being absent without leave.  (Docs. 59-4 at 121; 59-16, ¶ 11.)

## IV.    ARGUMENT AND AUTHORITIES

### A.    The panel's application of the "convincing mosaic" theory of liability under Title VII is contrary to established precedent.

#### 1.    *Supreme Court precedent requires a Title VII plaintiff to carry the initial burden of creating an inference of unlawful discrimination.*

In *Young v. UPS*, 135 S. Ct. 1338 (2015), the Supreme Court "made clear that a plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*."  *Id.* at 1345.  The Court has further explained that "[t]he importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that

any Title VII plaintiff must carry the *initial burden* of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 358 (1977) (emphasis added); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-256 (1981). This is so because the "'*prima facie* case serves an important function' . . . in that 'it eliminates the most common nondiscriminatory reasons' for the employer's treatment of the plaintiff – and in so doing 'give[s] rise to an inference of unlawful discrimination.'" *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-1224 (11th Cir. 2019) (*en banc*) (quoting *Burdine*, 450 U.S. at 253-54) (alteration in original).

As an alternative method for establishing the employer's discriminatory intent when the plaintiff is unable to identify a proper comparator, the Eleventh Circuit has recognized the "convincing mosaic" theory of liability, which permits a plaintiff to defeat summary judgment "if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011) ("*Lockheed*") (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).

Here, the panel's application of the "convincing mosaic" theory of liability has allowed Plaintiff to bypass her well-established burden to create an inference of discrimination *prior to* consideration of the legitimacy of the defendant's proffered reasons for the employment decision at issue. In particular, in analyzing whether Plaintiff has met her burden under the "convincing mosaic" test, the panel concluded that a jury could reasonably conclude that the City's decisions regarding Plaintiff were "extraordinarily arbitrary." (Op. 32.) By including the alleged arbitrariness of the City's decision as a factor in evaluating whether Plaintiff has established her initial burden, the panel collapses the prima facie and pretext stages of the analysis and "effectively shift[s] to the defendant the burden of *disproving* discrimination – which is precisely what the Supreme Court has forbidden." *Lewis*, 918 F.3d at 1223 (citing *Burdine*, 450 U.S. at 254-258 (1981)); *id.* (recognizing that comparator evidence must be analyzed separately from evidence of pretext at the prima facie stage because combining the two "would allow the plaintiff to proceed – and potentially to win – without *any* good ground for presuming that discrimination has occurred"); *see also Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000) ("a plaintiff's prima facie case, *combined* with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated" (emphasis added)).

For these reasons, review of the panel opinion is necessary to ensure consistency with Supreme Court precedent, this Court's *en banc* precedent, and to maintain uniformity of decisions in this Court.

> **2.    *The panel's finding that Plaintiff established a "convincing mosaic" of circumstantial evidence under Title VII using the same comparator evidence that this Court held was legally insufficient to create an inference of unlawful discrimination under the "similarly situated" theory of liability is contrary to binding precedent.***

In *Lewis v. City of Union City, Georgia*, the *en banc* Eleventh Circuit held that Plaintiff and her proposed comparators – Walker Heard and Sergeant Cliff McClure – were not similarly situated in all material respects, therefore, Plaintiff was unable to establish an inference of unlawful discrimination based on this evidence. *Id.*, 918 F.3d at 1229.  While the panel stated that the *en banc* "ruling, of course, is binding upon us," it nevertheless relied on the very same legally insufficient evidence to find that Plaintiff "has presented a mosaic of circumstantial evidence that raises a genuine issue of material fact," notwithstanding the absence of any other evidence of discriminatory animus by the relevant decisionmaker(s). (Op. 32.)

The primary evidence the panel relies on to support its finding of a "convincing mosaic" – other than the purported comparator evidence – relates to the City's reasons for Plaintiff's termination.  (Op. pp. 32-36.)  Under this Court's precedent, however, "[c]ontradicting [an employer's] asserted reason alone, though

doing so is highly suggestive of pretext, no longer supports an inference of unlawful discrimination." *Flowers v. Troup Cty.*, 803 F.3d 1327, 1339 (11th Cir. 2015); *see King v. Ferguson Enters.*, 568 F. App'x 686, 689 (11th Cir. 2014) (noting that under the *McDonnell Douglas* burden-shifting framework, "[t]he plaintiff must show that a proffered reason – to amount to pretext – is false, and that discrimination was the real reason for the adverse action." (citing *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006))). Therefore, this evidence is not a relevant "tile" to the "mosaic" because it is not probative of intentional discrimination based on Plaintiff's race or gender.

The only other evidence relied on by the panel as part of the "mosaic" that even touches on race or gender is a single comment made by Plaintiff's lieutenant during his deposition that he "assigned 'lady' detectives to 'children and women crimes' and 'the more aggressive stuff' to himself or Sergeant McClure."[1/]  (Op. 39.)  The panel stated that this comment "suggests unequal treatment of women on the basis of gender."  (*Id.*)  Even assuming this is correct, this evidence is completely irrelevant in this case because the comment was not made in the context of Plaintiff's termination, nor is there any evidence that the lieutenant was

---

[1/] When asked about his protocol for assigning cases, Lt. Hester testified: "I mean, I used my judgment on – you know, the ladies mainly will get children and women crimes.  You know, women feel – a victim feels better talking to a lady.  And then the more aggressive stuff, most of the time was Cliff McClure or myself."  (Appellant's Index, Vol. V, Doc. 67, pp. 10-11.)  He then testified that Plaintiff also was assigned burglaries, ID thefts, or "whatever."  (*Id.*, p. 11.)

involved in the decision to place Plaintiff on leave or terminate her employment. *Steger v. General Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) ("Although a decision maker's statement regarding an employee's "family man" status can serve as evidence of discrimination, 'statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process' at issue will not satisfy the employee's burden." (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)) (internal citations omitted)). Therefore, this evidence is also not a relevant "tile" in the purported "mosaic" because it is not probative of intentional discrimination by the relevant decisionmaker(s).

Finally, this Court has consistently required a plaintiff to present far more "convincing" evidence to establish a "mosaic" than the panel required of Plaintiff in this case. *See Lockheed*, 644 F.3d at 1329-40 (holding that the plaintiff established a "mosaic" because the decisionmaker created a column for race in his decision matrix, the defendant had reason to show that it did not discriminate against black employees in response to civil suits filed against the company, and white and African-American employees who violated the same policy were treated differently); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320-21 (11th Cir. 2012) (holding that under *Lockheed*, the plaintiff had established an inference of discrimination because the supervisor told the plaintiff that she needed to just take the year off when she informed him that she would need maternity

leave, and told the plaintiff that he "feared something like this would happen" when she informed him that she was pregnant); *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255-56 (2012) (holding that under *Lockheed*, the plaintiff had established an inference of discrimination because manager stated that he did not believe the plaintiff could perform her job duties because she was pregnant and failed to offer her a light-duty position despite the availability of such positions and the existence of a company policy to provide these positions).

For these reasons, review of the panel opinion is necessary to maintain uniformity of decisions in this court, and to provide guidance as to the standard of evidence sufficient to establish an inference of discriminatory treatment under the "convincing mosaic" theory of liability when the plaintiff and the proposed comparators are not similarly situated in all material respects, and there is no other evidence of discriminatory animus by the relevant decisionmaker(s). Left intact, the panel opinion leaves open the possibility that *all* employment decisions will now come under scrutiny when an employee is trying to establish an inference of discriminatory treatment under the "mosaic" test, or at trial.

**B.** **Review of the panel opinion is necessary to clarify the relevant decisionmaker under the ADA's "but for" causation standard based on Plaintiff's appeal of her termination to the City Manager.**

In the context of analyzing Plaintiff's Title VII claim, the panel found that "the [police] department made the decision to terminate [Plaintiff]" and Plaintiff's

"pursuit of an administrative appeal of the department's decision did not break the link of causation to the department's decision to terminate her." (Panel Opinion ("Op.") 40-41.) This finding raises the question of who is the relevant decisionmaker for purposes of Plaintiff's ADA claim, which has a different causation standard than Title VII. Title VII requires only that the alleged discriminatory animus be a *proximate* cause of the employment decision (i.e., that the discriminatory animus is a "motivating factor" in the employment decision), whereas under the ADA, the plaintiff must show that the discriminatory animus is the "but for" cause of the employment decision. *See Sims v. MVM*, *Inc.*, 704 F.3d 1327, 1336-37 (11th Cir. 2013) (explaining that different causation standards require different analyses); *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996) (applying "but for" standard to ADA claims); *Duckworth v. Pilgrim's Pride Corp.*, 764 F. App'x 850, 853 (11th Cir. 2019) (same). In *Sims*, the Eleventh Circuit held that the plaintiff could not establish that a subordinate supervisor's discriminatory animus was the "but for" cause of his termination under the Age Discrimination in Employment Act (ADEA) because the subordinate's recommendation was not a "determinative influence" on the ultimate employment decision. *Id.* at 1337. This analysis applies equally to ADA claims, which, like the ADEA, has a "but for" causation standard. *See McNely*, 99 F.3d at 1077.

Here, Plaintiff appealed the police department's decision to terminate her employment to the City Manager, Steve Rapson, who made the ultimate decision to terminate Plaintiff's employment.  In what appears to be an issue of first impression in this circuit, the issue is whether, under the ADA's "but for" causation standard, Plaintiff's appeal of her termination to the City Manager broke any causal link between the department's alleged discriminatory animus and the City Manager's ultimate decision to terminate Plaintiff's employment.

In analyzing Plaintiff's ADA claim, the panel focused on the discriminatory animus of Chief Odom and Assistant Chief Brown, finding that "a jury would be entitled to find that the department placed Ms. Lewis on administrative leave and fired her because it regarded her as disabled."  (Op. p. 24.)  The panel did not identify any evidence suggesting that Mr. Rapson made his decision to terminate Plaintiff's employment because he regarded her as disabled.  Furthermore, there is no evidence that Mr. Rapson was used as a "cat's paw" for the department's decisions.  To the contrary, the majority dismissed Plaintiff's claims under 42 U.S.C. § 1983 finding that Plaintiff "has not offered any facts to suggest that Mr. Rapson was a mere rubber stamp or that he approved any improper motive."  (Op. 44.)  The majority further found both that Mr. Rapson "conducted a hearing and heard from Ms. Lewis, who was represented by counsel in the proceeding," and

that the hearing was a "meaningful layer of review of an official's decision." (Op. 44.)

In light of these findings, review of the panel decision is necessary to clarify the relevant decisionmaker for purposes of Plaintiff's ADA claim, and to determine – as an issue of first impression – whether Plaintiff's appeal to Mr. Rapson broke any causal link between the department's initial decision to terminate Plaintiff's employment and Mr. Rapson's ultimate decision.

## C.    The panel's failure to consider all of the essential functions of Plaintiff's position in analyzing whether Plaintiff is a "qualified individual" under the ADA contradicts established precedent.

To establish a prima facie case of discrimination under the ADA, Plaintiff must show that she (1) has a disability; (2) is a qualified individual; and (3) was unlawfully subjected to discrimination because of the disability. *LaChance v. Duffy's Draft House,* 146 F.3d 832, 835 (11th Cir. 1998). A "qualified individual" is an individual who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). This includes being able to perform those functions without risk of serious physical harm to oneself or others. *LaChance*, 146 F.3d at 836 (finding that district court did not err in finding that the plaintiff was not a qualified individual because he could not perform the essential functions of the job without threat of harm to himself or others); *id.* (holding that "employee

retains at all times the burden of persuading the jury that he was not a direct threat or that reasonable accommodations were available); *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1280 (11th Cir. 2001) (stating that a plaintiff who cannot establish that he was not a direct threat or that reasonable accommodations were available is not a qualified individual); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1126 (11th Cir. 1993) (under the Rehabilitation Act of 1973, a person is "otherwise qualified" if he or she can perform the essential functions of the job in question, which means "among other things, being able to perform those functions without risk of serious physical harm to oneself or others"); *see Dickerson v. Sec'y, Dep't of Veterans Affairs Agency*, 489 F. App'x 358, 360 (11th Cir. 2012) (holding that a qualified individual under the Rehabilitation Act is one who can perform the essential functions of the job without risk of serious physical harm to oneself or others); *Cash v. Smith*, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000) (holding that "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa").

In its analysis, the panel focused solely on whether receiving a Taser shock and direct exposure to OC spray are essential functions of Plaintiff's job, without giving any consideration to other essential functions of her job that are relevant to whether she is a "qualified individual" under the ADA (e.g., the requirement that she work in the field alongside other officers and detectives who are carrying *and*

*using* Tasers and OC spray in arrest situations). (Op. 26-27 (holding that "a jury would be justified in concluding that receiving a Taser shock or direct exposure to OC spray was not an essential function of Ms. Lewis's job, in which case it would follow that she was a 'qualified individual.'")).

The panel's failure to consider all of Plaintiff's essential job functions in analyzing whether Plaintiff could perform the essential functions of the job without threat of harm to herself or others (particularly in light of her doctor's recommendation that she "would not recommend that a Taser gun and OC spray be used on *or near* [Plaintiff] secondary to her chronic conditions") is in contradiction of Eleventh Circuit precedent and has resulted in an incomplete analysis, and potentially improper remand for trial. (Op. p. 5.)

## V.    CONCLUSION

For the reasons stated herein, the City respectfully requests that this Court grant its Petition for Rehearing *En Banc*, and vacate the panel's August 15, 2019 Opinion.

Respectfully submitted, this the 5th day of September, 2019.

s/ Sharon P. Morgan
Sharon P. Morgan
Georgia Bar No. 522955
morgan@elarbeethompson.com
Tracy L. Glanton
Georgia Bar No. 415008
glanton@elarbeethompson.com

-16-

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718

Attorneys for Defendants-Appellees

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Fed. R. App. P. 32(g), I hereby certify that this petition complies with the type-volume limitations set forth in Fed. R. App. P. 35(b)(2)(A) because it contains 3,822 words, excluding the parts of the petition exempted by 11th Cir. R. 35-1.

This petition also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Submitted this, the 5th day of September, 2019.

s/ Sharon P. Morgan
Sharon P. Morgan
Georgia Bar No. 522955
morgan@elarbeethompson.com

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718

Attorney for Defendants-Appellees

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| **JACQUELINE LEWIS,** | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 15-11362** |
| | ) | |
| **CITY OF UNION CITY, GA, et al.,** | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2019, pursuant to 11th Circuit Rule 25-3, I electronically filed **DEFENDANTS-APPELLEES' PETITION FOR REHEARING EN BANC** with the Clerk of Court using the CM/ECF system which will automatically send email or other notification of such filing to all attorneys of record.

Submitted this, the 5th day of September, 2019.

s/ Sharon P. Morgan

Sharon P. Morgan

Georgia Bar No. 522955

morgan@elarbeethompson.com

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718
Attorney for Defendants-Appellees

**COPY OF OPINION SOUGHT TO BE REHEARD**

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11362
_____

D.C. Docket No. 1:12-cv-04038-RWS


JACQUELINE LEWIS,

Plaintiff - Appellant,

versus

CITY OF UNION CITY, GEORGIA,
CHIEF OF POLICE CHARLES ODOM,
in his official and individual capacities,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 15, 2019)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and KAPLAN,[*] District
Judge.

---

[*] The Honorable Lewis A. Kaplan, of the United States District Court for the Southern District of
New York, sitting by designation.

Case: 15-11362 Document: (2 of 65)15/2019 Page: 21 of 64

KAPLAN, District Judge:

Jacqueline Lewis, an African-American police detective in Union City, Georgia, was terminated abruptly from her position after about ten years of service. The ostensible reason was that Ms. Lewis was absent without leave—this notwithstanding that the Union City Police Department ("UCPD") only days earlier had placed her on indefinite administrative leave pending resolution of the questions whether she safely could be subjected to a Taser shock or exposed to pepper spray.

Ms. Lewis here contends that her discharge reflected unlawful disability and/or racial or gender discrimination. She seeks back pay, damages, and reinstatement.

## I.  FACTS

### A. Ms. Lewis's Medical Condition

Jacqueline Lewis joined the UCPD as a police officer in 2001. She was promoted to detective in 2008.

In January 2009, Ms. Lewis suffered a small heart attack. The episode was unusual in that a cardiac catheterization showed "no clot and no disease" in Ms. Lewis's heart, although heart attacks generally are caused by a "clot inside the coronary arteries." And while Dr. Arshed Quyyami, a Harvard-trained cardiologist who treated Ms. Lewis at Emory University's cardiology clinic, described the

damage to Ms. Lewis's heart as being "miniscule to small," enzyme levels confirmed the diagnosis of a heart attack.  Dr. Quyyami found also that the "global function of the heart was unaffected," though he noted that people who have had heart attacks tend to be at greater risk for subsequent heart attacks.

Ms. Lewis's primary care doctor, Dr. Erinn Harris, noted that Ms. Lewis had some residual "mild tricuspid regurgitation" but concluded that this did not have much effect on her bodily function.  Ms. Lewis occasionally did complain of paroxysmal nocturnal dyspnea—in other words, shortness of breath while lying down—which, according to Harris "can affect [Lewis's] ability to sleep."  Dr. Harris testified, however, that Lewis does not have heart disease that "chronically affects her life."  Accordingly, Dr. Harris, following Ms. Lewis's heart incident, cleared her to return to work without any "cardiac restrictions" because there "weren't any blockages to her heart."

After taking the month of February 2009 off, Lewis returned to full, active duty on March 2, 2009.  When she started back, her lieutenant, Jerry Hester, told her that detectives did not respond directly to calls but that they waited to be called out specifically.  Hester testified that he assigned "children and women crimes" to the "lady" detectives and gave "the more aggressive stuff" to himself or Sergeant Cliff McClure.

Case: 15-11362    Date Filed: (4 of 65)/2019    Page: 018 of 64

## B. UCPD's New Taser Policy

Prior to 2010, the UCPD allowed officers to choose which non-lethal weapons they carried. The options included oleoresin capsicum ("OC") spray,[1] ASP batons,[2] and Tasers.[3] In early 2010, however, then-Police Chief Charles Odom purchased Tasers for all UCPD officers and required each to carry one.

Chief Odom testified that he thought Tasers were superior to the ASP baton and OC spray because Tasers would "reduc[e] the risk of injury to officers, suspects, and the public because [a Taser] allows officers to maintain distance from an uncooperative subject when attempting to obtain compliance and effect an arrest." Although the manufacturer, Taser International, does not require trainees to receive a Taser shock to be certified in Taser use, Odom required his officers to receive a five-second shock as part of the Taser training. In moving for summary judgment, he offered five justifications for this requirement:

> "assisting [officers] in (1) evaluating the appropriate circumstances under which to deploy the Taser, (2) testifying in Court about the effects of the Taser, (3) knowing that they can go 'hands-on' with an uncooperative subject without being shocked, (4) considering how to defend themselves if threatened with a Taser or similar device, and (5) understanding what it feels like to be shocked by the Taser in the event of an accidental exposure so that they will have confidence in their ability to survive the experience."

---

[1] OC spray, commonly known as pepper spray, is a nonlethal aerosol used to blind and incapacitate temporarily in order to subdue a subject for arrest.

[2] An ASP is an expandable baton carried on an officer's duty belt.

[3] A Taser is a brand of electronic control device, a nonlethal weapon that deploys an electric shock that temporarily disables a subject through neuromuscular incapacitation.

4

### C. Ms. Lewis Is Scheduled for Training

Similar to Taser certification, officers certified to use pepper-spray required training which involved exposure to pepper spray. Lewis previously had been exposed to pepper spray when she was at the police academy, but was not certified in its use. On June 14, 2010, the department therefore scheduled Lewis for pepper-spray training three days later, on June 17, 2010.

Ms. Lewis was concerned that her prior heart attack might increase her risk of injury from a Taser shock or exposure to pepper spray as compared with the average officer. So she saw Dr. Harris, her primary care doctor, on June 15, 2010 to discuss the issue.

Dr. Harris shared Ms. Lewis's concerns, especially with regard to the Taser shock, worrying that the "electrical current . . . could cause undue stress to [Lewis's] . . . heart." Dr. Harris therefore wrote to Chief Odom. Her letter explained that she had been treating Ms. Lewis for "several chronic conditions including a heart condition" and that she "would not recommend that a Taser gun or OC spray be used on or near [Lewis] secondary to her chronic conditions." Dr. Harris urged the department to take this recommendation "into consideration when making any decisions about occupational training."

### D. Union City's Leave Policies

At this point we turn briefly to Union City's policies with respect to employee leave, as they are essential to understanding events subsequent to Dr. Harris's June 15, 2010 letter.

The City of Union City's Employee Handbook (the "Handbook"), as revised in March of 2010 and in force at the time of the events of this lawsuit, provided for various types of leaves of absence. Chapter 6, section 1.A, permitted an employee to request an unpaid leave of absence of up to 180 days. Notably, this provision stated also, however, that "[a]n employee may also be placed on leave of absence status without application."

In addition, Union City had a medical leave policy under the Family and Medical Leave Act ("FMLA"). It provided employees with up to 12 weeks of unpaid leave for, *inter alia*, a "serious health condition that makes the employee unable to perform the functions of that employee's job." Under the procedures set forth in the Handbook, when the need for medical leave could be anticipated, the employee was required to submit the paperwork thirty days prior to the effective date of the leave. Where such need was unanticipated, however, the Handbook provided no time period within which the paperwork had to be submitted.

### E. Ms. Lewis Placed on Administrative Leave

On June 17, following Chief Odom's receipt of Dr. Harris's June 15 letter, Assistant Chief Lee Brown notified Ms. Lewis by letter on June 17 that she was being placed on "*administrative leave* without compensation *until such time as your physician releases you to return to full and active duty.*"  He wrote that he took this action due to what he described as Dr. Harris's "instructions [that Lewis] . . . not come into contact with either" a Taser or OC spray, which, Brown wrote, could happen in "a variety of [field] and office settings."  The letter told Ms. Lewis to contact Tracie McCord in human resources to complete "the necessary FMLA paperwork concerning your absence."  But the letter fixed no time period during which Ms. Lewis was required to be medically cleared to return to full and active duty.  Nor did it specify any date by which the FMLA paperwork had to be completed.  Lastly, although the letter said Ms. Lewis was being placed on leave without pay, it gave her the option to use her accrued leave "until the time such leave is expended," an option that would have permitted her to continue being paid until she exhausted her accrued vacation and sick time.  The implication of the letter, a jury might find, was that Ms. Lewis would be on unpaid administrative leave

indefinitely, save to the extent she was on paid leave until she used her accrued paid leave to continue to receive her salary.

Ms. Lewis wrote Chief Odom on July 1, 2010, asking permission to resume her duties as a detective, explaining that she was "only asking for an accommodation on the taser [sic] and OC training." She sent Chief Odom a second letter, dated July 1, requesting permission to "seek temporary employment elsewhere while the Union City Police department and my doctor (Dr. Harris) are trying to come to some conclusion on this medical matter." She expressed concern in this second letter that her sick and vacation leave had nearly run out and that she "need[ed] to be able to provide for [her] family."

Chief Odom directed Assistant Chief Brown to reply to Ms. Lewis, which he did by letter dated July 1, denying her request to return to work. Brown noted first that Lewis was "out of work early in 2009 with what was suspected of being a heart attack," but that she subsequently received medical clearance to return to work without limitation. Brown then stated that "this changed"—presumably referring to Ms. Lewis's ability to work without limitation—when the department received Dr. Harris's June 15 letter. Brown's letter concluded that, "[b]ased on your current job description, your doctor's letter essentially makes it impossible for you to work or be at work." It denied Ms. Lewis's request to resume her duties "until your doctor

releases you for duty." Again, no time frame was fixed for obtaining such a medical release.

Dr. Harris was on vacation for the first week of July and was unreachable until July 7. Ms. Lewis so informed Assistant Chief Brown on July 2, adding that she had scheduled an appointment for the day of Dr. Harris's return. She asked also for Assistant Chief Brown's cell phone number so Dr. Harris could call him directly.

Ms. Lewis emailed again on July 6 to remind Assistant Chief Brown that Dr. Harris still was on vacation. He replied that day, providing his office telephone number and instructing Ms. Lewis that Dr. Harris should call him or his assistant to schedule a conversation. He stated also that "[a]s far as your seeking employment outside of the agency after filing for Family and Medical Leave[, which never occurred], it would be, as I understand, illegal for you to be employed elsewhere while you are currently on FMLA Leave with our department." At that time, however, Ms. Lewis was on administrative leave pursuant to Chief Brown's June 17 letter, not FMLA leave. In fact, she had not applied for FMLA leave.

## F. Ms. Lewis Is Terminated

Chief Odom testified that "I don't want to use the word with 'bated breath,' but we were waiting for either her doctor's appointment on the Wednesday [July 7] or [to] hear from the doctor on Wednesday or for her to bring us something on

9

Wednesday to say here is where we are at or here is where we need to go or . . . there is some kind of a plan of action here."  Dr. Harris in fact attempted to call on July 7, but she did not have the correct phone number.  In addition, although Dr. Harris largely filled out the FMLA paperwork on July 7, she did not complete, sign, and send it to the police department until July 12.

On July 8 at 10 a.m., Assistant Chief Brown terminated Ms. Lewis.  He did so without speaking to human resources manager Tracie McCord.  Nor did he make any attempt to contact or to have anyone else from the department contact Dr. Harris. His termination letter stated that Ms. Lewis had been placed on administrative leave without pay on June 17 but had had the option to use her accrued leave until it was exhausted.  Brown then stated that her accrued leave was exhausted on July 5, but that he "granted her request" because Ms. Lewis had advised him that Dr. Harris was on vacation until July 7, though it is not clear to what request, if any, this referred. Restating but otherwise ignoring the fact that his June 17 letter had placed Ms. Lewis on administrative leave without pay and imposed no time limits at all, he concluded that "[b]ecause you have exhausted all of your accrued [paid] leave and have failed to complete and turn in the necessary paperwork to be placed on Family and Medical Leave, your absence is unapproved and you are terminated effective immediately." Although Assistant Chief Brown had told Ms. Lewis one week earlier that she was not *permitted* to return to work, Chief Odom characterized this as "a situation where

Case: 15-11362    Document: 65    Date Filed: 03/13/2019    Page: 11 of 64

an employee has just failed to come to work." Chief Odom acknowledged that he never advised Ms. Lewis that she had to apply for 180 days of unpaid leave under the city's administrative leave policy, although she already had been placed on administrative leave, or warned her that she had to file FMLA paperwork within a certain time frame to avoid being terminated.

During the afternoon of July 8, after the termination letter already had been sent, Dr. Harris spoke with Assistant Chief Brown. To Dr. Harris's recollection, this conversation was unpleasant and left her "quite offended" because she felt that Assistant Chief Brown "questioned my professionalism and my professional opinion." Brown gave Dr. Harris the impression that he thought "Ms. Lewis was influencing [Harris's] decision to say that [Lewis] should not use the Taser or the pepper spray." Dr. Harris made clear that her opinion was based solely on her professional medical judgment and that she does not "do things because patients tell me to do them." In his deposition, Brown stated that he "would have had a conversation with [Dr. Harris] about reasonable accommodations" if she had called before July 8. But when the questioner pointed out to him that Dr. Harris had been on vacation, Brown responded simply: "According to Jackie [Lewis]."

By way of summary, it bears pointing out some conclusions a jury reasonably might draw from the preceding evidence. Given the nature of Ms. Lewis's interactions with the UCPD up through July 7, her termination on July 8 is

Case: 15-11362   Document: 165   Date Filed: 09/05/2019   Page: 22 of 64

mysterious in an important respect.  She had been placed on unpaid, indefinite administrative leave on June 17, at which time she was given the option first to use her accrued vacation and sick time so that she could continue receiving a salary until that leave was exhausted.  She never was given any deadlines, nor did any appear in the written city policies, by which she had to obtain medical clearance, file FMLA paperwork, or otherwise resolve the questions about whether she could perform her job duties.  She never was transferred from administrative leave to another type of leave.  Indeed, at oral argument, defendants conceded that Ms. Lewis was on administrative leave *at the moment she was fired*—an involuntary, unpaid leave initiated by a supervising officer.  They conceded further that inherent (though unarticulated) in the act of firing Ms. Lewis was the act of terminating her administrative leave.  Otherwise, there is no plausible way to justify the stated reason for her termination, which was that she was absent without leave.  Moreover, Assistant Chief Brown's deposition response to the examiner's suggestion that Dr. Harris had been on vacation—"[a]ccording to Jackie"—might be regarded by a jury as indicating a belief by Brown that Ms. Lewis had lied about Dr. Harris's being away in early July.

We make no findings of fact here, of course.  We are obliged, however, to view the evidence in the light most favorable to the non-moving party, Ms. Lewis, and to draw all reasonable inferences in her favor.  We therefore point out that a jury

Case: 15-11362    Document (13 of 65)    Date Filed: 09/05/2019    Page: 23 of 64

in these circumstances reasonably could find that the stated reason for terminating Ms. Lewis—that she was absent without leave—was a pretext for one or more other motives.  And there are several possible alternative motives for which there is some evidentiary support.  They include a belief that Ms. Lewis (1) could not properly do her job in consequence of her heart condition, (2) had procured unwarranted support from Dr. Harris in an effort to avoid the Taser test or OC training while retaining her job, and (3) had lied about Dr. Harris's unavailability until July 7.  We discuss additional possibilities below.

## G. Administrative Appeal

Lewis appealed her termination to the Union City manager, Steve Rapson.  At that hearing, Ms. Lewis was represented by an attorney and given the opportunity to present evidence.  However, she did not present evidence regarding whether she may have been entitled to 180 days of unpaid administrative leave or to question whether she had fully exhausted her paid leave.  Nor did Mr. Rapson or anyone from the city undertake an independent investigation of that issue.  Mr. Rapson ultimately upheld Chief Odom's decision to terminate Ms. Lewis.

## II. OTHER PROCEEDINGS

Ms. Lewis filed suit in the Northern District of Georgia on November 19, 2012, alleging disability discrimination under the Americans with Disabilities Act and race and gender discrimination under 42 U.S.C. § 1981 and Title VII.

Defendants moved for summary judgment dismissing all of Ms. Lewis's claims. In opposing the motion, Ms. Lewis pointed to two other Union City police officers as comparators for how she was treated.

The first was Sergeant Cliff McClure, a white man, who was placed on administrative leave after failing the balance portion of a physical fitness test on April 22, 2014. He was given 90 days of leave to remedy the conditions that caused him to fail the test and to retake it.

The second comparator was Patrol Officer Walker Heard, a white man who failed a physical fitness test. Heard was placed initially on leave without pay for 90 days, which enabled him to work with medical professionals to pass the fitness-for-duty test. Nearing the end of his 90-day leave, Officer Heard's attorney sent a letter to the UCPD stating that Heard had a disability and requesting that the fitness-for-duty test be waived. Chief Odom offered Heard the chance to transfer to a dispatcher position, which did not require him to pass the fitness-for-duty test. The dispatcher position was held open for Heard for eleven months before the UCPD terminated

him when he declined to transfer. At that point, Heard had been on administrative leave for 449 days before he was finally fired.

On November 26, 2014, a magistrate judge issued a report and recommendation that recommended granting the defendants' motion for summary judgment in its entirety on the bases that: (1) on her ADA claim, Ms. Lewis had failed to demonstrate a genuine issue of fact that she was a "qualified individual," thus failing to make out one of the three elements of her *prima facie* case, and (2) on her race and gender claims, Ms. Lewis's purported white male comparators were not "similarly situated" because they had failed physical fitness tests, not weapons certification tests, and because Ms. Lewis's lead physician had expressed concern about her proximity to Tasers and OC spray. The district court adopted the R&R on March 17, 2015, accepting in all relevant respects the magistrate's reasoning and conclusions. Ms. Lewis appealed from that order and from the judgment entered upon it.

On December 15, 2017, this panel issued an opinion affirming in part and reversing in part the district court's judgment. We affirmed to the extent that the judgment dismissed the Section 1981 and Equal Protection claims against the City of Union City and against Chief Odom. We reversed in all other respects and remanded for further proceedings consistent with the opinion. Specifically, we held that the evidence presented by Ms. Lewis was sufficient to establish a *prima facie*

case under the ADA.  With respect to her race and gender claims, we held that plaintiff presented (i) sufficient evidence to establish a genuine issue of fact under the *McDonnell Douglas* burden shifting framework, and (ii) a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.

On June 28, 2018, the full Court vacated our panel opinion and ordered that the case be reheard en banc[4] "to clarify the proper standard for comparator evidence in intentional-discrimination cases."[5]  On March 21, 2019, the en banc Court held that the appropriate standard for such evidence is whether the proposed comparators are "similarly situated in all material respects."[6]  Applying this standard to Ms. Lewis's case, the Court determined that she failed to make out a *prima facie* case under *McDonnell Douglas* because she and her proffered comparators were not so situated.[7]  It then remanded to this panel for proceedings consistent with its opinion.[8]

Neither Ms. Lewis's ADA claims, nor her "convincing mosaic" theory of liability was considered by the en banc Court.  Those claims and any other pending matters were returned to this panel for resolution.[9]  As our prior decision on those

---

[4] *Lewis v. City of Union City*, 893 F.3d 1352 (11th Cir. 2018).

[5] *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019).

[6] *Id.* at 1218.  The Court held also that the analysis of whether comparators are similarly situated should be conducted at the *prima facie* stage, as opposed to the pretext phase, of the *McDonnell Douglas* framework.  *Id.* at 1224.

[7] *Id.* at 1229-31.

[8] *Id.* at 1231.

[9] *Id.* at fn. 20.

16

matters was vacated when en banc review was granted, it now is incumbent upon us to restate and, as appropriate, modify or amplify our views on them.

## III. DISCUSSION

### A. Standard of Review

"We review the district court's grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Strickland*, 692 F.3d at 1154. The court must draw all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which "'are jury functions, not those of a judge.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### B. The Disability Discrimination Claim

Under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12112(a), it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees, . . . and

other terms, conditions, and privileges of employment." To establish a *prima facie* case for disability discrimination, a plaintiff must produce sufficient evidence to permit a jury to find that she: (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability. *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007)). "The ADA defines the term 'disability' as (1) a physical or mental impairment that 'substantially limits one or more' of an individual's 'major life activities,' (2) a 'record of such an impairment,' or (3) 'being regarded as having such an impairment' as described in subsection (1)." *Mazzeo*, 746 F.3d at 1268 (quoting 42 U.S.C. § 12102(1)).

1. <u>Ms. Lewis's Evidence Is Insufficient to Meet Her Prima Facie Burden that She Was Actually Disabled, But Is Sufficient on Whether She Was Regarded as Disabled.</u>

Ms. Lewis argues that she meets the definition of "disabled" under both the "actually disabled" and the "regarded as disabled" prongs. The district court, adopting the R&R, held that Ms. Lewis's evidence had sufficiently demonstrated, for the purpose of her *prima facie* case, that she had a physical impairment, but that she had not produced evidence sufficient to demonstrate that the impairment substantially limited any major life activity. It therefore held that there was no basis for a disability discrimination claim based on a theory that she was actually disabled.

But the district court agreed also with the magistrate judge's report and recommendation that there was sufficient evidence to raise a genuine issue of fact on the question of whether Ms. Lewis was "regarded as" disabled.

>   a. *The court below correctly concluded that Ms. Lewis did not*
>      *produce sufficient evidence to permit a conclusion that she is*
>      *actually disabled.*

Ms. Lewis contends that she is disabled because her heart attack left her with a "permanent injury to her heart and [she] continues to suffer regurgitation of the mitral tricuspid, and aortic heart valves." The district court rejected this argument, holding that she may have produced sufficient evidence of a physical impairment but she failed to adduce sufficient evidence that that impairment substantially limited any major life activity. Ms. Lewis here challenges this conclusion, contending that her heart condition substantially limits her ability to sleep and breathe.

An individual who is "actually disabled" is one with "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*. § 12102(2)(A).

Congress amended the ADA by enacting the ADA Amendments Act of 2008 (the "ADAAA") with the goal of broadening the interpretation of a disability under

19

the ADA. It sought to "convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Mazzeo*, 746 F.3d at 1268 (quoting 42 U.S.C. § 12101 Note). It was concerned also that "the Supreme Court's interpretation of the phrase 'substantially limits' . . . had 'created an inappropriately high level of limitation necessary to obtain coverage under the ADA.'" *Mazzeo*, 746 F.3d at 1269 (quoting 42 U.S.C. § 12101 Note). In consequence, Congress added a rule of construction to the definition of disability, instructing that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

We accept *arguendo* that Ms. Lewis's evidence is sufficient to permit a fact finder to conclude that her heart is physically impaired. *See, e.g.*, *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015). Nevertheless, there remains the question whether the evidence is sufficient to permit a conclusion that the impairment substantially limits a major life activity.

Ms. Lewis argues that her paroxysmal nocturnal dyspnea substantially limits the major life activities of breathing and sleeping. The only such evidence in the record, however, is plaintiff's own testimony that she has "periodic . . . shortness of breath," and Dr. Harris's testimony that this could—but, notably, not that it did— affect Ms. Lewis's ability to sleep. Without minimizing any discomfort these

episodes may cause Ms. Lewis, the record here is devoid of evidence of the severity, frequency, and duration of these episodes. Nor is there any evidence of the extent to which they limit Ms. Lewis's ability to sleep or that could lead a reasonable jury to conclude that Lewis is substantially limited in a major life activity. *Compare Mazzeo*, 746 F.3d at 1269 (finding sufficient evidence of an actual disability where record included affidavit from plaintiff's doctor detailing both the "specific pain the condition caused, and the limitations on major life activities" (quotations omitted)), *with Holton v. First Coast Serv. Options, Inc.*, No. 16-15289, 2017 WL 3446880, at *3 (11th Cir. Aug. 11, 2017) (distinguishing *Mazzeo* where plaintiff's chiropractor "included nothing to link her back impairment to the limitations on her major life activities that she alleged"), *and Vaughan v. World Changers Church Int'l, Inc.*, No. 1:13-CV-0746-AT, 2014 WL 4978439, at *9 (N.D. Ga. Sept. 16, 2014) (distinguishing *Mazzeo* where plaintiff's "treating physician did not, even in a conclusory fashion, state that the effects of this pain on her major life activities . . . were at all substantial, or at least substantial as compared to most people in the population" and "was unable to assess how episodic Vaughan's pain would be"). Accordingly, we agree with the district court that Ms. Lewis did not produce evidence sufficient to raise a genuine issue of fact that she is actually disabled.

Case: 15-11362    Document: 225    Date Filed: 03/03/2019    Page: 22 of 64

           *b.  Ms. Lewis has produced evidence sufficient to raise a genuine issue of fact on whether she was "regarded as" disabled.*

Ms. Lewis contends also that she is "disabled" under the "regarded as" definition regardless of whether she is actually disabled.  The district court agreed, holding that she had produced evidence sufficient to permit findings that the UCPD regarded her heart condition as a physical impairment and took adverse action—placing her on leave—because of the impairment.

The ADA provides that an individual is "regarded as" disabled if she "establishes that . . . she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).

As the district court held, there was ample evidence here to raise a genuine issue of fact as to whether the UCPD regarded Ms. Lewis as disabled.  Chief Odom himself was a witness to Ms. Lewis's heart attack.  In his June 17 letter putting Ms. Lewis on leave, Assistant Chief Brown referred to her chronic conditions and instructed her to complete FMLA paperwork, suggesting that he believed Ms. Lewis had a medical condition warranting medical leave.  Next, Assistant Chief Brown's July 1 letter forbade Ms. Lewis from returning to work until "everything is cleared up with your doctor," said that "your doctor's letter essentially makes it impossible for you to work or be at work," and concluded that Ms. Lewis could not return "until

22

your doctor releases you for duty." Assistant Chief Brown's July 6 email again referred to the possibility of Ms. Lewis taking leave under FMLA. Indeed, the department's own stated reason for putting Lewis on leave—that it feared for her safety in view of her heart condition—demonstrates the department's belief that Ms. Lewis's medical condition set her apart from other police officers.

Defendants nevertheless argue that they did not regard Ms. Lewis as disabled and that they did not put her on administrative leave because of her actual or perceived heart condition. Rather, they assert, they construed Dr. Harris's letter recommending that Ms. Lewis not be exposed to OC spray or a Taser shock as meaning that Ms. Lewis would be in danger by virtue of her "mere presence at work." But that argument does not carry the day for at least two reasons.

First, even if we were to assume that the UCPD's argument, if accepted, somehow could divorce its placement of Ms. Lewis on administrative leave and her subsequent termination from any perception or belief that Ms. Lewis suffered from a physical impairment—and it is difficult to credit any such assumption—it could do no more than raise an issue of fact. A jury would be entitled to accept Ms. Lewis's evidence, already detailed, and to conclude that the UCPD put her on leave and fired her because it regarded her as disabled.

Second, the defendants' argument is nearly identical to one rejected by the interpretive guidance that accompanies the regulations under the ADA. That

23

guidance gives the following example: "an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled." 29 C.F.R. § Pt. 1630, App. The guidance explains further that "[w]hether the employer has a defense (e.g., that the employee posed a direct threat to himself or coworkers) is a separate inquiry." *Id*. While not binding, the guidance illustrates the common sense principle that an employer that takes an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled.

In the last analysis, then, a jury would be entitled to find that the department placed Ms. Lewis on administrative leave and fired her because it regarded her as disabled. We therefore agree with the district court that Ms. Lewis has produced evidence sufficient to meet her *prima facie* burden on this element.


### 2. The District Court Erred in Holding that Ms. Lewis Failed to Produce Sufficient Evidence that She was a Qualified Individual.

Having concluded that Ms. Lewis met the first element of her *prima facie* case of disability discrimination on the "regarded as" theory, we turn to the second

Case: 15-11362    Document: 250-065/08/2019    Page: 25 of 64

element, viz., whether there was evidence sufficient to conclude that she was a "qualified individual."

The ADA defines a qualified individual as one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The district court held that Ms. Lewis was not a qualified individual. It did so by adopting the UCPD's position that she could not perform the essential functions of a Union City detective, which, it held, included being exposed to OC spray and a Taser shock. In adopting the UCPD's contention, however, the district court made a factual determination that was inappropriate on summary judgment.

"'Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors.'" *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (quoting *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000)). Courts consider the employer's judgment of whether a particular function is essential, *id.*, and may choose to accord additional weight to such a judgment when the employer is a police department, *cf. Ethridge v. State of Alabama*, 860 F. Supp. 808, 816 (M.D. Ala. 1994). But courts must consider also:

> "any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience of employees in similar jobs."

*Samson v. Fed. Exp. Corp*., 746 F.3d 1196, 1201 (11th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(3)(ii)-(vii)). Accordingly, "[a]lthough the employer's judgment is 'entitled to substantial weight in the calculus,' this factor alone is not conclusive." *Id.* (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1285 (11th Cir. 2007)).

In this case, there is significant evidence that cuts against Union City's contention that exposure to OC spray and Taser shocks are essential functions of the job of police detective. The city's written job description for the position of detective nowhere mentions that it is necessary for a detective either to carry or to be exposed to OC spray or a Taser shock. Indeed, there is no such mention in an entire paragraph listing various "physical demands" of the job. The "work environment" section states that a detective "[m]ust be willing to carry a firearm on and off the job [and be] mentally and physically capable of using deadly force, if justified," but contains no reference to OC spray or Tasers. Further, Ms. Lewis offered evidence that detectives previously were permitted a choice of what nonlethal weapon or weapons to carry. Moreover, neither party disputes the fact that Taser International does not require trainees to receive a shock in order to become certified in Taser use.[10]

---

[10] The dissent misconstrues the record and fails to view the evidence in the light most favorable to Ms. Lewis in arriving at its conclusion that Ms. Lewis definitively could not work in the *police department building at all*. It argues that because merely being present in the police building carries the risk of being exposed to OC spray, Ms. Lewis was not a qualified individual because her "own doctor's advice was the city manager's sole reason for affirming Lewis's termination." This position is contradicted by the city manager's own testimony and other evidence.

26

In these circumstances, a jury would be justified in concluding that receiving a Taser shock or direct exposure to OC spray was not an essential function of Ms. Lewis's job, in which case it would follow that she was a "qualified individual."

3. Ms. Lewis Met her Prima Facie Burden of Demonstrating that the City Discriminated Against Her Because of Her Perceived Disability.

We turn next to the third element of the *prima facie* case, which requires evidence sufficient to permit the fact finder to conclude that the employee was discriminated against "because of" her disability.[11]

As was demonstrated in the analysis of the first *prima facie* element, built in to the "regarded as" definition of disabled is an analysis of whether the employer

---

As an initial matter, there was evidence that Ms. Lewis's doctor's advice with respect to OC spray exposure was *not* a factor in the city manager's thinking and would not have mattered in any case. When asked if the fact that Assistant Chief Brown had spoken to Ms. Lewis's doctor following the termination and that the doctor was "not concerned about the OC spray" had come up in the administrative appeal, Mr. Rapson said that it had not. When asked if this would have affected his decision in any way, he said that it would not have because "we were really there about whether every officer was going to be tasered or not tasered."

This exchange exposes the other important flaw in the dissent's argument: There is ample evidence in the record demonstrating that Ms. Lewis could withstand the type of indirect exposure to OC spray that would allow her to work inside of the police department building if that option had been made available to her. In the conversation with Assistant Chief Brown after he fired Ms. Lewis, Dr. Harris reiterated only the recommendation that she not be exposed to a taser shock and said that she was not as concerned about Ms. Lewis being exposed to OC spray. Furthermore, the FMLA paperwork submitted by Dr. Harris stated only that Ms. Lewis "should not have a Taser used on her secondary to previous cardiac history," and contained no mention of any OC exposure limitations. We decline to engage in the fact finding that would be required to accept the dissent's argument that Ms. Lewis's medical condition prevented her from being in the police department building.

[11] In cases where the employee meets either the first or second definitions of "disabled" (that is, the employee shows that he or she is or has a history of being actually disabled) on the first *prima*

subjected the employee "to an action prohibited under this chapter because of an actual or perceived physical or mental impairment." 42 U.S.C. § 12102(3)(A). The evidence tending to prove the "regarded as" definition of disabled therefore often is duplicative of the evidence relevant to the third *prima facie* element. *See* 29 C.F.R. § Pt. 1630, App. ("While a person must show, for both coverage under the 'regarded as' prong and for ultimate liability, that he or she was subjected to a prohibited action because of an actual or perceived impairment, this showing need only be made once.").[12] Because we hold Ms. Lewis's evidence sufficient to meet her *prima facie*

_____

*facie* element, that employee may meet his or her *prima facie* burden on this third element by showing that the employer does not make reasonable accommodations for the disability. *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) ("An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer."); *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (framing issue on appeal as "whether Defendant discriminated against Plaintiff by failing to provide a reasonable accommodation that would have enabled her to perform either her CSO duties or the essential duties"); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) ("[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."); *see also* 42 U.S.C. § 12112(b)(5)(A). In other words, an employer's failure to provide a reasonable accommodation may be evidence that that employer has discriminated against her "because of" her disability.

Ms. Lewis contended that the UCPD's failure to put her in an administrative role constituted a failure to provide a reasonable accommodation and thus was evidence of discrimination. Given our conclusion that Ms. Lewis has not put forth evidence sufficient to warrant a finding that she is actually disabled, however, we need not address this argument because an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.9(e).

[12] Defendants state that the district court did not reach the third element of the *prima facie* case—whether Ms. Lewis was discriminated against because of a disability. The district court, however, did find that there was sufficient evidence that Ms. Lewis was regarded as disabled. Because, as discussed above, the evidence of the third *prima facie* element is duplicative of the evidence

burden on the first element, we therefore hold also that her evidence is sufficient on this element of her *prima facie* case for the same reasons detailed *supra* section II.A.2.

### 4. Plaintiff Has Produced Sufficient Evidence that She is Not a Direct Threat.

The magistrate judge held in a footnote that the city would be entitled to summary judgment under the "direct threat" defense even if Ms. Lewis established her *prima facie* case.  *See* 42 U.S.C. § 12113.    Specifically, he reasoned that Dr. Harris's letter recommending that Ms. Lewis not be exposed to OC spray or a Taser shock meant that Ms. Lewis's "presence near the use of OC spray and Tasers while in the workplace posed a significant risk of harm to her health."  Ms. Lewis argues on appeal that she poses no direct threat to herself or others and that the court below failed to conduct the requisite individualized assessment.

"Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."  29 C.F.R. § 1630.2(r).  Moreover, the "direct threat" defense:

> "must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after

---

needed to show that Lewis was regarded as disabled, the district court, in fact, did resolve this question in Ms. Lewis's favor.

considering, among other things, the imminence of the risk and the severity of the harm portended."

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)).

Here, we disagree with the district court for one simple reason. The definition of the direct threat defense requires an analysis of the individual's ability to perform safely the "essential functions of the job." 29 C.F.R. § 1630.2(r). As we have held that there is a genuine dispute of material fact on what the essential functions of a UCPD detective are, we certainly cannot resolve the question of whether she can perform those as-yet-undefined essential functions safely.

### C.    Race and Gender Discrimination Claims

Ms. Lewis alleges also sex and race discrimination under Title VII, the Equal Protection Clause, and 42 U.S.C. § 1981.[13] The legal elements under any of these frameworks are identical. "To make out a *prima facie* case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see also Stallworth v.*

---

[13] The Equal Protection and § 1981 claims are brought pursuant to 42 U.S.C. § 1983.

Case: 15-11362 Document 65 Date Filed: 09/05/2019 Page: 31 of 64

*Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical.").

As discussed previously, the en banc Court determined that Ms. Lewis failed to establish a *prima facie* case of intentional discrimination under the burden shifting framework of *McDonnell Douglas* because her chosen comparators were not similarly situated in all material respects. That ruling, of course, is binding upon us. There is no occasion to discuss it further. But that determination does not foreclose altogether Ms. Lewis's race and gender discrimination claims because "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Even without similarly situated comparators, "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*.

This, of course, is perfectly logical. Not every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator. Among other things, a proper comparator simply may not exist in every work place.

31

Accordingly, a "plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011), *overruled by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) (footnote omitted)). A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. *Silverman*, 637 F.3d at 733-34 (quotations omitted).

Here, Ms. Lewis has presented a mosaic of circumstantial evidence that raises a genuine issue of material fact.

*First*, Ms. Lewis has presented evidence from which a jury would be entitled to conclude that the city's actions in regards to Ms. Lewis were extraordinarily arbitrary in at least three ways. *First*, the UCPD initiated Ms. Lewis's indefinite administrative leave on June 17 and informed her on July 1 that she would not be permitted to return to work until she was medically cleared. Yet a week later, and despite Ms. Lewis's request to return to work and Chief Brown's explicit denial of that request, the UCPD terminated her for being absent without leave. *Second*, the UCPD gave no warning that if Ms. Lewis exercised the option to use her accrued

32

leave in lieu of being on unpaid status, she would be terminated upon exhausting her accrued leave instead of simply reverting to unpaid administrative leave status. *Third*, the UCPD gave Ms. Lewis no notice that she had to file FMLA paperwork by any specific date, nor did the department's written FMLA policy provide any such deadline.  She informed the department on two occasions that her doctor was on vacation until July 7, but that she had an appointment scheduled for that day.  At no time was she told that she would be terminated if her doctor failed to contact the department on the very first day she returned from vacation.  From all this evidence, a jury could conclude that the UCPD was searching for a policy to fit its desire to terminate Ms. Lewis rather than neutrally enforcing an existing policy.  As noted in Judge Rosenbaum's opinion concurring in part and dissenting in part in the en banc, these are precisely the types of "arbitrary action[s] that Justice Rehnquist [, as he then was,] noted could be probative of discriminatory intent."[14]

*Second,* there is ample evidence suggesting that the UCPD's stated reasons for firing Ms. Lewis were pretextual.  As explained in Judge Rosenbaum's opinion, the UCPD offered several nondiscriminatory reasons for its firing of Ms. Lewis, and

---

[14] *Lewis*, 918 F.3d at 1260, *citing Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("[W]e know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for [the adverse employment action] have been eliminated as possible reasons for the employer's actions, it is more likely than not [that] the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.").

Case: 15-11362 Document: 65 Date Filed: 09/05/2019 Page: 64 of 64

Ms. Lewis alleged that each was pretextual. A plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies.[15]

One reason offered by defendants for Ms. Lewis's firing is that her medical condition was permanent. There is evidence, however, suggesting that the department believed either that Ms. Lewis was faking her medical condition or that her condition was not sufficiently serious to prevent her from working as a detective. The initial letter placing Ms. Lewis on leave stressed that she had been cleared for full duty without restrictions after her heart attack and emphasized that the letter disclosing her chronic conditions came as a surprise. Chief Odom testified that he was caught off guard by Dr. Harris's June 17 letter. And Dr. Harris testified that Assistant Chief Brown made clear to her in the July 8 telephone conversation that he thought Dr. Harris's letter was more a product of Ms. Lewis's influence than Dr. Harris's unbiased medical judgment. In fact, in his deposition, Assistant Chief Brown at least arguably evidenced disbelief of Ms. Lewis's assertion that Dr. Harris

---

[15] *Id.* at 1257.

was on vacation for the week leading up to her termination, suggesting that he doubted her truthfulness more generally. At the same time, however, at least two of Chief Brown's letters could reasonably be construed as indicating a belief that Ms. Lewis's doctor ultimately would clear her for duty and that the medical condition, in the department's view, would not permanently prevent Ms. Lewis from doing her job as a detective. This inconsistency in the department's view of the nature and severity of Ms. Lewis's condition could be interpreted as evidence that the medical condition was a pretext for Ms. Lewis's termination.

The UCPD contends also that Ms. Lewis was fired: (i) for being absent without leave as a result of her paid leave having expired at the time of her termination, and (ii) because she failed to timely file her FMLA paperwork. Substantial evidence exists to cast doubt on these alleged motivations for Ms. Lewis's firing.

As explained above, the UCPD placed Ms. Lewis on administrative leave on June 17 until such time that her physician released her to continue working. Ms. Lewis again was informed on July 1 that she would not be permitted to return to work until such time as she was medically cleared by her doctor to do so. Ms. Lewis was in regular contact with her superiors over the first week of July to let them know that Dr. Harris was on vacation and that she had scheduled an appointment on the same day of Dr. Harris's return. Nonetheless, she was terminated for being absent

35

Case: 15-11362 Document: 65-1 Date Filed: 09/05/2019 Page: 36 of 64

without leave on the morning after the day of her appointment with Dr. Harris and before her superiors ever spoke to or received any information from Ms. Lewis or her doctor. This all was despite the department a week earlier—and for the second time—having told Ms. Lewis that she would remain on leave until cleared by her doctor to return to work.

As to the timeliness of Ms. Lewis's FMLA paperwork, Judge Rosenbaum cogently explained that: (i) there is no evidence that the UCPD ever set any deadline for filing such paperwork, (ii) Ms. Lewis diligently communicated to her superiors the progress in obtaining the needed paperwork while her doctor was on vacation throughout the relevant period, and (iii) the communications between Ms. Lewis and her employers made clear that she would be taking FMLA leave at the expiration of her paid leave.[16] She even was informed on July 6—two days before she was terminated—that she was "currently on FMLA leave." At the very least, a jury reasonably could infer that the UCPD's "sudden imposition of an apparently previously non-existent deadline for submitting FMLA paperwork [and contradictory signals as to the status of her administrative leave] suggests a cover for discrimination."[17]

---

[16] *Id.* at 1260.

[17] *Id.*

Case: 15-11362 Document: 65 Date Filed: 09/05/2019 Page: 37 of 64

*Third*, accepting, as we must, that Officer Heard and Sergeant McClure do not meet this Circuit's strict definition of similarly situated comparators, the evidence of their treatment in the face of physical limitations on their ability to perform as police officers is not irrelevant. That evidence was sufficient to permit the conclusions that (1) three officers—two white men and one African-American woman—each were required to possess a physical ability said to be essential to the performance of his or her job, (2) each either failed a test as to whether the officer possessed the respective physical ability or failed to provide a certificate evidencing the possession of the relevant physical ability, and (3) both of these white men then were treated far more favorably than this African-American woman in that both were given extended periods of time to attempt to demonstrate the physical ability but the African-American woman was fired without warning. Specifically, Officer Heard and Sergeant McClure were told that they would be given 90 days of administrative leave to cure the deficiencies precluding their fitness for duty, in accordance with the existing physical fitness policy that had not yet been promulgated at the time of Ms. Lewis's firing. But, in reality, Officer Heard was afforded 449 days of administrative leave before finally being terminated, in contravention to the relevant policy. Therefore, regardless of the applicable personnel policy governing Ms. Lewis's leave status versus that of Officer Heard and Sergeant McClure, "a reasonable jury could find that the [UCPD] did not consistently exercise its authority

37

in placing physically unfit officers on administrative leave and that the [UCPD] did not comply with its own policies"— to the benefit of white men and to the detriment of black women.[18]

But the evidence goes further still. The record shows that Officer Heard was offered a transfer to a position that did not require him to continue taking the fitness test that he had failed. Ms. Lewis, on the other hand, was fired without notice after 21 days of administrative leave and was "offered no such alternative [assignment] before or after."[19] Even assuming, *arguendo*, that Ms. Lewis's condition was permanent, the fact that Officer Heard was offered a transfer to a different position to which the fitness requirement did not apply while Ms. Lewis was not given any such option is itself evidence of disparate treatment that a jury is entitled to consider.

Furthermore, Ms. Lewis was fired while actively working with her doctor to ascertain the extent, if any, to which her medical condition could pose a risk in future training. She was in near daily communication with her superiors about the progress of that endeavor. Judge Rosenbaum's en banc opinion points out that the department had a history of working with others with heart conditions to allow them to receive a milder version of taser training than officers without heart conditions received.[20]

---

[18] *Id.* at 1258.

[19] *Id.* at 1259.

[20] *Id.* at 1258.

Lewis, however, was fired summarily without consideration of any potential modifications or alternatives.

Finally, there are still more tiles in this mosaic.

Jerry Hester, Ms. Lewis's lieutenant, testified in his deposition that he assigned "lady" detectives to "children and women crimes" and "the more aggressive stuff" to himself or Sergeant McClure – a comment that suggests unequal treatment of women on the basis of gender.

The dissent agrees "that the department's handling of Lewis's leave (and thus its decision to terminate her employment) was arbitrary and pretextual, at least when we view the record in her favor," yet claims that "the only person whose conduct is relevant to Lewis's claim" is the city manager, and not the department itself.  We respectfully disagree.

The record is clear that the department made the decision to terminate Ms. Lewis and did in fact terminate her on July 8.  There is no question that it therefore was responsible for her "discharge or other significant change in the terms or conditions of [Ms. Lewis's] employment."  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam).  The fact that Ms. Lewis appealed that decision to the city manager did not create a "blank slate"—as the dissent suggests— by which Ms. Lewis's termination was washed clean of the discriminatory evidence tainting the department.  The cases cited by the dissent only prove this point.  In

*Stimpson*, 186 F.3d 1328, we noted that "under Alabama law, the City has no power to terminate police officers" and therefore that "the City's recommendation that the Board terminate Stimpson does not, itself, constitute a change in the terms or conditions of employment absent a sufficient causal link between the termination and the discriminatory animus behind the recommendation." *Id.* at 1331. Likewise, *Llampallas v. Mini–Circuits, Lab, Inc.,* 163 F.3d 1236 (11th Cir.1998), involved a situation in which the evidence of discriminatory animus was against an employee with no authority to make an employment action with respect to the plaintiff. *See also Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008) ("Under a 'cat's paw' theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct)."

The dissent is correct in noting that we did not "so much as mention the cat's paw theory," but not because it fails to offer a "lick of support" for our position, but because it is irrelevant. This case does not involve evidence of discrimination against a non-decisionmaking employee or a situation in which the department lacked authority to fire its police officers. Assistant Chief Brown terminated Ms. Lewis on July 8. This unquestionably constituted a change in the terms of Ms. Lewis's employment. Ms. Lewis's pursuit of an administrative appeal of the department's decision did not break the link of causation to the department's

decision to terminate her.  Accordingly, we do not supplant our own review of Ms. Lewis's termination—and any evidence of discrimination involved therein—with Mr. Rapson's.[21]

Of course, there are many conclusions a jury could reach based on the evidence presented, many of which would not support a finding of discrimination. We conclude, however, that the evidence of arbitrary personnel decisions surrounding Ms. Lewis's termination, the pretextual justifications offered for the same, the differing treatment of Ms. Lewis's white male colleagues, and other evidence coalesces into a mosaic of circumstantial evidence sufficient to create a triable issue of material fact on whether the UCPD's actions were discriminatory on the basis of race and/or gender.

---

[21] Ironically, even if the facts of this case merited a cat's paw analysis—which they do not—there is evidence that the city manager was a mere conduit for the department's employment decision with respect to Ms. Lewis.  In his deposition, Mr. Rapson stated that he viewed Ms. Lewis's termination as a product of the new requirement that officers be tasered.  He regarded it as "an operational decision that the police chief had made, and I was supporting his position . . . it would be no different than -- I wouldn't walk into my fire chief's operations and tell him how he should dispatch fire trucks."

### D.    Municipal Liability Under Section 1983

Ms. Lewis argues that Union City is liable under section 1981 for Odom's discriminatory actions because Odom was the final decision-maker.[22]

A municipality may not be held liable for the torts of its employees on a *respondeat superior* theory. *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)). "Instead, municipalities may only be held liable for the execution of a governmental policy or custom." *Id.* The Supreme Court has clarified that "'municipal liability may be imposed for a single decision by municipal *policymakers* under appropriate circumstances.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). However, we have repeatedly recognized that "a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Id.*

Where review of a municipal official's employment decision does exist, a plaintiff can attempt to show that the review was not meaningful, but rather "'serve[s] as the conduit of the subordinate's improper motive'" by "'rubber-stamp[ing] the recommendation of a subordinate.'" *Quinn v. Monroe Cty.*, 330 F.3d

---

[22] This theory of municipal liability applies only to the claims under § 1983, not those under Title VII. As this court has recognized, "the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly," *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991), as Ms. Lewis has done here.

Case: 15-11362  Document: 405-1  Date Filed: 05/23/2019  Page: 43 of 64

1320, 1326 (11th Cir. 2003) (quoting *Hitt v. Connell*, 301 F.3d 240, 248 (5th Cir. 2002)); *see also Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997)). However, where there is an opportunity for the plaintiff to appeal an official's decision to a reviewing board, such review is generally sufficient to find that the official was not the final policymaker. *See Scala*, 116 F.3d at 1403 (finding meaningful review where "there is no evidence . . . that the Board's decision approved any improper motive that Barrett or Younger may have had"); *Quinn*, 330 F.3d at 1326 (finding meaningful review where "the Council afforded her a full adversarial and evidentiary hearing" and both parties were represented by counsel); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1293 (11th Cir. 2004) (finding no meaningful review despite "appellate process that was theoretically available on paper" because plaintiff "as a practical matter [could not] take advantage of it").

Ms. Lewis argues that Chief Odom should be considered the final policymaker because the review of the termination decision by Steve Rapson, city manager, was not meaningful. She argues that Mr. Rapson failed to investigate properly whether Lewis still had any unused sick or vacation leave at the time she was terminated and that no evidence was presented to Mr. Rapson about Ms. Lewis's ability to be exposed to OC spray. Whether a fuller investigation by Mr. Rapson would have been proper or desirable is immaterial, however. There is no

requirement that the administrative review be ideal, simply that it be a meaningful layer of review of an official's decision. Mr. Rapson conducted a hearing and heard from Ms. Lewis, who was represented by counsel in the proceeding. Ms. Lewis has not offered any facts to suggest that Mr. Rapson was a mere rubber stamp or that he approved any improper motive.

## IV. CONCLUSION

In the last analysis, the evidence before the district court properly might have yielded any of a number of conclusions. Perhaps Ms. Lewis was terminated simply because the UCPD regarded her as disabled, thus violating the ADA. Perhaps she was terminated because it concluded, rightly or wrongly, that Ms. Lewis was shirking to avoid the Taser shock or OC exposure and had enlisted her doctor to provide unwarranted support in attaining that goal. Perhaps a jury might find that the mosaic of circumstantial evidence presented by Ms. Lewis supports the conclusion that her firing was a product of, or influenced by, race and/or gender. At bottom, however, the ultimate decision in this case is for a properly instructed jury that has seen the witnesses and heard all of the evidence.

The judgment appealed from is AFFIRMED to the extent it dismissed the Section 1981 and Equal Protection claims against the City of Union City and against

Case: 15-11362    Date Filed: 09/05/2019    Page: 45 of 64

Chief Odom,[23] REVERSED in all other respects, and REMANDED for further proceedings consistent with this opinion and the Court's en banc opinion.

---

[23] Although Ms. Lewis's Notice of Appeal stated that she appealed from the judgment dismissing her claims in their entirety, in this Court she failed to address the district court's grant of qualified immunity to Chief Odom in her opening brief. She therefore has waived this claim. *E.g.*, *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1307 (11th Cir. 2012); *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004); *see also* FED. R. APP. P. 28(a)(5).

Case: 15-11362   Document: 460   Date Filed: 03/05/2019   Page: 46 of 64

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:[1]

When the panel first heard this case, I dissented with respect to its treatment of Lewis's claims under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101−12213, and Title VII of the Civil Rights Act of 1964 ("Title VII"), *id.* §§ 2000e−2000e-17 (the "disability-discrimination claim" and the "race-and sex-discrimination claim").[2]

As to the disability-discrimination claim, I argued among other things that Lewis had failed to prove that she was a qualified individual, which is a necessary element of her *prima facie* case.  *See Lewis*, 877 F.3d at 1021−22 (Tjoflat, J., dissenting).  I agreed with the Majority that "whether receiving a Taser shock is an essential function of being a detective is a question for the jury.  But surely Lewis would at least have to be medically able to be *around* Tasers and OC spray."  *Id.* at 1022.  The detective position, after all, "requires working with other officers who carry and use such weapons."  *Id.*  I explained that "OC spray is an aerosol that can affect anyone in its vicinity; an inadvertent discharge in the Police Department

---

[1] I concur that summary judgment was properly granted in favor of Defendants for all claims against the chief and for the Equal Protection and § 1981 claims against the City.

[2] *See Lewis v. City of Union City*, 877 F.3d 1000, 1021 (11th Cir. 2017) (Tjoflat, J., dissenting), *reh'g en banc granted*, *opinion vacated sub nom. Lewis v. City of Union City*, 893 F.3d 1352 (11th Cir. 2018), *and on reh'g en banc sub nom. Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019).

Case: 15-11362   Document: 165   Date Filed: 03/25/2019   Page: 47 of 64

building might affect everyone present.  Taser shocks can endanger many others beside the intended recipient." *Id.*

As to the race- and sex-discrimination claim, I saw two flaws with the Majority's reasoning.  Lewis's two comparators were legally insufficient, thus precluding her from proving a *prima facie* case.[3]  *Id.* at 1022−23.  Moreover, Lewis had not painted a convincing mosaic of circumstantial evidence.  *Id.* at 1023.  I agreed with the Majority that the record contained sufficient evidence of arbitrary and even pretextual conduct by the police department.  *Id.*  But it contained no evidence of intentional discrimination.  *See id.* ("Lewis may have put forth a mosaic of circumstantial evidence that would allow a jury to infer *something*.  But there is no evidence that something would be *intentional discrimination*.).

This Court vacated the panel's decision and reheard the case *en banc* "to clarify the proper standard for comparator evidence in intentional-discrimination cases." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc).  The *en banc* Court held that "a plaintiff proceeding under *McDonnell Douglas* must show that she and her comparators are 'similarly situated in all material respects.'" *Id.* at 1226.  It then concluded that Lewis's comparators failed

---

[3] As described below, the Court ultimately vacated the panel opinion and took the case *en banc* to clarify the appropriate standard.

to meet that standard.[4]  *Id.* at 1231.  The *en banc* Court did not analyze Lewis's

disability-discrimination claim at all or her race- and sex-discrimination claim

under the convincing mosaic theory of liability.  *Id.* at 1231 n.20.  Instead, it

remanded the case to the panel for reconsideration of those claims and theories in

the first instance.  *Id.*

Today, I am forced to dissent again.  In so doing, I elaborate on my prior

reasons for dissenting and offer new grounds for why the Majority errors on this

rehearing.

As to the disability-discrimination claim, I continue to believe that Lewis's

heart condition, and thus her inability to be exposed to a shock or a spray, prevents

her from working as a police detective.  After reviewing the record, however, I'm

now convinced that she couldn't work in the police department building *at all*.

This irrefutable fact matters because the Majority insists that the essential functions

of the position are open to reasonable disagreement and thus are questions of fact.

Maybe so.  What's not open to reasonable disagreement, however, is that an

essential function of being a police officer is, from time to time, being in the police

department building.  Because Lewis cannot do even that, she is not a qualified

individual, and her claim accordingly fails as a matter of law.

---

[4] The reasons, though not relevant to this dissent, were that Lewis and the comparators were "subject to different personnel policies and placed on leave for different underlying conditions." 918 F.3d at 1231.

Turning to the race- and sex-discrimination claim, I maintain my prior position that the record allows no inference of discriminatory intent on the part of the chief or of anyone else at the department. As it turns out, though, that's not the relevant question. The law requires us to analyze the intent of the person who terminated Lewis. Here, that person is not the chief—or for that matter, anyone at the department—but the city manager. And regardless of what inferences the record might allow about the department, the record allows absolutely no inference of discriminatory intent by the city manager.

I take the two claims in turn. But first, I briefly highlight relevant facts for this appeal that I see as underemphasized by the Majority.[5]

## I.

When Lewis first felt concern about being subjected to a shock or a spray due to her previous heart attack, she reached out to her primary-care doctor. The doctor then wrote to offer the department her advice. That advice was unambiguous: Neither the shock nor the spray should be used "either 'on or near' Lewis." *See id.* at 1219. "Because as a detective Lewis would inevitably be (at the very least) 'near' pepper spray—and under the new policy, Tasers, as well—Chief

---

[5] For facts, I cite to Judge Newsom's opinion for the *en banc* Court because that interpretation of the record binds the panel on remand.

Odom concluded that the restrictions described by Lewis's doctor prevented her from performing the essential duties of her job." *Id.*

After receiving the doctor's letter, the department, through the chief, placed Lewis on administrative leave until her doctor released her to "full and active duty." As the *en banc* Court made clear, however, this moment was never going to come: Lewis's condition was definitively permanent. *See id.* at 1230 (observing that Lewis "suffered from what her doctor described as a 'chronic' heart condition and what she herself has called a 'permanent' heart injury" (citations omitted)). In the interim, Lewis was advised to contact human resources personnel to complete her leave paperwork. She was also told, however, that she could use her accrued (paid) leave. I agree with the Majority that the department's handling of Lewis's leave (and thus its decision to terminate her employment) was arbitrary and pretextual, at least when we view the record in her favor, and so I do not rehash those facts here. What is important, though, is what transpired *after* the department reached its decision, however arbitrary or pretextual it might have been.

The power to terminate Lewis was held not by the chief, or by anyone at the department, but by the city manager, to whom Lewis appealed the department's decision. Pursuant to the appeal, Lewis received an in-person hearing before the

city manager.  At the hearing, she was represented by a lawyer and afforded the opportunity to present evidence.

Though the record could be clearer,[6] the sole argument Lewis made to the city manager was that, given her condition, the department should have excused her from being exposed to a shock or a spray.  So the evidence the Majority relies on today to find sufficient evidence of animus was evidence that was *not* presented to the city manager.  This includes evidence of arbitrariness,[7] pretext,[8] and a sexist remark.[9]  The Majority also relies on the same two comparators, both white males, as evidence of animus.[10]  Because the events concerning these comparators

---

[6] A fault that lies with Lewis.  The plaintiff bears the burden of properly developing the record, but during her deposition, Lewis could not detail *anything* that she shared with the city manager during the hearing:

> Q: Did you have the opportunity . . . to present information to Mr. Rapson during the meeting?
>
> A: We did.
>
> Q: Do you remember what you presented?
>
> A: No, I don't.

[7] *See* Maj. Op. at 33−34 (chronicling the department's unexpected termination of Lewis, its failure to warn her that using paid leave would preclude her from later using unpaid leave, and its failure to specify a date by which the leave paperwork had to be completed).

[8] *See* Maj. Op. at 34−37 (chronicling the department's belief that Lewis's condition was temporary (not permanent), its sudden termination of her, and its imposition of a previously non-existent deadline to complete the leave paperwork).

[9] *See* Maj. Op. at 39 (highlighting a comment by one of Lewis's supervisors that he assigned "children and women crimes" to "lady" detectives and "the more aggressive stuff" to male detectives).

[10] *See* Maj. Op. at 37−39 (indicating that each received extensive administrative leave, in contravention of the department's policies, despite being physically unfit and that one comparator was offered a transfer to another position that did not require him to meet fitness standards).

occurred years after Lewis's appeal, the department's treatment of them was also evidence that was not presented to the city manager.

Recognizing that Lewis could not be exposed to a shock or a spray, the city manager ultimately affirmed the department's decision to terminate her. As he succinctly explained, "Obviously, everybody in the police department has OC spray. When they use it, it's on their clothes and they can be accidently discharged." In other words—and this is important—Lewis's own doctor's advice was the city manager's sole reason for affirming Lewis's termination.

## II.

To prevail on her disability-discrimination claim, Lewis must establish, among other things, that she is a "qualified individual." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014); 42 U.S.C. § 12112(a). "A 'qualified individual' is 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Mazzeo*, 746 F.3d at 1267–68 (quoting 42 U.S.C. § 12111(8)).

I continue to agree with the Majority that whether being *subjected to* a shock or a spray is an essential function of the detective position is a question of fact. *See Lewis*, 877 F.3d at 1022 (Tjoflat, J., dissenting). What the Majority omits from its analysis, however, is that Lewis cannot even be *exposed to* a shock or a spray.

Though the City was under no obligation to reasonably accommodate Lewis's condition,[11] it is worth explaining why the City would still be entitled to summary judgement even if it were. This analysis exposes the Achilles' heel of my colleagues' reasoning: However cautiously they wish to define the "essential functions" of the detective position, *see Mazzeo*, 746 F.3d at 1267–68 (quoting 42 U.S.C. § 12111(8)), Lewis is not a qualified individual under *any* construction of that position.

Recognizing that she could not work as a detective in the field, Lewis identified two positions in the department that would accommodate her condition, one in the communications room and one in the records room. *Cf. Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017) ("[W]hether a reasonable accommodation can be made for that employee is determined by reference to a *specific position*." (emphasis added) (quoting *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224–25 (11th Cir. 1997) (per curiam))). Even if these positions constituted accommodations,[12] Lewis would still face an insurmountable

---

[11] This is so because Lewis was merely "regarded as" disabled, *see Mazzeo*, 746 F.3d at 1268 (quoting 42 U.S.C. § 12102(1)), not actually disabled. The Majority concedes as much. Maj. Op. at 19−21. And an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.9(e).

[12] A conclusion that is far from foregone.

"The [ADA] does not require employers to create new positions for employees with disabilities. 'Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified.'" *Boyle*, 866 F.3d at 1289 (citation omitted) (quoting *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997) (per curiam)). The

challenge.  An ADA plaintiff bears the burden of "showing that the accommodation would allow him to perform the essential functions of the job in question," *Boyle*, 866 F.3d at 1289, a feat that Lewis cannot achieve.

Lewis's own physician recommended that the spray not be used "'on or near' Lewis."[13]  *Lewis*, 918 F.3d at 1219.  But both proposed positions would still expose her to the spray.  As the chief explained, "every room inside the building has a common air duct return system," and these positions would be within the building.  Lest you think that the spray would be so diluted that it couldn't possibly affect Lewis, compare how the spray actually affected someone with how Lewis's doctor surmised it would affect Lewis.

The chief stated that the last time the spray was used in the building, his own secretary began "hacking" so badly that she had to go home for the day.  The

---

positions that Lewis identified are for "light duty."  But light-duty positions aren't guaranteed: The department must first have a need for them, a showing that Lewis hasn't made.

More problematically, however, because Lewis's condition is permanent, she would be on light duty permanently, and permanent placement on light duty transcends the bounds of what's a reasonable accommodation.  *See, e.g.*, *Frazier-White v. Gee*, 818 F.3d 1249, 1256 (11th Cir. 2016) ("Plaintiff's request for an indefinite extension of light-duty status was unreasonable as a matter of law.").

For both these reasons, then, I doubt that Lewis's proposed positions constitute accommodations within the meaning of the ADA.

[13] Lewis intended to follow this advice.  *See* Lewis Depo. at 180 ("[O]nce I had my heart attack, everything I do, I have to go back to my doctor first.").

Case: 15-11362    Document: 565    Date Filed: 05/03/2019    Page: 55 of 64

secretary, mind you, would not react to the spray any differently than you or I.[14]
Yet Lewis's reaction to the spray would be worse.

Lewis indicated that she could be affected if she merely "touch[ed] someone who's been sprayed."  Her doctor described exposure to the spray as a "stress-related injury" that would be caused by "*any* increased stress to your heart."  She then defined stress as "*any* physical stress, emotional stress, [or] mental stress."  And the doctor wasn't shooting from the hip.  Before writing the letter at issue, she apparently researched the spray to understand the risks it posed to Lewis's health.

The Majority purports to come up with "ample evidence" that Lewis could withstand exposure to the spray—contrary to her doctor's letter to the department.  *See* Maj. Op. at 27 n.10.  This evidence is twofold, each bit of which supposedly entails Lewis's doctor contradicting her letter.  First, the leave paperwork completed by the doctor, which asks for "job functions the employee is unable to perform," listed the shock (but not the spray).  And second, when she spoke to the chief on the phone sometime after sending the letter, the doctor said that the spray was "[s]till a concern, but not as much of a concern as the Taser."  To be sure, this evidence establishes that the doctor eventually qualified her letter.  But reading my colleagues' opinion, one might (falsely) conclude that the doctor walked back on

---

[14] At least the record affords no reason to think otherwise.

her letter altogether.  In fact, her position that the spray not be used on or near

Lewis was unchanging:

> Q: As of July 8, 2010,[15] were you still recommending . . . that [Lewis]
> not be exposed to the pepper spray as well?  Was that still your
> recommendation?
>
> A: Yeah.

So try as it might to characterize my review of the record as "fact finding," *see*

Maj. Op. at 27 n.10, I've done nothing more than observe the testimony of Lewis

and of her own doctor—each of whom has effectively advised that Lewis not work

in the police department building.[16]  If listening to Lewis and Lewis's doctor at

summary judgment isn't viewing the evidence in her favor, I don't know what is.

Given Lewis's testimony, as well as that of her own doctor, the point is this:

The record contains no evidence of any reasonable accommodation the City could

have made for Lewis, in or out of the field.  As such, she could not prove, as part

of her *prima facie* case, that she was a "qualified individual."  *See Mazzeo*, 746

F.3d at 1267 (quoting 42 U.S.C. § 12111(8)).

*     *     *

---

[15] This was the date that Lewis's doctor spoke with the chief on the phone.

[16] The Majority also states that the city manager's reason for terminating Lewis concerned the shock, not the spray.  Maj. Op. at 26–27 n.10.  But whether he considered the effect of the spray bears not one iota on whether Lewis was a qualified individual.

The Majority's reversal of the District Court on Lewis's disability-discrimination claim is troubling given the litany of reasons for why Lewis fails to survive summary judgment. Lewis asks this Court to accept that as a police detective, she is qualified to serve in her position when all her colleagues carry and use non-lethal weapons to which she cannot even be exposed. That argument cannot survive the laugh test. It didn't before the District Court, yet it does before my colleagues. As I explained, because Lewis was only regarded as disabled, the City was not required to accommodate her. But the gravity of Lewis's heart condition, and her corresponding inability to discharge the essential functions of the position, become most obvious once you realize that the City could not have accommodated her even if it had wanted to.

With that, I turn to the Majority's equally troubling treatment of Lewis's race- and sex-discrimination claim.

### III.

The *en banc* Court held that Lewis's comparators were legally insufficient to satisfy the comparator element of her *prima facie* case under the burden-shifting framework of *McDonnell Douglas*.[17]  *Lewis*, 918 F.3d at 1231. So the Majority commits itself to assembling a "'convincing mosaic' of circumstantial evidence,"

---

[17] For a full description of how the framework operates, see Judge Newsom's opinion for the *en banc* Court. *Lewis*, 918 F.3d at 1220−21.

*see id.* at 1220 n.6, to reverse the District Court's grant of summary judgment for the City.  My colleagues' principal error is analyzing evidence about the department instead of evidence about the city manager—the only person whose conduct is relevant to Lewis's claim.

## A.

Regardless of whether a Title VII−plaintiff invokes *McDonnell Douglas* or presents a convincing mosaic of circumstantial evidence, the record must permit the inference of a "causal link" between the "discriminatory animus" and the "discharge or other significant change in the terms or conditions of employment." *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam).  Normally, then, we look only to the conduct of the decisionmaker—the party with the "power to actually discharge the employee."  *See id.*

We deviate from this general rule when "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee."  *See id.* at 1332.  Our cases have come to call this concept the "'cat's paw' theory" because the recommender has wielded the decisionmaker as a "mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus."  *See id.*  The cat's paw theory is not an exception to general principles of causation but a specific application of them in which "the harasser *is* the decisionmaker," "regardless of which individual actually signs the employee's

walking papers." *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1250 (11th Cir. 1998).

To invoke the cat's paw theory, "causation must be truly direct." *See Stimpson*, 186 F.3d at 1331. "Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001). So long as the decisionmaker reaches an independent decision, then, any animus by any other actor is purged from the analysis.

Lewis's case is not a cat's paw scenario. *Cf. Stimpson*, 186 F.3d at 1332 (requiring a showing that "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee"). The decisionmaker who terminated Lewis was the city manager, not the chief and not anyone at the department. The Majority's claim to the contrary, *see* Maj. Op. at 40, is refuted by the City's employee handbook. That handbook makes crystal clear that the city manager is the only person with the power to terminate a promoted employee, like Lewis, who fails to meet performance standards.[18] And Lewis received an in-person hearing before him, a hearing at which the chief, the

---

[18] It reads, in relevant part, "In the event that a promoted employee fails at any time to meet the required standards of performance for the new position, he/she may be . . . terminated if, *in the City Manager's sole discretion*, reassignment is considered impractical."

Case: 15-11362 Document (of of D65 3/2019 Page: 60 of 64 Page: 91 of 96

assistant chief, and the human-resources manager were present. Lewis was

represented by a lawyer at the hearing.

The Majority argues that even if the city manager was the person who

terminated Lewis (a proposition that seems clear as day to me), the cat's paw

theory nonetheless applies because the city manager was supposedly a "mere

conduit" for the department. *See* Maj. Op. at 41 n.21 (suggesting that the city

manager simply rubberstamped the department's decision because it was

"operational"). But my colleagues refuse to wrestle with the fact that this Court

has never—*never*—applied the cat's paw theory when, as here, a Title

VII–plaintiff is afforded a hearing, counsel, and the opportunity to plead her case

to the decisionmaker. *See Llampallas*, 163 F.3d at 1249 (finding no cat's paw

scenario when the decisionmaker "summoned [the plaintiff] . . . to investigate the

situation," "afforded [her] a private audience of several hours," and "gave her the

opportunity to explain the situation"); *Stimpson*, 186 F.3d at 1332 (same when the

decisionmaker "conducted a three day hearing to investigate the charges" and

when the plaintiff "was represented by legal counsel and was allowed to put on

defense evidence and witnesses" during a hearing); *Crawford v. Carroll*, 529 F.3d

961, 979 n.21 (11th Cir. 2008) (same when the decisionmaker "reviewed [the

plaintiff's] complaint and met with her to discuss the issues it presented"). Simply

put, Lewis's hearing was—as a matter of law—an independent investigation that severed causation between the department and the termination.

In brief, the Majority side skirts this cat's paw analysis—and for an obvious reason. It wouldn't find a lick of support in our precedent for its decision to assess animus on the part of any person but the city manager. And as described below, the city manager is as clean as a whistle.

## B.

The Majority relies on three categories of circumstantial evidence—broadly speaking, evidence at the department of arbitrary and pretextual decision-making and of comparators being treated differently. Maj. Op. at 33−39. But Lewis doesn't allege that the city manager acted arbitrarily, pretextually, or treated comparators differently. What's more, he couldn't have acted on this information because he didn't so much as know about it.

Lewis's heart condition, and her related need not to be shocked or sprayed, was the sole reason she presented to the city manager in opposition to her would-be termination. It is thus logically impossible to impute animus to the city manager based on facts that were not before him. Yet facts *not* before him are precisely what the Majority relies on. Its reliance on the comparators to establish animus is erroneous for a related reason. The comparators were treated differently not by the city manager, but by the department. Indeed, because the department

supposedly afforded the comparators favorable treatment, the city manager never crossed paths with them in an appeal.

In summary, "[Lewis] adduced no evidence that [the city manager's] decision was tainted by [the department's] decision or the retaliatory animus which we assume with respect to [the department]. The record indicates that [the city manager's] decision was completely independent of [the department's] decision, and therefore untainted." *See Pennington*, 261 F.3d at 1270. The city manager did not hear the evidence on which the Majority hangs its case. And even if some inference could be drawn from the comparators, it isn't an inference about the city manager. For this reason, then, it seems clear why my colleagues implicitly and incorrectly treat Lewis's case as a cat's paw scenario: It's their only hope for reversing the District Court.

## C.

One last word. In its recitation of the facts, the Majority cursorily notes Lewis's appeal to the city manager, the hearing, and that Lewis was represented by a lawyer and afforded the opportunity to present evidence. Maj. Op. at 13. It observes, however, that Lewis "did not present evidence" on the department's handling of her leave. *Id.* My colleagues, I suspect, feel that we should transform Lewis's case into a cat's paw scenario simply because the decisionmaker did not hear the evidence they find most probative of animus—the goings-on at the

department.  But Lewis faced the burden of raising the relevant issues to the

decisionmaker, and her failure to present certain evidence at the hearing does not

undermine the independence of the decision.  *See, e.g.*, *Llampallas*, 163 F.3d at

1250 ("[The plaintiff], although she had the opportunity to do so, failed to inform

[the decisionmaker] . . . of the information she possessed that would have put [the

decisionmaker] on notice that [the employment decision] may have been motivated

by a discriminatory animus."); *Stimpson*, 186 F.3d at 1332 n.2 ("We curiously note

that [the plaintiff] apparently never mentioned any discriminatory motive behind

the charges at her hearing before the [decisionmaker].  It seems like that would

have been an ideal time and place to do so.").  Lewis's failure to do so does,

however, negate the usefulness of that evidence to establish any animus by the

decisionmaker.

*        *        *

The Majority pushes to the background the most significant fact relevant to

Lewis's race- and sex-discrimination claim: the fact that she pleaded her case

before someone outside the department and benefitted from the advice of counsel

when she did so.  Under the law, that hearing creates a blank slate for our Title

VII−analysis, and the record contains no evidence to stain the slate.  After hearing

Lewis out, the city manager reached the more-than-reasonable decision to

terminate Lewis because given her condition, she could not discharge the duties of

a detective.  Everything else—the department's arbitrary and pretextual conduct, the supervisor's sexist comment, and the comparators—is noise.  The city manager did not himself act arbitrarily or pretextually, make the comment, or decide anything with respect to the comparators.  Nor did he hear any of that evidence.

IV.

For these reasons, I would affirm the District Court's grant of summary judgment for the City on Lewis's ADA and Title VII claims.  I respectfully dissent.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 15, 2019

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  15-11362-GG
Case Style:  Jacqueline Lewis v. City of Union City, Georgia, et al
District Court Docket No:  1:12-cv-04038-RWS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joe Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion